1  HULETT HARPER STEWART LLP
   KIRK B. HULETT, SBN: 110726
2  KAREN THOMAS STEFANO, SBN: 149536
   LINDSAY J. MERTENS, SBN: 254008
3  525 B Street, Suite 760
   San Diego, CA  92101
4  Telephone:      (619) 338-1133
   Facsimile:      (619) 338-1139
5

6  Attorneys for Plaintiff Ramon Eugenio Sanchez
   Ritchie
7

8              **IN THE UNITED STATES DISTRICT COURT**

9              **SOUTHERN DISTRICT OF CALIFORNIA**

10 | RAMON EUGENIO SANCHEZ RITCHIE, | Case No. 10-CV-1513-JLS (WVG) |

11              Plaintiff,                **SECOND AMENDED COMPLAINT FOR:**
                                          **1.  TRESPASS;**
12 v.                                     **2.  CONVERSION;**
                                          **3.  INTENTIONAL INTERFERENCE**
13                                        **    WITH PROSECTIVE ECONOMIC**
   SEMPRA ENERGY, a California            **    ADVANTAGE;**
14 corporation,                           **4.  VIOLATIONS OF BUSINESS AND**
                                          **    PROFESSIONS CODE SECTIONS**
15              Defendant.                **    17200, *ET SEQ.*;**
                                          **5.  UNJUST ENRICHMENT;**
16                                        **6.  CONSTRUCTIVE TRUST;**
                                          **7.  MALICIOUS PROSECUTION; AND**
17                                        **8.  ABUSE OF PROCESS**
18
                                          **DEMAND FOR JURY TRIAL**
19
                                          **REQUEST FOR PUNITIVE DAMAGES**
20

21

22

23

24

25

26

27

28

## INTRODUCTION

1.     This case arises from a continuing pattern of unlawful and illegal conduct, including the malicious prosecution of Plaintiff  by the Defendant and its co-conspirators involving, among other things, the unlawful seizure and improper, but profitable and lengthy use by Defendant of over 600 acres of Plaintiff's property located approximately 15 miles north of Ensenada, Mexico.   In order to obtain and unlawfully possess Plaintiff's property, Defendant engaged in a multitude of non-communicative and non-privileged acts of fraud, deceit and criminal activities.  Immediately upon the dispossession of Plaintiff and trespass onto his property in September 2006, Defendant through its armed employee, Gil Moya forcibly removed Plaintiff's family from the property and thereafter Defendant bulldozed Plaintiff's permanent house and its fixtures to the ground.   Defendant and its agents furthered their ongoing scheme through the creation of sham land agreements, knowing such agreements were based on false pretense and were non-binding.  Obtaining possession to Plaintiff's property was essential to Defendant's effort to build and operate the Liquified Natural Gas ("LNG") Plant.

2.     After much malicious litigation, instituted and pursued by Defendant against Plaintiff and the trespass by Defendant on the Property and the destruction by Defendant and its co-conspirators of Plaintiff's personal and real property, Plaintiff was successful in recovering possession of the Property in May 2010 when in March 2010 the Mexican courts re-affirmed that Plaintiff and not Sempra was the sole legal possessor and title holder of the land and that Plaintiff and not Sempra was entitled to the exclusive quiet use, enjoyment and access to the property.  This March 2010 Order was consistent with earlier court findings for Plaintiff and against Sempra dating back to October 2007 wherein findings were made that Plaintiff was the legal possessor of the Property.  While Plaintiff was dispossessed of his land from September 2006 to May 2010, the provisional order of dispossession issued in September 2006 lapsed as a consequence of the October, 2007 order finding for Plaintiff on the question of entitlement to possession, at which time the trial court, in terminating the criminal prosecution against Plaintiff of trespass or any other crime against Plaintiff, rejected and voided any further prosecution of Plaintiff and in so doing concluded that Plaintiff at all relevant times was entitled to legal possession of the Property.

1   Despite this finding in October, 2007, which was affirmed on appeal by order dated March 2009,

2   Sempra defied these findings and failed to return possession to Plaintiff until May 2010.

3   Accordingly, to the extent the provisional order of the court dated September 18, 2006 was

4   initially procured by privileged communications as defined by California Civil Code § 47, and to

5   the extent the occupation of the Property by Sempra in September 2006 was a privileged act, the

6   privilege, if it even existed, lapsed at such time *(i.e.* October, 2007) since the provisional order of

7   dispossession preliminary findings were rejected by the Court and Plaintiff was found by the Court

8   to be entitled to possession.  Continued possession and occupation of the land by Sempra after that

9   date was an unprivileged non-communicative act of trespass.  Plaintiff seeks compensatory and

10  punitive damages and equitable relief for trespass and other claims arising from its outrageous and

11  knowingly illegal, fraudulent and malicious prosecutorial conduct.  The damages sought are

12  damages suffered by Plaintiff as a direct consequence of non-privileged and non-communicative

13  acts by the Sempra Entities that trespassed on Plaintiff's Property without a privileged basis for

14  nearly three years.  (October 2007-May 2010).  All benefits derived by Defendant while in

15  unlawful and unprivileged possession of the Property arise as a proximate cause of Defendant's

16  wrongful and unlawful possession of the Property.  Similarly, the acts of conversion are not

17  privileged nor a communication.  Similarly, the act by Defendant of engaging in a fraudulent land

18  purchase is not a privileged communication.  Yet, that wrongful act caused Plaintiff substantial

19  damage in that Plaintiff's prospective economic opportunity to sell his valuable property which

20  was eliminated due to the cloud of title created by the creation of the sham purchase agreement.

21  Plaintiff alleges on information and belief, except as to those allegations describing his own

22  actions, as follows:

23  **<u>BACKGROUND</u>**

24  3.   Plaintiff is an individual who is a citizen of Mexico.  Plaintiff alleges that

25  Defendant Sempra Energy did willfully, maliciously and systematically violate Plaintiff's rights

26  for the purpose and with the effect of suppressing and/or deterring Plaintiff's quiet enjoyment of

27  his property which Sempra Energy desperately needed to legally build and operate a LNG Plant

28  just north of Ensenada, Mexico.

