1   MARK C. ZEBROWSKI (CA SBN 110175)
    mzebrowski@mofo.com
2   JAMES J. CEKOLA (CA SBN 259443)
    jcekola@mofo.com
3   JESSICA A. ROBERTS (CA SBN 265570)
    jroberts@mofo.com
4   12531 High Bluff Drive, Suite 100
    San Diego, California  92130-2040
5   Telephone: 858.720.5100

6   Attorneys for Defendant and Counter-Complainant
    SEMPRA ENERGY
7

8                   UNITED STATES DISTRICT COURT

9                 SOUTHERN DISTRICT OF CALIFORNIA

10  RAMON EUGENIO SANCHEZ              Case No. 3:10-cv-1513-CAB-KSC
    RITCHIE,
11                                     **SEMPRA ENERGY'S**
              Plaintiff,               **FIRST AMENDED**
12                                     **COUNTER-COMPLAINT FOR**
         v.                            **RICO VIOLATIONS**
13
    SEMPRA ENERGY, a California
14  corporation,
15            Defendant.
16
17                                     Judge: Hon. Cathy Ann Bencivengo
18
    SEMPRA ENERGY, a California
19  corporation,
20            Defendant and
              Counter-Complainant,
21
         v.
22
    RAMON EUGENIO SANCHEZ
23  RITCHIE and JOSE SUSUMO AZANO
    MATSURA,
24
25            Counter-Defendants
26
27
28

**INTRODUCTION**

1.    Defendant and Counter-Claimant Sempra Energy ("Sempra") is being unlawfully attacked by the actions in furtherance of an enterprise owned and controlled by Plaintiff Ramon Eugenio Sanchez Ritchie ("Sanchez Ritchie") and his partner, Jose Susumo Azano Matsura ("Azano"), through myriad tactics in the United States and Mexico intended to improperly extract a very large payment from Sempra to which neither Sanchez Ritchie nor Azano are legally entitled.  As set out below, these tactics amount to violations of the civil Racketeer Influenced and Corrupt Organization ("RICO") statute.

**JURISDICTION**

2.    Pursuant to 28 USC § 1367(a), this Court has jurisdiction over all other claims that are so related to the claims within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

3.    To the extent the Court has subject matter jurisdiction in the underlying action, the Court has supplemental jurisdiction over this action because it arises out of the same nucleus of operative facts at detailed herein.

4.    Moreover, the Court has jurisdiction of Sempra's RICO claims pursuant to 28 U.S.C. § 1331.

**PARTIES**

5.    Sempra is a California corporation with its principal place of business in San Diego, California.

6.    As alleged in the underlying action, Sanchez Ritchie is, and was during all relevant times, a citizen of Mexico.

7.    Upon information and belief, Azano is, and was during all relevant times, a citizen of Mexico.

8.    Also upon information and belief, Azano currently resides in Coronado, California.

**FACTUAL BACKGROUND**

9.  In 2006, Sempra's indirect subsidiary, Energía Costa Azul S. de R.L. de C.V. ("ECA"), purchased land in Baja California, Mexico designated as Lot A-3 near its planned liquefied natural gas ("LNG") terminal.

10.  ECA takes pride in building its facilities to meet or exceed all safety requirements, in developing energy infrastructure that is compatible with the protection and preservation of the environment, and in creating innovative solutions for its clients' needs.

11.  ECA's LNG terminal began operations in May 2008 and is capable of processing 1 billion cubic feet of natural gas per day, which can then be delivered to the pipeline system of another Sempra indirect subsidiary with delivery capacity in Baja California, Mexico and the United States.

12.  LNG is natural gas that has been cooled to approximately -160 degrees Celsius to condense the gas into a liquid, making it easier to transport.  Natural gas is an energy source that has much lower air emissions than other fossil fuels, such as oil or coal.  LNG is odorless, colorless, non-corrosive and non-toxic.  The process by which LNG is returned to its gaseous state, referred to as regasification, is a proven, reliable and safe process, and it has been used in the United States since 1944.  Sanchez Ritchie and Azano have been engaged in a campaign to hamper Sempra and ECA's efforts to provide cheap, clean, and efficient energy to customers in the United States and Mexico.