2

4.      The unfair and unlawful business practices which emanated from Sempra Energy's California based operations, were engaged in by Sempra Energy and its agents.  As alleged herein, Defendant caused and is responsible for the trespass upon, and destruction of, Plaintiff's real and personal property.

## JURISDICTION

5.      Jurisdiction is proper in this Court under title 28 U.S.C. § 1332, because Sempra Energy is a San Diego, California based corporation and Plaintiff is a citizen of Mexico.  Many of the acts complained of herein emanated from Sempra Energy's business offices located in San Diego, California.  The claims stated herein exceed $75,000.00.

6.      Venue is proper in this County because Defendant Sempra Energy is a resident of San Diego County.

## PARTIES

**Plaintiff**

7.      Plaintiff Ramon Eugenio Sanchez Ritchie is, and was during all relevant times, a citizen of Mexico.

**Defendant**

8.      Defendant Sempra Energy is a California corporation.   Its principal place of business and headquarters are located at 101 Ash Street in San Diego, California.  According to its website, Sempra Energy is a Fortune 500 energy services company with 2009 revenues of nearly $8 billion.   Sempra Energy owns, controls and operates regulated and unregulated subsidiaries, including Sempra LNG, Sempra Energy México, and Energía Costa Azul, S. de R.L. de C.V. ("ECA").  It also owns, controls and operates LNG receipt terminals, including the Energía Costa Azul terminal located at lots 24 through 28-1, 28 miles north of Ensenada, Baja California, Mexico.

9.      At all relevant times, Sempra Energy México, and ECA, were Mexican based wholly-owned subsidiaries of Sempra Energy and were controlled by and were agents of Sempra Energy.

10.     At all times alleged herein, with respect to the events at issue, Sempra Energy, Sempra Energy México, and ECA (the "Sempra Entities") including, but not limited to, Sempra Energy management and other personnel in California and other parts of the United States and Mexico were acting within the course and scope of such agency, employment and/or concerted activity.  The wrongful conduct alleged herein was not legally or otherwise privileged and was perpetrated by the Sempra Entities' management and other personnel both in Mexico and the United States, including California.

11.     Sempra Energy (a) aided and abetted Sempra LNG, Sempra Energy México, and ECA, in the commission of the acts alleged herein, (b) conspired with Sempra LNG, Sempra Energy México, and ECA, to commit the acts alleged herein, and/or (c) ratified the acts of Sempra LNG, Sempra Energy México, and ECA, alleged herein.

12.     Whenever and wherever reference is made in this Second Amended Complaint to any conduct committed by Sempra Energy, and/or their agents Sempra LNG, Sempra Energy México, and ECA, such allegations and references shall also be deemed to mean the conduct of Sempra Energy, acting individually, jointly and severally, through personnel working in the United States and Mexico for the benefit of Sempra Energy.

13.     Plaintiff is informed and believes and based upon such information and belief alleges that Sempra Energy management and other personnel both in California and in other parts of the United States and in Mexico were informed of the ongoing events complained of herein and personally participated in the decision making, planning, preparation, ratification, and/or execution of the plan.

14.     Whenever and wherever reference is made to individuals who are not named as a Defendant in this Second Amended Complaint, but who were employees/agents of Sempra Energy, such individuals at all relevant times acted on behalf of the Sempra Entities and within the scope of their respective employments.

**Co-Conspirators**

15.     Various others, including the Sempra Entities and others presently unknown to Plaintiff, participated as coconspirators with the Defendant in the violations of law alleged in this

4

Second Amended Complaint and have engaged in conduct and made statements in furtherance thereof.  The acts charged in this Second Amended Complaint have been done by Defendant and its co-conspirators, or were authorized, ordered or done by their respective officers, agents, employees or representatives while actively engaged in the management of Defendant's business or affairs.

16.     Each of the Sempra Entities named herein acted as the agent or joint venture of or for the other Sempra Entities with respect to the acts, violations and common course of conduct alleged herein.

## FACTUAL BACKGROUND

### Plaintiff's Claim to Legal Possession of the Property

17.     In or about 1972, Plaintiff acquired legal possession of property located adjacent to the Colonial Federal Costa Azul, in Ensenada, Mexico, known as "Las Brisas" (the "Property"). The Property consists of approximately 272 hectares, or 672 acres.  In or about 1993, Plaintiff constructed and maintained his personal residence on the portion of the Property known as Lots A and B.

18.     In or about 1992, a purported sale of the Property was made to Elodia Gomez Castañon ("Castañon") and Armando Navarro Peña ("Peña") despite the seller not having legal title or possession of the Property.  In 2001, Castañon and Peña went to court seeking an order entitling them to possession of the Property to the exclusion of all others but were unable to obtain a certificate of possession, due to the Court's finding that Peña and Castañon, were not the rightful possessors or owners, thus recognizing Plaintiff as the legal owner and possessor.  Plaintiff did not learn of Peña and Castañon's effort to obtain a declaration of possession nor of the rejection of Peña and Castañon's claims of ownership findings until after 2006.

### Securing The LNG Plant Contract

19.     In or about 2001, Sempra Energy, Sempra Energy México, and ECA announced their plan to build the Energía Costa Azul terminal near Ensenada, Mexico (the "LNG Plant").  On or about September 13, 2002, Sempra Energy, through ECA, submitted its applications to obtain the construction and operating permits for the LNG Plant.  The application disclosed that the LNG

5

Plant would be 15 miles north of Ensenada, Baja California, Mexico, and would require hundreds of acres of land for construction and operations, including required setback cushions. These setback cushions were required because of, among other things, the inherent danger to the community, including Plaintiff and his family, of the LNG operations Sempra Energy intended to conduct at Costa Azul.

20.     At least ten properties, including Plaintiff's, were located in or around the intended boundaries of the LNG Plant and the setback cushion, and Sempra Energy needed to acquire Plaintiff's property to satisfy the setback requirements. In or about 2001, Sempra Energy, through Sempra Energy México, retained Francisco Molina Robles to negotiate ECA's acquisition of the properties located within the boundaries of the LNG Plant. Sempra Energy, through ECA, began to acquire each of the properties within and around the boundaries of the LNG Plant. Press articles reflect that ECA paid up to $5 million for each of the properties located within the boundaries and setback cushion of the LNG Plant. ECA did not, however, purchase Plaintiff's Property.