13.  Counter-Defendants' campaign has been based in part upon false claims that Sempra "stole" Lot A-3 from Sanchez Ritchie.  In fact, ECA purchased Lot A-3 in 2006, Sanchez Ritchie is a squatter who never owned Lot A-3, and he has gone to great lengths to delay, interfere with, and avoid the legal determination being sought by ECA in Mexican courts to confirm its ownership and right to possession of Lot A-3.

2

**Jose Susumo Azano Matsura**

14.    A March 9, 2011 article in the *San Diego Union-Tribune* entitled "Coronado tycoon is Sempra's 'enemigo'" correctly confirmed that "Eugenio Sanchez Ritchie is not acting alone."  *See* First Amended Counter-Complaint ("FACC") Ex. 1.

15.    The *Union-Tribune* article noted that Sanchez Ritchie's "efforts have been financed in part by a Coronado resident, Jose Susumo Azano Matsura, who flies a private jet tending to business interests in the U.S., Mexico, and elsewhere." *Id.*

16.    In 2008, Sanchez Ritchie and Azano formed a "business venture" pursuant to which Azano promised to obtain a title to the Lot A-3 property claimed (but admittedly not owned) by Sanchez Ritchie, to negotiate payment for the property from Sempra, and to fund all actions required to carry out that purpose.  In return for orchestrating attempts to so extract money from Sempra, Azano is entitled to 55% (fifty-five percent) of any amount Sanchez Ritchie obtains from Sempra and 66% (sixty-six percent) of the property.

17.    The "business arrangement" undertaken between Sanchez Ritchie and Azano is formalized in a written contract (the "Agreement").  *See* FACC Ex. 2 (in Spanish with certified translation).  The Agreement, dated April 2008, describes Sanchez Ritchie as the "Client" and Azano as the "Service Provider."

18.    In furtherance of the Agreement, the "business partners" have pursued an illegal scheme of extortion and other misconduct directed at Sempra in California and elsewhere in the United States as well as in Mexico.

19.    The "business agreement" between Sanchez Ritchie and Azano is in fact a RICO enterprise.

20.    Sanchez Ritchie and Azano direct the affairs of the RICO enterprise while C. E. Cortes ("Cortes") and various others unknown to Sempra at this time participate or have participated as agents, employees, and co-conspirators of the

enterprise with Sanchez Ritchie and Azano in connection with the acts alleged in this FACC.  These agents, employees, and/or co-conspirators have engaged in conduct and made statements in furtherance of the enterprise.  The acts charged in this FACC have been done by Sanchez Ritchie and Azano and their co-conspirators, or were authorized, ordered, or done by their respective agents, employees, or representatives while actively engaging in the management of the RICO enterprise.

**Conspiracy**

21.     Under California Penal Code section 182, conspiracy is punishable if, among other things, two or more persons conspire to: (1) to commit any crime; (2) falsely and maliciously to indict another for any crime, or to procure another to be charged or arrested for any crime; (3) falsely to move or maintain any suit, action, or proceeding; or (4) to cheat and defraud any person of any property, by any means which are in themselves criminal, or to obtain money or property by false pretenses or by false promises with fraudulent intent not to perform those promises.

22.     Federal statutes also make conspiracy illegal.  For example, 18 U.S.C. § 1962(d) makes it illegal to conspire to violate the RICO Act.

23.     As explained below, Sanchez Ritchie and Azano have plotted unlawfully to bribe officials and extort money from Sempra.

24.     This conspiracy began as early as 2008 when the pair entered into their "business agreement" to extort as large a "settlement" as possible from Sempra, despite the fact that they did not have a legal right on which to base their claims.

25.     The pair has also worked together under their "business arrangement" to procure criminal charges against Sempra's subsidiary ECA and ECA's representatives despite the fact that neither ECA nor its representatives have committed any wrongdoing.

4

26.     This is all part of the plan by Sanchez Ritchie and Azano to knowingly extort money from Sempra so as to maximize profits achieved under the Agreement.

**Bribery**

27.     Under California Penal Code section 92:

> Every person who gives or offers to give a bribe to any judicial officer, juror, referee, arbitrator, or umpire, or to any person who may be authorized by law to hear or determine any question or controversy, with intent to influence his vote, opinion, or decision upon any matter or question which is or may be brought before him for decision, is punishable by imprisonment in the state prison for two, three or four years.

28.     The parties to the Agreement have engaged in multiple individual acts of bribery as part of their RICO enterprise to maximize a potential "settlement" from Sempra.