21.     In or about July 2001, Robles arranged a meeting with Plaintiff and his neighbor, Felipe Lopez Ruvalcaba, at Sanborn's Café in Tijuana, Mexico. The purpose of the meeting was to negotiate ECA's purchase of Ruvalcaba's and Plaintiff's Property. Plaintiff presented Robles with documentation, including his Certificate of Possession from the Secretary of Agrarian Reform, reflecting that he was in lawful possession and the owner of the Property, and informed Robles of his intent to negotiate the sale of his property to ECA.

22.     On January 11, 2005, Mexico's state-owned electrical utility, Comisión Federal de Electricidad ("CFE"), awarded Sempra Energy's subsidiary, Sempra LNG, a 15-year natural gas supply contract estimated at $1.4 billion. By the time the CFE awarded Sempra LNG the gas supply contract, Sempra Energy, through Sempra Energy México and ECA, had acquired each and every one of the properties it needed for Sempra LNG to begin the LNG Plant's operations, save Plaintiff's. Despite not having acquired lawful possession of Plaintiff's Property, and thus in violation of its license to build and operate Sempra LNG, Defendant began construction of the LNG Plant along the coast of Baja California, on property immediately adjacent to Plaintiff's Property.

**Fraudulent Schemes of Sempra Energy and Others to Illegally Acquire Plaintiff's Property**

23.     In or about 2005, in order to avoid any delays in acquiring possession of Plaintiff's Property, which was needed by Sempra to obtain the operating permit for the LNG Plant and to commence operations, Sempra Energy, Sempra Energy México and ECA, and it co-conspirators devised and implemented secret schemes to fraudulently acquire possession of Plaintiff's Property. As described below, Sempra Energy and its co-conspirators, participated in executing the fraudulent scheme.

24.     In or about 2005, Sempra Energy, through Sempra Energy Vice President and ECA representative, Darcel Lloyd Hulse, entered into an agreement with Armando Navarro Peña, Gabriela Natera Ramirez, and Dinorah Villafan Gutierrez, who allegedly had a power of attorney to act for Castañon, for the purported sale of the Property to ECA.  Sempra Energy and its co-conspirators knew, however, that Plaintiff, and not Peña, Ramirez or Castañon, was the legal possessor and owner of the Property, and Sempra and its agents but not Plaintiff, knew that Gutierrez could not lawfully effectuate a sale of the Property on behalf of Castañon because Gutierrez's power of attorney to do so expired when Castañon died in 2004.  Plaintiff did not learn of Castañon's death until after 2006 and thus could not and did not offer this evidence in his defense in 2006.  In contrast, Sempra knew or wrecklessly disregarded that due to Castañon's death in 2004, the Power of Attorney was a nullity and Sempra's alleged purchase and claim to possession a nullity too.  These and other material facts were willfully withheld by Sempra as it sought judicial intervention in 2006 to oust Plaintiff from his property.  As the Attorney General of Baja California in 2006, Antonio Martinez Luna and his Assistant Attorney General, Sonia Navarro who investigated Sempra's complaint against Plaintiffs have testified under oath, had these facts about Castañon's death been revealed by Sempra and its agents in 2006, the Attorney General's office would have terminated the investigation and would not have sought and not obtained a provisional order of dispossession.

25.     In furtherance of the scheme, on January 31, 2006, Sempra Energy, through Sempra LNG's Vice-President and CEO, Hulse, executed a purchase agreement reflecting ECA's purported purchase of the Property from Peña, Ramirez and Castañon.  Thereafter, Sempra Energy

7

1  caused ECA to file the sham purchase agreement relating to the Property with Mexican officials in

2  furtherance of the schemes to illegally obtain title and possession of Plaintiff's Property and

3  defraud the CFE into granting the operating permit for the LNG Plant.

4      26.      Thereafter, in order to obtain the operating permit for the LNG Plant, the Sempra

5  Entities, through their representatives, submitted knowingly false documents to Mexican

6  governmental agents and with the Mexican courts falsely reflecting ECA's purported ownership

7  and possession of the Property through the Peña, Ramirez, and Castañon agreement.  Plaintiff and

8  his family were subsequently forcibly evicted by Sempra employees from the Property and his

9  home and personal effects were, through the use of unlawful self-help, bulldozed by Sempra to the

10  ground.  Sempra Energy, through its agents, then secured Plaintiff's land and personal property to

11  their own use.  While there was a provisional finding by the court in September 2006 that Sempra

12  was to be given possession, the order did not permit Sempra to use self-help in affecting the

13  eviction.   The use by Sempra of its own private security force were non-communicative,

14  unprivileged and unlawful acts.

15      27.      The forceable physical removal of the Sanchez-Ritchie family from Plaintiff's

16  home was carried out by a Sempra employee and U.S citizen, Gil Moya.  Before joining Sempra as

17  an employee, Moya was either a former U.S. federal agent or former California based Peace

18  Officer.   Upon unlawfully entering Plaintiff's Property, Moya physically assaulted Plaintiff's

19  daughter and other family members.  A copy of a photograph of Moya during this trespass reveals

20  his physical assault on Plaintiff's daughter in furtherance of Sempra's efforts to oust Plaintiff and

21  his family is attached hereto as Exhibit A.  The gun toting Moya is pictured with one arm around

22  Plaintiff's daughter's neck and the other secured around her waist.  Shortly after the photo was

23  taken, Moya roughly and without justification threw her to the ground, causing her serious bodily

24  injury.  As a consequence of being forced to the ground by Moya, she struck her head on the rocky

25  ground so severely that Plaintiff's daughter was hospitalized.  She has had several operations to

26  treat the head injuries caused by Moya.   She is a lawyer and has been unable to recover

27  sufficiently from Moya's attack so that her professional and personal life continues to suffer.