29.     On or about March 18, 2010, following a ruling in the litigation relating to charges against Sanchez Ritchie for unlawfully entering the property, a federal prosecutor in Ensenada informed ECA's attorney Miguel Araiza that he had been offered a bribe by a person the prosecutor was unwilling to identify.  In particular, the prosecutor stated that this person had said the prosecutor could "name his price" for not filing an appeal of a ruling that favored Sanchez Ritchie. The person also stated to the prosecutor that the judge in Ensenada who issued the ruling had been paid $60,000 up front, and would receive an additional $60,000 later.  The Agreement incentivized Azano to make such bribes, and upon information and belief, somebody working on behalf of the enterprise approached the prosecutor with the bribe; indeed, only Sanchez Ritchie and Azano would have any reason to make or offer these bribes.

30.     At a December 10, 2011 hearing, attorney Omar Paz Arellano ("Paz") - officially representing Sanchez Ritchie and acting on behalf of both Sanchez

Ritchie and Azano - told an attorney for Sempra's subsidiary that his team was ready to "drop two bombs" on ECA.

31. On January 25, 2011 - just 17 days before an attempted shutdown of the company by the municipality of Ensenada - a United States bank account at J.P. Morgan bank under the name of the son of the Mayor of Ensenada received a wire transfer of $2 million. *See* FACC Ex. 3. The Mayor of Ensenada later admitted that the account belonged to him and his son. Sempra is informed and believes this money was deposited for the purpose of securing the ongoing cooperation of the Mayor of Ensenada in the enterprise's scheme against Sempra.

32. Records of the transfer show that the money came from a company in Guadalajara, Mexico that has nothing to do with the types of business in which the Mayor's son is involved. *See, e.g., id.* In a radio interview, the Mayor publicly acknowledged that the $2 million came from Azano. The Mayor claimed that the deposit was intended to have been in the amount of 2 million pesos—approximately $166,000—but that a "mistake" had been made; he further claimed that the excess $1.83 million had been returned, but failed to present proof that any such amount had been transferred.

33. On February 11, 2011, an attorney working on behalf of Sanchez Ritchie and Azano was observed at an all-day meeting with Ensanada municipal officials at the Hotel Las Rosas in Ensenada.

34. At approximately 3:30 pm that same day, the Mayor of Ensenada dispatched dozens of armed police, some in SWAT uniforms, in an effort to shut down ECA's $1 billion LNG terminal. Ensenada municipal officials and others wearing black masks went with the police to the site, and asserted that the shutdown was being ordered because the permits were not valid - despite the fact that the Municipality of Ensenada had previously filed documents with a Mexican federal court correctly attesting that the Municipal permits issued to the ECA terminal were legal and valid.

35.     On or about February 16, 2011, the Mayor received another deposit in the amount of $41,000 to the same U.S. bank account.  This money was deposited from the same Guadalajara business that Sempra is informed and believes belongs to Azano, and for the purpose of securing the ongoing cooperation of the Mayor of Ensenada in the enterprise's scheme against Sempra.  *See* FACC Ex. 4.

36.     On or about February 18, 2011 the Mayor received a third deposit, in the amount of $146,000, to the same U.S. bank account.  This money was deposited from the same Guadalajara business that Sempra is informed and believes belongs to Azano, and again for the purpose of securing the ongoing cooperation of the Mayor of Ensenada in the enterprise's scheme against Sempra.  *See* FACC Ex. 5.

37.     Sempra is informed and believes that it was necessary to the activities and intentions of Sanchez Ritchie and Azano in furtherance of their RICO enterprise that the bribe payments to the Mayor of Ensenada be made in and through a United States bank so that the payments could be made and received in a manner that would minimize the risk that they would be discovered in Mexico by Mexican authorities and/or the Mexican public, and to attempt to remove the funds paid to the Mayor from the jurisdiction of Mexican authorities.

38.     Azano has subsequently admitted to talking with the Mayor regarding the terminal, and the Mayor has admitted to having a friendship with Azano.

39.     Two weeks after the enterprise dropped its "first bomb" on Sempra on February 11, 2011 by attempting to close down ECA's LNG terminal, the attorney described in paragraph 33 above approached ECA's attorneys in a public setting in Mexicali, Mexico and reiterated the payment demand.