28  These and other unprivileged non-communicative intentional self-help acts by Sempra's employee

8

1   Moya have caused Plaintiff on-going and serious emotional distress.

2         28.     The police on site were *not* there as officers of the law but as bribed agents of
3   Sempra.  While there was a provisional order of entitlement to possession in Sempra's favor at that
4   time, there was no court order or law permitting Sempra to use self-help or excessive force to
5   dispossess Plaintiff from the property, and the Mexican police officers on site were there as bribed
6   agents of Sempra, and not acting in their legal capacity.  Within days after Sempra forceably and
7   unlawfully removed Plaintiffs family from the property and barred Plaintiff from the Property,
8   Sempra swiftly bulldozed Plaintiff's ranch house and established a 50 person armed private guard
9   force on the property, and erected an exorbitantly priced $1.0 million perimeter fence.  As part of
10  the on-going scheme to maintain unlawful possession of Plaintiff's property, the Sempra Entities,
11  through their representative Francisco Molina Robles, asked Plaintiff's neighbor, Felipe Lopez
12  Ruvalcaba, to lie to the Attorney General regarding Plaintiff's claim of ownership of the Property
13  and Ruvalcaba refused.  The Sempra Entities, through Rippa, an ECA attorney, and another ECA
14  attorney, Gerardo Ranero Puig, as well as Armando Navarro Peña, and others, maliciously
15  presented false testimony purporting to establish that Plaintiff was a trespasser and not entitled to
16  possession of the property.  To conceal the fact that the purchase of the Property was a sham,
17  Sempra Energy maliciously presented knowingly false testimony through Rios and Navarro-Peña
18  that Castañon was residing in Nicaragua in September 2006, even though Castañon had died in
19  2004.  Plaintiff did not know these facts in 2006 while attempting to defend himself and these later
20  learned facts were not presented to the Attorney General of Baja or trial court for consideration
21  until years later when Mr. Ritchie learned of the fraud.  Plaintiff's defense was limited to
22  presenting evidence of his title and of his belief that the "sale" by Navarro-Peña and Castañon to
23  Sempra was ineffective, but no evidence or adjudication of the invalidation of the sale due to the
24  inability of the seller, Castañon, to sell due to her death in 2004, was presented or adjudicated.

25        29.     On or about April 16, 2008, in furtherance of the fraudulent scheme, Sempra
26  Energy, through its Managing Attorney Raul Olamendi Smith, retained private investigator Jaime
27  Niebla of Chula Vista, California, for the purpose of harassing and intimidating Plaintiff under the
28  guise of conducting surveillance and reporting on Plaintiff and his family and others, including

9

Plaintiff's lawyer, Omar Paz Arrellano.  On or about June 30, 2008, after discovering that he was being followed by Niebla and reasonably fearing for his physical safety, Plaintiff called the local police to inform them of Niebla's activities.   When Niebla called Lt. Governor Aguirre and informed him that the local police had detained him, Aguirre directed Niebla to conceal Niebla's association with Sempra Energy.  ECA's General Counsel, Rippa, subsequently directed Niebla to alter his invoices to conceal from the authorities the true nature and dates of Niebla's investigation and surveillance of Plaintiff.

30.      In January 2007, based on Sempra Energy's malicious prosecution of Plaintiff and abuses of process and based on Sempra's knowingly false testimony, the First Criminal Judge of Tijuana, Mexico, issued an arrest warrant against Plaintiff arising from Sempra's false statements.  On October 11, 2007, after a hearing and presentation of evidence by Plaintiff, the court found that Plaintiff and *not* Sempra was the lawful possessor and thus the prosecution of Ritchie ended and there was thus no conviction of Plaintiff on these or any other charges.  Instead of returning the property to Ritchie based on the court's rulings, Sempra caused an appeal to be filed.  In March 2009, the Superior Court of the Tenth District of Ensenada, Mexico sustained the trial court's findings that Plaintiff was in fact the legal possessor of the Property.  The October 2007 Order, as later affirmed by the March 2009 Court of Appeals order, eliminated Sempra's colorable or privileged right of possession as provisionally adjudicated in 2006.  Despite the October 2007 findings and subsequent affirmance on appeal in March 2009, and thus the elimination of any colorable or privileged right to possess, Sempra refused and failed to allow Mr. Ritchie back on his property.  Instead, Sempra remained defiant and continually denied possession to Mr. Ritchie until it was forcibly removed in May 2010.

31.      Later, in 2009, based on Sempra Energy's and its agent's further abuse of process and malicious prosecution of Plaintiff and knowingly false assertions and material omissions, the Attorney General instituted a second criminal prosecution against Plaintiff relating to Sempra's frivolous claims of possession of the property.  Sempra Energy and its co-conspirators again maliciously presented knowingly false evidence purporting to establish that Plaintiff was not the lawful possessor of the Property.  The trial court rejected these claims and dismissed the charges in

10

Plaintiff's favor.  Sempra caused an appeal of the ruling.

32.     Thereafter, on March 10, 2010, the Superior Court for the Tenth District of Baja California, Mexico, affirmed the trial court's dismissal of charges and again found as had the Court in October 2007, that Plaintiff was the legal possessor of the Property and absolved him of any criminal liability relating to ECA's allegation of dispossession and eviction.  The Court re-iterated and again found that Plaintiff is the owner and had been in lawful possession of the Property since at least 1983 and that Sempra Energy, Sempra Energy México, and ECA knew as early as July 18, 2001 that Plaintiff, and not Peña, Gutierrez or Castañon, was in lawful possession of the Property.  It further ordered that possession of the Property be restored to Plaintiff.  As a result of Sempra Energy's failure to comply with the court's order, on May 24, 2010 the court ordered that Plaintiff's Property be restored to him within 24 hours of the issuance of the Order. The Mexican authorities executed the Order on May 25, 2010, and thereafter restored possession of the Property to Plaintiff.  However, because there now exists an LNG Plant and dangerous natural gas pipeline within walking distance of Plaintiff's Property, Plaintiff no longer has quiet use and enjoyment of his Property.