40.     This attorney informed ECA's attorneys that Azano continues to finance the case and that Azano has million dollar contracts to supply arms to various foreign countries, including Mexico; but the pair no longer expects $200 million; rather, they are now willing to take $80 million.  The attorney also indicated that he has received $1 million for his assistance in the matter.

1    41.    On March 15, 2011, ECA's attorney was once again approached by

2    Paz, the attorney representing Sanchez Ritchie and the interests of Azano.  Paz

3    referred to the attempted shutdown of February 11, and stated that he had delivered

4    on his December 10, 2010 promise to "drop the first bomb."  Paz also stated that

5    there is a second attack against the company in place, and that it will be better for

6    the company to settle before he "drops this bomb" because the company would not

7    be able to fix the situation through lawsuits after that point.  He further advised

8    ECA's attorney that because he (Paz) "likes" ECA's attorney, he would call 15

9    minutes before "dropping the bomb" so that ECA's attorney "would not get

10   burned."

11   **Extortion**

12   42.    Under California Penal Code section 518, "extortion is the obtaining of

13   property from another, with his consent, or the obtaining of an official act of a

14   public officer, induced by a wrongful use of force or fear, or under color of official

15   right."

16   43.    Federal statutes also make extortion illegal.  The term "extortionate

17   means" is defined in 18 U.S.C. § 891(7) as "any means which involves the use, or

18   an express or implicit threat of use, of violence or other criminal means to cause

19   harm to the person, reputation, or property of any person."  The Hobbs Act,

20   codified at 18 U.S.C. § 1951, defines "extortion" as "the obtaining of property from

21   another, with his consent, induced by wrongful use of actual or threatened force,

22   violence, or fear, or under color of official right."

23   44.    In order to exert improper pressure on Sempra to succumb to the

24   enterprise's demands, Cortes, acting as the spokesperson for Sanchez Ritchie and

25   the enterprise, issued numerous statements specifically designed to injure Sempra's

26   goodwill and business reputation in the United States and its stock price on the New

27   York Stock Exchange.

28

45.     Beginning in June 2010, in an effort to increase financial and public pressure on Sempra to pay them off, Sanchez Ritchie and Azano directed a series of communications designed to manipulate and depress Sempra's stock price on the New York Stock Exchange by conducting a smear campaign against Sempra via the website www.gatewaymediapartners.com, a website registered with an address in Chula Vista, California and which Sempra is informed and believes is or was controlled and operated directly or indirectly by Sanchez Ritchie and Azano and their RICO enterprise; and by the dissemination in the United States of press releases and other communications targeted at Sempra shareholders and United States stock analysts containing fraudulent misrepresentations and other defamatory statements.

46.     On or about June 17, 2010, the enterprise issued a press release falsely proclaiming "Loss of Litigation of Necessary Land Parcel Required For Plant's Operation Places LNG Facility At Risk of Closure By Mexican Authorities."  The release was issued in the United States by a person who identified himself as C.E. Cortes of a company called "Gateway Media Partners."  Mr. Cortes gave a United States telephone number and delivered the press release to a United States wire service.  Mr. Cortes identified himself as representing Sanchez Ritchie.  The release was false in that the "Land Parcel" was not required for the operation of the LNG terminal, and Sanchez Ritchie and his counsel knew that it was not required.  The false release also included false accusations that Sempra had mislead its investors and failed to report information required to be reported to the United States Securities Exchange Commission ("SEC").  The release also contained comments from Cortes that "[c]losure of this facility would effectively close the pipeline to much-needed natural gas supply to the Northern region of Baja California, Southern California, and Arizona."

47.     On or about June 21, 2010, the enterprise issued another press release in the United States in the same manner as the June 17 release.  This press release

1   falsely stated, among other things, that Mexican authorities had "issued a Federal
2   Court Order to shut down the plant forthwith," and again claimed, falsely, that the
3   disputed property was "part of the 'set back cushion,' which was an express
4   condition to Energia Costa Azul obtaining operation permits from the Mexican
5   environmental agency, 'SEMARNAT.'"  Again, Sanchez Ritchie knew this was
6   false at the time.

7          48.    On or about June 23, 2010, the enterprise issued a third press release in
8   the United States in the same manner as the June 17 and June 21 releases.  The June
9   23 press release falsely asserted that Sempra/ECA were continuing to operate the
10  terminal "in contempt of a Federal Court Order."  In fact, there was no order ever
11  issued requiring ECA to cease operations.