**Fraudulent Concealment and Delayed Discovery of Sempra's Conduct Causing Plaintiff's Harm**

33.     As set forth above, Sempra engaged in a pattern of corrupt and fraudulent conduct designed to conceal that it was engaged in an on-going conspiracy to wrongfully oust Plaintiff from his property and to itself solely possess, control and profitably use Plaintiff's property.  The fraudulent concealment by Sempra and its agents included, but are not limited to, making repeated false statements about ownership of the property, denying involvement in the use of excessive and violent force to oust Plaintiff and his family from the property and concealing that Sempra was the entity responsible for harassment and threats against Plaintiff.  In so acting, Sempra affirmatively concealed material facts and delayed discovery by Plaintiff of facts alleged herein.

**The Effect of Sempra Energy's Illegal Conduct on California**

34.     As a result of Sempra Energy's and its co-conspirators fraudulent scheme and illegal activities relating to Plaintiff's Property and the LNG Plant, Sempra Energy has obtained a

competitive advantage in the United States and has impacted the United States economy. ECA transports fifty-percent of the LNG Plant's gas production into the United States largely through pipes and terminals located in California. According to ECA's website, the LNG Plant "provides a new supply alternative to California and the West, where an increasing imbalance between supply and demand has led to rapidly escalating natural gas prices and electric rates."

35.     According to Sempra Energy's annual reports, the LNG Plant generates large profits for Sempra Energy in California. Further, despite the Mexican court rulings affirming Plaintiff's entitlement to lawful possession of the Property, ECA continues to operate the LNG Plant even though without legal possession of Plaintiff's Property, the LNG Plant may not legally operate.

36.     Each of the foregoing acts and pattern of misconduct involved and were furthered by the use of interstate or foreign wires and mail, in order to transmit documentation, including false documentation designed to conceal the true nature of the facts and payment relating to the Property and LNG Plant, the transfer of funds, including funds used for unlawful purposes and communications relating to Plaintiff, the Property and the LNG Plant.

## FIRST CLAIM FOR RELIEF

### Trespass

37.     Plaintiff incorporates by reference the previous statements and allegations as if restated herein.

38.     In September 2006 and before, Plaintiff was in possession of certain real property of over 600 acres situated in Northern Mexico.

39.     Plaintiff was using the property described in paragraph 17 as a place of residence and agrarian use.

40.     In or about September 2006, Defendant, without the consent or authority of Plaintiff and against the will of the Plaintiff, entered onto the Property and forcibly ejected Plaintiff and his family and destroyed Plaintiff's home and other structures.

41.     While Sempra was granted a provisional possession order in September 2006 to occupy the Property, the order was procured by fraud and perjury as set forth herein.

42.     After an initial order provisionally ordering possession of the Property to Sempra, in October 2007, the court after a full review of the evidence terminated the prosecution of Plaintiff arising from the false assertions by Sempra that Plaintiff was a trespasser and not legally entitled to possession.  This order as subsequently affirmed by order dated March 2009, and eliminated any claim by Sempra that it was privileged to continued possession in reliance on the provisional right of possession it was granted in September 2006.

43.     Between September 2006 and May 2010, Defendant physically excluded Plaintiff from his Property by use of armed guards and fencing and refused to return the Property to Plaintiff.

44.     By reason of Defendant's conduct, Plaintiff has been deprived of the use and possession of the Property for a period of years and has been damaged thereby and Defendant has been unjustly enriched by use thereof.

45.     With respect to each of the foregoing causes of action, the facts alleged herein show that Defendant acted fraudulently, oppressively, and maliciously.  Pursuant to California Civil Code § 3294, therefore, Plaintiff is entitled to punitive damages in an amount to be determined at trial.

46.     Defendant is liable for committing, conspiring to commit, and aiding and abetting and/or ratifying these trespasses, as specified in this cause of action.

## SECOND CLAIM FOR RELIEF

### Conversion

47.     Plaintiff incorporates by reference the previous statements and allegations as if restated herein.

48.     Defendant deprived Plaintiff of personal property by wrongful acts and disposition as alleged above.  At the time of the conversion, Plaintiff owned and was in possession of the personal property, including, but not limited to, personal effects in his home and farming and other equipment. While there was a provisional order in September 2006 ordering the dispossession of Plaintiff from the Property, the order did not authorize the conversion of Plaintiff's personal property.

13

49.     As a result of Defendant's conversion of Plaintiff's personal property, Plaintiff was damaged by the total loss and/or the loss of the use of personal property.

50.     Defendant is liable for committing, conspiring to commit and aiding and abetting and/or ratifying the conversion of Plaintiff's personal property.

51.     With respect to each of the foregoing causes of action, the facts alleged herein show that Defendant acted fraudulently, oppressively, and maliciously.   Pursuant to California Civil Code § 3294, therefore, Plaintiff is entitled to punitive damages in an amount to be determined at trial.

**THIRD CLAIM FOR RELIEF**

**Intentional Interference with Prospective Economic Advantage**

52.     Plaintiff incorporates by reference the previous statements and allegations as if restated herein.

53.     Defendant knew of Plaintiff's contractual rights to sell to others and ownership of his property in Northern Mexico, from which he stood to receive a substantial economic benefit. Defendant knew that a disruption of Plaintiff's ownership rights to his property in Northern Mexico and the substantial economic benefit he stood to obtain was substantially certain to result from its conduct.  This conduct complained of herein was independently wrongful because it was fraudulent, corrupt and was in violation of law including the Foreign Corrupt Practices Act.  The independent wrong also included Defendant's trespass on the Property.  The purpose and effect of Defendant's conduct was to remove and intentionally interfere with Plaintiff's authority and ability to sell his property.  Defendant's conduct also constituted an act of unfair competition pursuant to California Business & Professions Code §§ 17200, *et seq*. as alleged herein because their conduct eliminated Plaintiff's possession of his property.

54.     Defendant's conduct intentionally interfered with and disrupted Plaintiff's ownership rights to his property in Northern Mexico and the substantial economic benefit he stood to obtain.  Plaintiff suffered damages in an amount to be determined by the evidence.

55.     Defendant is liable for committing, conspiring to commit, and aiding and abetting and/or ratifying these interferences as specified in this cause of action.