12         49.    On or about June 24, 2010, the enterprise issued a fourth press release
13  in the United States in the same manner as the earlier releases.  This time the
14  enterprise acknowledged that the Lot A-3 property was not required by any permit
15  as a "set-back cushion" for the LNG facility, but it falsely asserted, among other
16  things, that "Sempra "inappropriately remove[d] a key provision in environmental
17  impact document to continue its operations," and that Sempra had caused the
18  alleged requirement to be removed from the ECA permit "under questionable
19  circumstances."  This press release also quoted Sanchez Ritchie as saying that "the
20  plant could be shut down permanently."  The press release further falsely stated that
21  Sanchez Ritchie had that day "uncovered" these "facts," but in truth Sanchez
22  Ritchie made the same baseless claims about the permit provisions in 2006 in
23  sworn pleadings he filed in the Mexican court admitting that the setback
24  requirement did not exist.

25         50.    On or about June 30, 2010, the enterprise issued a fifth press release in
26  the United States in the same manner as the earlier releases.  The June 30 press
27  release falsely accused Sempra of misrepresenting a court order that, they falsely

28

claimed, required the shut-down of the LNG terminal.  In fact, there was no such court order.

51.    On or about July 2, 2010, the enterprise issued a sixth press release in the United States in the same manner as the earlier releases.  The July 2 release falsely accused Sempra of "conceal[ing] and misinform[ing] the public at large with regard to its legal issues impacting the closure of" ECA.

52.    Beginning on or about February 14, 2011, shortly after the attempted shut down of the ECA LNG terminal by the mayor of Ensenada, Cortes contacted several market analysts working for firms in New York and elsewhere in the United States who specialize in research regarding power, utilities, natural gas, liquefied natural gas, and coal.  Sempra is informed and believes that Cortes made false statements to the analysts in an attempt to manipulate Sempra's stock price on the New York Stock Exchange.

53.    On or about February 16, 2011, Cortes sent an email to one such market analyst falsely accusing Sempra of making false statements and violating United States securities laws.  Specifically, Cortes stated that information posted on Sempra's website "is absolutely categorically FALSE, with relation to the representations being made by the company, and this is a clear material violation of SEC disclosure laws, and they are concealing the factual circumstances surrounding their issues in the south, to you, the markets, and the public."  The email included false statements that the ECA terminal was operating illegally.  In the ensuing email correspondence Cortes admitted he was acting on behalf of a client who was seeking compensation for damages from Sempra, whom Sempra is informed and believes is Sanchez Ritchie and his co-conspirator, Azano.

54.    After the February 11, 2011 attempt to shut down the terminal (the "first bomb") failed, Azano and the enterprise devised a new threat to the terminal's operations to force Sempra to pay.  This tactic involved the use of the Mexican Congress, through which they sought to obtain action to shut down the terminal.

1   Sempra is informed and believes that Azano flew one or more members of

2   Congress in his private jet from Mexico to San Diego, California to conspire to plan

3   and carry out this gambit.

4       55.    The enterprise also attempted to increase the pressure on Sempra to

5   "settle" by issuing a press release in the United States on or about February 28,

6   2011, announcing Sanchez Ritchie's "protest with the State and Federal Congress

7   pursuant to the improper reopening of SEMPRA Energy's Mexican LNG Unit."

8   The release quotes Cortes as saying:  "Gone unchecked, this LNG unit that is

9   operating with compromised environmental and safety conditions could result in a

10  natural disaster not unlike the BP disaster in the Gulf."

11      56.    These acts and threats had one aim:  To obtain money from Sempra.

12  The enterprise intended either to shut down the terminal to force Sempra to pay to

13  avoid the economic harm Sempra would suffer as a result, or to make it so

14  expensive for Sempra to continue to defend its rights that it would give in to the

15  demands of the enterprise.

16  **Additional Wrongful Conduct**

17      57.    Sempra is informed and believes that Azano met in the United States

18  with a disgruntled former Sempra employee to conspire regarding the enterprise's

19  smear campaign against Sempra.  Sempra is further informed and believes that

20  Azano paid this former Sempra employee for confidential Sempra information -

21  including confidential documents stolen from Sempra by the former employee - to

22  be used in the enterprise's smear campaign to pressure Sempra to pay.  Certain of

23  the documents were posted on an "anti-Sempra" Facebook page, which Sempra is

24  informed and believes was operated by the enterprise, with misrepresentations as to

25  their import.