## FOURTH CLAIM FOR RELIEF

### Violation of California Business and Professional Code Sections 17200, *et seq.*, Unfair Business Practices

56.     Plaintiff incorporates by reference the previous statements and allegations as if restated herein.

57.     Plaintiff brings this cause of action on behalf of himself pursuant to Business & Professions Code § 17204.  The Defendant's conduct as alleged herein has been and continues to be deleterious to Plaintiff, and Plaintiff is seeking to enforce important rights affecting the public interest within the meaning of the Code of Civil Procedure § 1021.5.  Plaintiff also seeks compensation for the loss of his property, the personal financial impacts he has suffered as a result of Defendant's unfair business practices, and unjust enrichment.

58.     The California Business & Professions Code §§ 17200, *et seq.* prohibits "unfair competition," defined as any "unlawful, unfair, or fraudulent business acts or practice."  These acts or practices consist of those forbidden by law.  Defendant's conduct constitutes violations of each of the three prongs of § 17200, unlawful, unfair and fraudulent, a conspiracy to violate § 17200 and the aiding and abetting of § 17200 violations.

59.     The unlawful, unfair, and fraudulent acts and practices described herein constitute ongoing and continuous unfair business practices within the meaning of Business & Professions Code §§ 17200, *et seq.*, as they are prohibited by state, federal, and international laws.

60.     Defendant's practices described herein offend established public policies and involve business practices that are immoral, unethical, oppressive, and/or unscrupulous and violate policies reflected in the laws referred to herein.

61.     Such practices include, but are not limited to, fraud, abuse of process and malicious prosecution.  Plaintiff and members of the public have been in the past and will in the future likely be damaged by these practices.

62.     Plaintiff seeks an injunction, disgorgement of all profits resulting from these unfair business practices, restitution and other appropriate relief as provided in California Business & Professions Code § 17203.

15

## FIFTH CLAIM FOR RELIEF

### Unjust Enrichment

63.     Plaintiff incorporates by reference the previous statements and allegations as if restated herein.

64.     At all times relevant to this Second Amended Complaint, the Defendant knew that it had to acquire the rights to the Property owned by Plaintiff in order to begin operations of the LNG Plant.  When Defendant was unable to do so by lawful means, the Sempra Entities conspired to create a scheme to make it appear that it had lawfully acquired title to the Property.  This, in turn, allowed the Sempra Entities to falsely represent that it had acquired all the land necessary to receive approval to operate the LNG Plant, and that Plaintiff was in unlawful possession of the Property.

65.     The Sempra Entities' actions caused Plaintiff and his family to be evicted from his Property and maliciously prosecuted by Sempra so that the Sempra Entities could operate the LNG Plant within the boundaries of Plaintiff's Property.  The Sempra Entities failed to deliver money, security or other consideration for its use of the Property.  By virtue of its unlawful use of the Property, the Sempra Entities have been unjustly enriched in an amount equal to, but not limited by, the profit resulting from the operation of the LNG Plant.

66.     Plaintiff is entitled to restitution and recovery of a sum equal to the amount by which the Sempra Entities have been unjustly enriched.

## SIXTH CLAIM FOR RELIEF

### Imposition of a Constructive Trust

67.     Plaintiff incorporates by reference the previous statements and allegations as if restated herein.

68.     At all material times herein, Plaintiff was the owner of residential real property located in Northern Mexico.

69.     Between September 2006 and May 2010, Defendant unlawfully acquired and exercised control over Plaintiff's property.  It used Plaintiff's Property to secure licenses and to operate a LNG plant.

70.     Defendant unjustly benefited during this time period because it was able through the unlawful taking and continued possession between September 2006 and May 2010 of Plaintiff's Property to build and operate the LNG Plant and make substantial profits as a result.

71.     By virtue of their fraudulent acts, Defendant held the Property described above during September 2006 to May 2010 as a constructive trustee for Plaintiff's benefit.

**SEVENTH CLAIM FOR RELIEF**

**Malicious Prosecution**

72.     Plaintiff incorporates by reference the previous statements and allegations as if restated herein.

73.     In early 2006, Sempra initiated criminal proceedings in Baja, California Mexico against Plaintiff to oust Plaintiff from his Property.   At the conclusion of the initial and preliminary investigation by Mexican officials and the Attorney General of the State of Baja, California, the preliminary findings were that Sempra, and not Plaintiff, should be given possession.   The trial court entered a preliminary order of possession in September 2006 and Sempra, thereafter in September 2006 through the use of unlawful self-help invaded the Property, ousted Plaintiff and assaulted his family and destroyed all structures and personal property that were then on the land.

74.     Thereafter, on January 25, 2007, as part of the on-going efforts by Sempra to eliminate Plaintiff as a threat to Sempra opening and profitably operating the LNG Plant, caused an arrest warrant to be issued for Plaintiff's arrest arising from Sempra's false statements to Mexican authorities that Sempra was in possession of the Property when it allegedly bought the property on January 31, 2006.

75.     After the arrest warrant was issued, Plaintiff, by and through his attorneys, successfully fought the frivolous and maliciously motivated prosecution.   By order dated October 11, 2007, Plaintiff was exonerated of all charges, and the court found that Plaintiff was the rightful possessor and owner of the land.   In October 2007, the court dismissed the charges against Plaintiff finding that Plaintiff had established his rights to possession.   Then Sempra, not Plaintiff, appealed from the October 11, 2007 trial court order.   That appeal was unsuccessful and

17

1  it was denied by order dated March 13, 2009.  The Court of Appeal in March 2009 thus affirmed

2  the trial court's findings that Plaintiff and not Sempra was the party entitled to possession of the

3  land.