26  **Open and Close Ended Continuity**

27      58.    The actions of the RICO enterprise are continuous.  They occurred

28  over a substantial period of time (from 2008 through 2011), and Sempra is

1    informed and believes that there is a substantial threat that the actions are

2    continuing and will continue unless and until Sempra obtains relief from this Court.

3        **Damages**

4        59.    While the attempt to shut down the natural gas terminal failed, the

5    proceeding initiated by Sanchez Ritchie continues and Sempra has been required to

6    spend significant time and resources – for example, in dealing with the attempt by

7    Azano and Sanchez Ritchie to interfere with the operations of the LNG terminal

8    through a raid by a paid official and in dealing with false statements directed to the

9    United States securities industry.

10       60.    In addition to the harm suffered in connection with the shutdown,

11   Sanchez Ritchie and Azano's acts have caused Sempra further injury flowing from

12   the actions taken by the pair in order to extort money from Sempra.  In part because

13   of the pair's representative's public lies that the terminal is in violation of its license

14   and would be closed, Sempra suffered an unwarranted loss of goodwill and

15   business reputation.

16       61.    Sempra has also been harmed because ECA has had to spend large

17   sums of money based on the need to defend against the attacks described above,

18   including increased security costs, public relations efforts, and legal fees and costs.

19   Causing ECA to pay this money is part of the pair's scheme to make it more

20   expensive to defend against unwarranted attacks than to settle them.

21       62.    In furtherance of their RICO enterprise, Sanchez Ritchie and Azano

22   are going to continue to try to extract money from Sempra and to continue to cause

23   Sempra harm during the process.

24                    **FIRST CLAIM FOR RELIEF**

25               **(Civil RICO Pursuant to 18 U.S.C. § 1962(c))**

26       63.    Counter-Complainant incorporates by reference each and every

27   allegation contained in Paragraphs 1 through 62 as though fully set forth herein.

28

64.     Through the partnership establishing the Agreement and conspiracy, Counter-Defendants are engaged in a RICO enterprise.

65.     The Counter-Defendants' enterprise engaged in conduct constituting racketeering activity.  This pattern of racketeering activity includes, but is not limited to, bribery of Mexican officials, conspiracy, extortion, and attempts to extort a substantial payment from Sempra through threats to ECA and the LNG plant.

66.     Sempra has been injured by reason of the pair's violations of 18 U.S.C. Section 1962(c), and the pair aims to gain substantial sums of money through their actions.

## **PRAYER FOR RELIEF**

WHEREFORE, Counter- complainant demands judgment against Counter-Defendants as follows:

1.     For compensatory damages;

2.     For treble damages as allowed under the RICO statute;

3.     For injunctive relief, including but not limited to, an order enjoining the pair - or anybody acting on behalf of the pair - from participating in wrongful conduct against Sempra;

4.     For attorneys' fees and costs; and

5.     For any other such remedies as this Court deems appropriate under the circumstances.

Dated: February 21, 2012                MORRISON & FOERSTER LLP


By:  ___/s/Mark C. Zebrowski_____
          Mark C. Zebrowski
          MZebrowski@mofo.com

Attorneys for Defendant and
Counter-Complainant
SEMPRA ENERGY

1

**CERTIFICATE OF SERVICE**

2  The undersigned hereby certifies that on February 21, 2013 a true and correct

3  copy of SEMPRA ENERGY'S FIRST AMENDED COUNTER COMPLAINT

4  FOR RICO VIOLATIONS was transmitted electronically to the Electronic Filing

5  System of the United States District Court for the Southern District of California

6  which, under Local Civil Rule 5.4(b) &(c), is believed to have sent notice of such

7  filing, constituting service of the filed document, on all Filing Users, all of whom

8  are believed to have consented to electronic service.

9  Executed on February 21, 2013, at San Diego, California.

10  MORRISON & FOERSTER LLP

11

12  By:      /s/Mark C. Zebrowski
        Mark C. Zebrowski
13      MZebrowski@mofo.com

14  Attorneys for Defendant
    SEMPRA ENERGY
15

16

17

18

19

20

21

22

23

24

25

26

27

28