4        76.    Thereafter, in April 2009, having just been told by the Court of Appeals what

5  Sempra had earlier been told by the trial court in October 2007 that Plaintiff as the rightful

6  possessor and owner, Sempra initiated a second and equally frivolous criminal complaint against

7  Plaintiff arising from the same earlier asserted, but rejected, alleged crimes of trespass.  These

8  already rejected allegations were frivolous and malicious.  Sempra's malicious intent arose from

9  its knowledge that it needed to neutralize Plaintiff and his claims of possession and ownership in

10 order to insure the timely opening of its expected to be hugely profitable operation of its LNG

11 Plant.  Delay, deception and confusion was a strategy employed by Sempra in the belief that the

12 longer the LNG Plant operated, thus creating jobs and money for the local economy, the more

13 political pressure it would be able to exert to insure continued operations with or without

14 Plaintiff's Property.

15       77.    Initially, Sempra's "delay at all cost" strategy was successful.  It used the time and

16 its political and other influences to procure an alleged amended license to operate the LNG Plant that

17 it now asserts, in contrast to its representations in 2005 and 2006, allows it to legally operate the

18 LNG facility without possession of Plaintiff's Property.  Sempra's alleged "new" license has been

19 challenged in court and continues to be a hotly contended issue between Sempra and Mexican

20 governmental officials.  By this bogus re-licensing maneuver, Sempra has also sought to minimize

21 the value of Plaintiff's property that Sempra first claimed was essential to its legal operations and for

22 which Sempra paid approximately $5 million for in 2006, and now having lost the property dispute

23 fight with Plaintiff, it now claims the Property is not necessary to its operations.

24       78.    As Sempra expected when it initiated the prosecution of Plaintiff in 2006 and the

25 renewed prosecution of Plaintiff in April 2009, there would be long delays before the courts would

26 be able to, as Sempra knew would happen, exonerated Plaintiff.  Indeed, despite an early and

27 predictable loss at the trial court level by Sempra in October 2007, the subsequent and frivolous

28 appeal Sempra caused to be filed was rejected on March 13, 2009.  Despite Sempra having been

told by the trial court in October 2007 that Plaintiff and not Sempra was the person entitled to possession, Plaintiff did not receive possession back from Sempra until May 2010.

79.     Despite Plaintiff's initial mistaken belief that he had been found to have violated some law, he never has been.  His mistaken belief derived from his reasonable, but flawed, assumption that he would not have been evicted from his property in 2006 absent having been convicted of a crime.  In fact, while Sempra did initiate and pursue criminal and civil cases against Plaintiff, Plaintiff has, except for the September 2006 provisional order of dispossession, prevailed against these false charges at every phase and in every tribunal.

80.     Even had Plaintiff not prevailed below, Sempra is liable for malicious prosecution, because the findings of the court in September 2006, giving provisional possession to Sempra was procured by Sempra and its agents by fraud and perjury.  These were at least two key pieces of evidence reasonably known to Sempra and its agents at the time of the investigation and provisional possession proceedings that were fraudulently withheld and affirmatively and knowingly misstated in furtherance of seeking an order to provisionally dispossess Plaintiff of the Property.  These facts were not known by Plaintiff at the time he was defending against the efforts by Sempra in 2006 to dispossess him of the Property and accordingly, none were offered in his defense when the provisional order of dispossession was entered in September 2006.  First, Plaintiff did not know, unlike Sempra and its co-conspirators that Castañon (one of the alleged "sellers" to Sempra) had died in 2004, making the alleged sale by her to Sempra on January 31, 2006 a nullity as a matter of law.  Indeed, at least one basis for the court later affirming Plaintiff's right to possession was the revelation that Castañon had died in 2004 making the earlier Power of Attorney she had allegedly signed many years earlier a nullity upon her death.  As Antonio Martinez Luna, the Attorney General of Baja California from 2001-2007 and Sonia Navarro, a professor of law at University of Baja California, Ensenada and Assistant Attorney General in 2006 who investigated Sempra's claims against Plaintiff both testified to under oath, had they and the Attorney General's office known that Castañon had died in 2004, there would have been no further investigation of Plaintiff and no further prosecution of Sempra's false claims nor pursuit of a provisional order of dispossession.  These facts, having been hidden from Plaintiff and the

19

1    prosecutors, were not relied on by Plaintiff in his defense of the action in 2006 because he did not

2    know these facts in 2006.

3           81.    Second, Plaintiff did not know in 2006 because it was fraudulently withheld from

4    him and from the Attorney General of Baja California, Antonio Martinez Luna and his office that

5    the alleged sellers of the property to Sempra, Navarro-Peña and Castañon, had in 2001 applied for

6    an Amparo which was a request for an order of court declaring the sellers (Navarro-Peña and

7    Castañon) to be the legal owners and possessors of the property to the exclusion of Plaintiff.

8    Plaintiff was not aware of the 2001 Amparo sought by Navarro-Peña and Castañon and did not

9    know of the court's subsequent rejection thereof until years after 2006.  In contrast Sempra and its

10   agents knew as of and before September 2006 of the court's 2001 Order rejecting the Amparo and

11   of the court's findings that Navarro-Peña and Castañon were not in legal possession of the

12   Property and could therefore not transfer legal title.  As the former Attorney General of Baja,

13   California Mexico, Luna, testified under oath, had this material fact been revealed to him and his

14   investigators, the investigation in 2006 would have been halted and no action to dispossess

15   Plaintiff would have proceeded.  Mr. Luna's Assistant Attorney General Sonia Navarro similarly

16   testified that had this material fact been revealed by Sempra and its agents in 2006, the

17   investigation would have terminated and no action to dispossess Plaintiff from the Property would

18   have proceeded.  While Plaintiff did learn of these facts at a later time, they were not known to

19   him, and were not offered as evidence in his defense in 2006 and were thus not considered by the

20   trial court sitting in consideration in 2006 of whether to issue a provisional order of dispossession.

21          82.    In furtherance of the fraudulent scheme and in order to prevent disruption of the

22   LNG Plant's operations resulting from Plaintiff's ownership and right to possess the property,

23   Sempra Energy, through ECA's General Counsel, Rippa, and ECA attorney, Sergio Fillad Fahme,

24   met with the Lieutenant Governor, Bernardo Martinez Aguirre, who referred them to the Attorney

25   General of Baja California, Mexico, to file a criminal complaint to have Plaintiff forcibly removed

26   from the Property under the guise and false representation that Plaintiff was an illegal squatter who

27   had unlawfully dispossessed and evicted ECA from the Property.  Sempra Energy, through its

28   agents, Rippa and Fahme gave the Attorney General the sham purchase agreement to initiate the

criminal prosecution of Plaintiff to remove him from his property.  Rippa and Fahme fraudulently concealed from the Courts the fact that Sempra Energy knew as early as 2001 that Plaintiff was the lawful possessor of the Property and that Castañon, as the purported sellers of the Property to ECA, was deceased when the sham purchase agreement was executed.

83.     In furtherance of the fraudulent scheme, on or about July 21, 2006, Sempra Energy caused the Attorney General to institute provisional dispossession actions against Plaintiff.   In reliance on the sham purchase agreement reflecting ECA's purported ownership of the Property and the false statements of Rios, Rippa and Fillad, the Attorney General ordered the granting of possession to Sempra.  Sempra thereafter used self-help and excessive force and removed Plaintiff and his family.

84.     The Sempra Entities, in furtherance of their conspiracy to oust Plaintiff and thereafter wrongfully possess and profitably use Plaintiff's land, paid $16,000 in cash to Mexican officials who would not otherwise have accompanied Gil Moya in Sempra's raid of Plaintiff's property and thereafter falsely arrest Plaintiff.  Once this illegal raid was successfully completed by Sempra and Plaintiff's home destroyed, Sempra Energy's management rewarded Alex Rios, a key LNG Plant employee with an all expenses paid $22,000 vacation to Europe, all disguised by Sempra Energy as a "bonus."

85.     The criminal and civil actions referenced above were instituted against Plaintiff at the direction of Defendant.

86.     The criminal and civil actions instituted against Plaintiff at the direction of Defendant lacked probable cause.  To the extent there is deemed to have been any judicial findings for Sempra and against Plaintiff, those findings, specifically those relating to the provisional order of dispossession of September 2006, were the result of fraud and perjury by Sempra and its agents.

87.     The criminal and civil actions were instituted at the direction of Defendant and with malice.

88.     The criminal and civil actions instituted against Plaintiff at the direction of Defendant terminated favorably to Plaintiff.

89.     As a result of Defendant's conduct in directing initiation of civil and criminal actions against Plaintiff without probable cause, with malice, fraud and perjury, Plaintiff suffered damages in an amount to be determined at trial.

## EIGHTH CLAIM FOR RELIEF

### Abuse of Process

90.     Plaintiff incorporates by reference the previous statements and allegations as if restated herein.

91.     Criminal and civil actions were instituted against Plaintiff at the direction of Defendant for ulterior reasons, including, but not limited to, securing LNG operating licenses.

92.     In directing the institution of criminal and civil actions against Plaintiff, Defendant misused court processes, including the filing of false police reports and offering bribes and bribing Mexican officials.  Defendant used court processes for a purpose other than the purposes for which the processes were designed.

93.     As a result of Defendant's conduct in directing initiation of civil and criminal actions against Plaintiff for an end other than that which the process was designed, Plaintiff suffered damages in an amount to be determined at trial.

## PRAYER

WHEREFORE, Plaintiff demands judgment against Defendant as follows:

A.     For restitution in the amount by which Sempra Energy and the other Sempra Entities have been unjustly enriched, according to proof at trial;

B.     For compensatory and punitive damages in amounts to be determined at trial;

C.     For an order declaring that Defendant and the Sempra Entities hold all monies earned from their unlawful possession of Plaintiff's property in trust for Plaintiff;

D.     The costs and disbursements incurred in prosecuting this action, including a reasonable allowance for the fees and expenses of Plaintiff's attorneys and experts; and

1    E.    Such other and further legal and equitable relief as the Court may deem just and

2  proper in these circumstances.

3                                   **<u>JURY DEMAND</u>**

4    Plaintiff demands a trial by jury.

5  DATED: October 3, 2011              HULETT HARPER STEWART LLP
                                       KIRK B. HULETT
6                                      KAREN THOMAS STEFANO
                                       LINDSAY J. MERTENS
7

8

9                                       */s/ Kirk B. Hulett*
                                       KIRK B. HULETT
10

11                                     525 B Street, Suite 760
                                       San Diego, CA  92101
12                                     Telephone:    (619) 338-1133
                                       Facsimile:    (619) 338-1139
13
                                       Attorneys for Plaintiff, Ramon Eugenio Sanchez
14                                     Ritchie

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                        23

1

**PROOF OF SERVICE**

2
*Ritchie v. Sempra Energy*
CASE NO: 10CV1513-JLS(WVG)

3

4
    I, the undersigned, declare under penalty of perjury that I am over the age of eighteen years and not a party to this action.  I am employed in the County of San Diego, State of California.  My business address is: 525 B Street, Suite 760, San Diego, CA 92101.

5

6
    That on October 3, 2011, I served the following document(s) entitled:

7
**SECOND AMENDED COMPLAINT FOR:**
**1.    TRESPASS;**

8
**2.    CONVERSION;**
**3.    INTENTIONAL INTERFERENCE WITH PROSECTIVE ECONOMIC**

9
       **ADVANTAGE;**
**4.    VIOLATIONS OF BUSINESS AND PROFESSIONS CODE SECTIONS**

10
       **17200, *ET SEQ.*;**
**5.    UNJUST ENRICHMENT;**

11
**6.    CONSTRUCTIVE TRUST;**
**7.    MALICIOUS PROSECUTION; AND**

12
**8.    ABUSE OF PROCESS**

13
**DEMAND FOR JURY TRIAL**

14
**REQUEST FOR PUNITIVE DAMAGES**

15
on ALL INTERESTED PARTIES in this action.

16

17
☒    **BY CM/ECF Electronic Service:** I caused such document to be served via the Court's (NEF) electronic filing system on all registered parties.

18

19
☐    **BY MAIL PER ATTACHED SERVICE LIST**: By placing a true copy thereof in a sealed envelope addressed as listed on the attached service list, and placing it for collection and mailing following ordinary business practices.  I am readily familiar with the firm's practice of collection and processing correspondence, pleadings, and other matters for mailing with the United States Postal Service.  The correspondence, pleadings and other matters are deposited with the United States Postal Service with postage thereon fully prepaid in San Diego, California, on the same day in the ordinary course of business.  I am aware that on motion of the party served, service is presumed invalid if the postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

20

21

22

23

24

25
    I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed on October 3, 2011, at San Diego, California.

26

27
          */s/ Kirk B. Hulett*
          KIRK B. HULETT

28

# Exhibit A

