1   HULETT HARPER STEWART LLP
2   KIRK B. HULETT, SBN: 110726
    DENNIS STEWART, SBN: 99152
3   550 West C Street, Suite 1500
4   San Diego, CA  92101
    Telephone:   (619) 338-1133
5   Facsimile:   (619) 338-1139

6
    Attorneys for Plaintiff Ramon Eugenio
7   Sanchez Ritchie
8   [Additional Counsel on Signature Page]

9           **IN THE UNITED STATES DISTRICT COURT**

10          **SOUTHERN DISTRICT OF CALIFORNIA**

11

| | |
|---|---|
| 12  RAMON EUGENIO SANCHEZ RITCHIE, | CASE NO. 10CV1513-CAB(KSC) |
| 13 | **PLAINTIFF'S MEMORANDUM OF** |
|       Plaintiff, | **POINTS AND AUTHORITIES IN** |
| 14 | **OPPOSITION TO DEFENDANT** |
| 15  v. | **SEMPRA ENERGY'S MOTION FOR** |
| 16 | **SUMMARY JUDGMENT OR** |
|     SEMPRA ENERGY, a California | **SUMMARY ADJUDICATION** |
| 17  Corporation, | |
|     | DATE:      August 28, 2015 |
| 18      Defendant. | JUDGE:    Honorable Cathy Ann Bencivengo |
| 19 | CTRM:     4C (4th Floor – Schwartz) |

20

21                          **[SEALED VERSION]**

22

23

24

25

26

27

28

1

## <u>**TABLE OF CONTENTS**</u>

2

3

I.     INTRODUCTION .......................................................................... 1

II.    STATEMENT OF FACTS............................................................ 2

    A.    Securing the LNG Plant Contract ................................... 2

    B.    The Fraudulent Schemes of Sempra and Others to Illegally
        Acquire Plaintiff's Property ........................................... 5

III.    ARGUMENT .............................................................................. 9

    A.    Sempra Cannot Satisfy the Legal Standard for Summary
        Judgment ....................................................................... 9

    B.    Because Sempra's Knowledge at the Time It Instigated the
        Criminal Actions in the Summer of 2006 and in 2009 Is in
        Dispute, Probable Cause Remains a Question of Fact that Must Go
        to the Jury ..................................................................... 10

        1.    The Mexican Court's Interim Orders in September 2006
            and January 2007 Do Not Insulate Sempra from Liability ...... 12

        2.    Sempra is Collaterally Estopped from Re-Litigating the
            Final Findings of the Mexican Courts ...................................... 12

    C.    The Prosecutions Were Procured by Fraud and Perjury.................... 14

    D.    The Investigation Was Neither Independent Nor Free of
        Sempra's Unreasonable Pressures ........................................... 16

    E.    Sempra Acted with Malice.................................................... 19

    F.    The False Criminal Charges Initiated By Sempra Were
        Determined Favorably to Plaintiff ........................................ 22

    G.    The False Criminal Complaints Were Initiated by Sempra................ 22

    H.    Summary Judgment is Improper as to Ritchie's Claims for
        Damages ....................................................................... 24

IV.    CONCLUSION .......................................................................... 25

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Albertson v. Raboff*
    46 Cal. 2d 375 (1956) ........................................................................................ 19

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ..................................................................................... 9, 10

*Awabdy v. City of Adelanto*,
    368 F.3d 1062 (9th Cir. 2004) ........................................................................ 24

*British Midland Airways Ltd. v. Int'l Travel, Inc.*,
    497 F.2d 869 (9th Cir. 1974) .......................................................................... 13

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) .......................................................................................... 9

*Clark v. Bear Stearns & Co., Inc.*,
    966 F.2d 1318 (9th Cir. 1992) ........................................................................ 13

*Conrad v. United States*,
    447 F.3d 760 (9th Cir. 2006) .................................................................... 10, 12

*Daniels v. Robbins*,
    182 Cal. App. 4th 204 (2010) .................................................................... 11, 20

*Davis v. Local Union 11 Int'l Bhd. of Elec. Workers*,
    16 Cal. App. 3d 686 (1971) ............................................................................ 24

*Drummond v. Desmarais*,
    176 Cal. App. 4th 439 (2009) .................................................................... 11, 19

*Ecker v. Raging Waters Group, Inc.*,
    87 Cal. App. 4th 1320 (2001) ......................................................................... 10

*Grindle v. Lorbeer*,
    196 Cal. App. 3d 1461 (1987) ......................................................................... 19

*Jackson v. Beckham*,
    217 Cal. App. 2d 264 (1963) .......................................................................... 24

ii

*Jacobs v. CBS Broad., Inc.*,
   291 F.3d 1173 (9th Cir. 2002) ........................................................... 12

*Lucido v. Superior Court*,
   51 Cal. 3d 335 (1990) ................................................................ 13, 14

*Manco Contracting Co. (W.W.L.) v. Bezdikian*,
   45 Cal. 4th 192 (2008) ....................................................................... 13

*Nationwide Life Ins. Co. v. Bankers Leasing Ass'n, Inc.*,
   182 F.3d 157 (2d Cir. 1999) ............................................................... 9

*Parklane Hosiery Co., Inc. v. Shore*,
   439 U.S. 322 (1979) ........................................................................... 12

*Parrish v. Latham & Watkins*,
   238 Cal. App. 4th 81 (2015) .............................................................. 12

*Peterson v. Highland Music, Inc.*,
   140 F.3d 1313 (9th Cir. 1998) ........................................................... 21

*Real v. Driscoll Strawberry Assoc.*,
   603 F.2d 748 (9th Cir. 1979) ............................................................... 9

*Roberts v. McAfee, Inc.*,
   660 F.3d 1156 (9th Cir. 2011) ................................................ 10, 11, 12

*Sangster v. Paetkau*,
   68 Cal. App. 4th 151 (1998) .............................................................. 11

*Sheldon Appel Co. v. Albert & Oliker*,
   47 Cal. 3d 863 (1989) .................................................... 10, 11, 19, 20

*Starrh & Starrh Cotton Growers v. Aera Energy LLC*,
   153 Cal. App. 4th 583 (2007) ............................................................ 25

*Von Brimer v. Whirlpool Corp.*,
   536 F.2d 838 (9th Cir. 1976) ............................................................. 24

*Walsh v. Bronson*,
   200 Cal. App. 3d 259 (1988) ............................................................. 11

*Williams v. Coombs*,
   179 Cal. App. 3d 626 (1986) ............................................................. 11

*Williams v. Hartford Ins. Co.*,
    147 Cal. App. 3d 893 (1983) ............................................................................ 12

*Wilson v. Parker*,
    28 Cal. 4th 811 (2002) ...................................................................................... 2

**<u>Statutes, Rules & Regulations</u>**

Federal Rules of Civil Procedure
    Rule 56(a) ........................................................................................................ 9

California Civil Code
    § 3333 .............................................................................................................. 25
    § 3334 .............................................................................................................. 25

iv

# I.   **INTRODUCTION**

The crux of this case stems from Sempra having filed a knowingly false criminal complaint against Plaintiff in August 2006. That complaint falsely asserted that Sempra was in legal possession of Plaintiff's Property and that Plaintiff was a "squatter" with no known claim to any interest in the land. Those assertions formed the cornerstone of Sempra's complaint to remove Ritchie from his ranch. Those knowingly false assertions were presented to the prosecutor's office, were consistently reiterated by Sempra to the courts, and were the basis for Ritchie being physically ousted from his ranch in September 2006. After numerous hearings and appeals wherein Sempra repeated the false allegations, the courts of Mexico found as a matter of law and fact that ***Sempra knowingly lied to the prosecutors and to the courts*** when it presented its criminal complaint in 2006 and when it pursued a similar criminal complaint in 2009. Ex. 1, Order of the Tenth District Court of the State of Baja California, dated March 10, 2010 (affirming dismissal of criminal charge against Ritchie).[1] The Tenth District Court concluded, "[I]t is fully ***proven*** that the aggrieved party ENERGÍA COSTA AZUL S. de R.L. de C.V., SEMPRA ENERGY MÉXICO, and SEMPRA ENERGY, had ***knowledge***, since July 18, 2001, that RAMON EUGENIO SANCHEZ had possession of the affected real estate . . . ." *Id.* at 57. The court further found: "Consequently, from the reasoning stated, it has been ***proven*** that the body of the crime of DISPOSSESSION attributed to RAMON EUGENIO SANCHEZ RITCHIE was ***not*** accredited, in consequence, even less, his ***probable*** responsibility in the commission of such crime . . . ." *Id.* at 58. These findings alone defeat Sempra's motion.

Sempra's reliance on an interim court ruling in September 2006, secured with the use of its knowingly false accusations, resulting in Ritchie being ousted from his land and the subsequent proceedings leading to an arrest warrant being

---

[1]   Unless otherwise noted, all "Ex. __" references herein are to the Declaration of Kirk B. Hulett in Support of Plaintiff's Opposition to Defendant Sempra Energy's Motion.  All emphasis is added and all citations omitted, unless otherwise noted.

issued in early 2007, provide it no defense to the claims in this case. Those proceedings were irreparably tainted by Sempra's knowingly false testimony and accusations, and the investigation was not independent or free from Sempra's undue political and other influences. The law is clear that if an interim ruling was obtained by fraud or perjury, or was tainted by the lack of an independent investigation or undue pressure being exerted, the interim ruling does not itself establish probable cause. *Wilson v. Parker*, 28 Cal. 4th 811, 820 (2002).

Accordingly, Sempra's Motion for Summary Judgment must be denied.

## II.   <u>STATEMENT OF FACTS</u>

After much malicious litigation, instituted and pursued by Defendant in 2006 against Plaintiff, Plaintiff was successful in finally obtaining a declaration in October 2007 that there was insufficient evidence of the crime of *despojo*,[2] the crime Sempra falsely asserted against him. *See* Ex. 2 at 178-79. Thereafter, there were appeals pursued at Sempra's behest and a lengthy delay. Finally, in March 13, 2009 the Tenth District Court reiterated that there was insufficient evidence and found consistent with earlier court findings for Plaintiff dating back to the October 2007 Order. Ex. 4 at 199-200. Despite these court rulings, Sempra defied them and failed to return possession to Plaintiff until forced to by the Courts in May 2010. Sempra Energy's First Amended Answer to Second Amended Complaint ("Sempra's Answer"), ¶¶ 30 and 32 [Doc. No. 142]. As noted, the March 10, 2010 Order not only agreed that there was insufficient evidence against Ritchie, but that ***Sempra knowingly lied to prosecutors in securing the arrest warrant and that it was not ever probable that Ritchie had committed the alleged crime of despojo***. Ex. 1 at 59.

### A.   **Securing the LNG Plant Contract**

In or about 2001, Sempra announced its plan to build the Energía Costa Azul

---

[2]  The crime of *despojo* (dispossession) is punishable by imprisonment from one to six years if someone is convicted of occupying or making use of someone else's property. The crime of *despojo* protects possession of property, not ownership. Ex. 3 at 186 (Ibañez Depo. at 54:18-23).

terminal near Ensenada, Mexico (the "LNG Plant"). On or about September 13, 2002, Sempra submitted its applications to obtain the construction and operating permits for the LNG Plant. Sempra's Answer, ¶ 20 [Doc. No. 142]. The application disclosed that the LNG Plant would require hundreds of acres of land for construction and operations, including required setback cushions. These setback cushions were required because of, among other things, the inherent dangers the LNG Plant posed to the community. Ex. 5 at 246-47 (Resp. to Interrog. No. 5).

Several properties, including Plaintiff's, were located in or around the intended boundaries of the LNG Plant and the setback cushion. In or about 2001, Sempra Energy, through Sempra Energy México, retained as its agent Francisco Molina Robles to negotiate ECA's acquisition of the properties located within the boundaries of the LNG Plant. Sempra's Answer, ¶ 20. Sempra Energy, through ECA, began to acquire each of the properties within and around the boundaries of the LNG Plant. ECA paid $149 million pesos (approximately $14 million U.S.) for one adjoining parcel and paid on average about $145,000 U.S. per hectare for all the acreage surrounding the plant. Ex. 6 at 313-14 (Suppl. Resp. to Interrog. No. 10).

As part of this effort, in or about July 2001, Sempra's agent Robles arranged a meeting with Plaintiff, his neighbor, Felipe Lopez Ruvalcaba, and others, at Sanborn's Café in Tijuana, Mexico. Ex. 7 at 319-24 (Ruvalcaba Depo. at 142:1-147:12); Ex. 8 at 345-49 (Ritchie Depo. at 95:1-99:17); Ex. 9 at 373-74, ¶¶ 22-26; Ex. 10 at 418-23 (Figeroa Depo. at 169:14-174:7). Ex. 1 at 58. The purpose of the meeting was to discuss ECA's purchase of Ruvalcaba's and Plaintiff's properties. Ex. 7 at 319-25, 331-32, 335 (Ruvalcaba Depo. at 142:1-148:21, 155:10-156:1, 200:2-15); Ex. 8 at 348-53 (Ritchie Depo. at 98:12-103:22); Ex. 9 at 373, ¶ 22; Ex. 10 at 418-23 (Figeroa Depo. at 169:14-174:7). Ritchie presented Robles with documentation, including his Certificate of Possession from the Secretary of Agrarian Reform, reflecting that he was in lawful possession and the owner of the Property, and informed Robles of his intent to negotiate the sale of his property to

ECA. Ex. 7 at 328-32 (Ruvalcaba Depo. at 152:13-156:1); Ex. 8 at 356 (Ritchie Depo. at 106:20-25); Ex. 9 at 373, ¶ 22; Ex. 10 at 418-23 (Figeroa Depo. at 169:14-174:7). Robles told Ritchie of Sempra's interest in purchasing the land from Ritchie, but he did not contact Ritchie as promised. Ex. 7 at 335 (Ruvalcaba Depo. at 200:2-15); Ex. 8 at 356 (Ritchie Depo. at 106:20-25); Ex. 9 at 373-74, ¶¶ 22-26; and Ex. 10 at 418-23 (Figeroa Depo. at 169:14-174:7).

Thereafter, on January 11, 2005, Sempra was awarded a 15-year natural gas supply contract estimated at $1.4 billion. Sempra's Answer, ¶ 22 [Doc. No. 142]. While Plaintiff's claim does not rise or fall on proof that Sempra "needed" Plaintiff's land, the evidence reveals it surely did. Specifically, when Ritchie was first approached in the 2001 time frame, he was told by Sempra's agent Robles that Sempra needed his land. Ex. 8 at 357-58 (Ritchie Depo. at 111:19-112:21). Which makes sense since the licensing body within Mexico, Semernat, issued an operating condition in approximately 2001 including a statement known as "Condition 5" that required the acquisition of additional land as a "buffer zone" for safety. Ex. 5 at 246-47 (Resp. to Interrog. No. 5). In response, Sempra allegedly re-designed certain of its plans to cause "Condition 5" to be modified and, it argues, eliminated any alleged legal need for the Property. *Id.* Even with that need allegedly eliminated by the redesign, Sempra was already then planning for an expansion of the LNG Plant. Ex. 11 at 431-34 (Hulse Depo. at 82:17-85:4); Exs. 12, 30. As Sempra's CEO of its LNG Division Darcel Hulse testified, Sempra could not submit permit requests until all the necessary property was secured. Ex. 11 at 433-34 (Hulse Depo. at 84:24-85:4). Thus, in 2005, as part of the expansion planning, Sempra renewed its efforts to secure the Property. Only after allegedly buying the land in early 2006 from the Peña/Castañon group, a void purchase (Ex. 18 at 610-14 (Galván Depo. at 66:14-67:11, 93:13-95:16); Exs. 19 and 20), did Sempra file its expansion plan permit request. Ex. 11 at 431-34 (Hulse Depo. at 82:17-85:4); Ex. 12. Sempra's suggestion that its acquisition of the Property was something other than a business "need" is frivolous and contradicted by its own

4

admissions and actions.[3]

## B.  The Fraudulent Schemes of Sempra and Others to Illegally Acquire Plaintiff's Property

In 2005, Sempra knew there were two parties, the Ritchie and the Peña/Castañon groups, claiming an ownership interest in the Property. Ex. 8 at 343-56, 360 (Ritchie Depo. at 93:22-106:25, 246:8-17); Ex. 7 at 324-28, 331-34 (Ruvalcaba Depo. at 147:2-150:11, 152:13-19, 155:10-156:1, 198:13-199:19); Ex. 10 at 418-23 (Figeroa Depo. at 169:14-174:7); Ex. 1 at 58. Peña was a lawyer and Ritchie was a rancher whose rights to the Property were acquired through an Agrarian Reform land grant process. Ex. 9 at 368-72, ¶¶ 1-18. Sempra's dilemma became clear: deal with both parties and pay both Ritchie and Peña/Castañon to avoid the likely lengthy contest over ownership, or await the outcome of a legal contest over ownership rights and incur substantial delays in progressing with its expansion and other LNG plans. Instead, Sempra chose neither of these options and instead initiated a sham purchase process with the Peña/Castañon group which excluded Ritchie. Sempra undoubtedly believed that Ritchie's capacity to challenge Sempra and its army of lawyers and political allies would be weak at best. However, when surprisingly confronted with a determined Ritchie, Sempra chose to exert its political and other significant influence and opted to file knowingly false criminal charges against him, assuming its influence and lies would carry the day and that Ritchie would not only go away, he would be locked away. But for his and his counsel's tenacity and unlikely ability to weather the storm of Sempra's legal and other influences to wrongly wrestle control of the property from him, Sempra would have succeeded. But it did not. Instead, the Mexican courts recognized after much testimony and evidence that Sempra lied to the

---

[3]  Sempra's own internal documents explain that the property was "needed" by Sempra. "[T]he ECA expansion project includes Lot A-3 . . . ." The AFE (Sempra's internal process) states that the land is either *required* for expansion or *must be* purchased to gain the sale of other land we *need* and wanted control of the land. Ex. 13 at 441. *See also* Ex. 14, "buffer zone" land bought for planned expansion. "Property was purchased as a buffer zone for the ECA facility . . . ." Ex. 15 at 450.

1   prosecutors and the courts in attempting to secure Ritchie's arrest and detention. Ex. 1

2   at 58. It is within this background that Sempra's malicious conduct must be viewed.

3        Electing to ignore Ritchie, in or about 2005, as part of its expansion planning,

4   Sempra Energy, through its executive Darcel Hulse, entered into an agreement with

5   Armando Navarro Peña, Gabriela Natera Ramirez, and Dinorah Villafan Gutierrez,

6   who allegedly had a power of attorney to act for Castañon, for the purported sale of

7   Ritchie's Property to ECA. Sempra's Mem. at 2-3. Armed with the purchase

8   agreement, and supported by its political and other powerful allies, Sempra then

9   proceeded to seek the ouster of Ritchie from the land he had occupied and ranched for

10   over 20 years through the filing of a criminal complaint in August 2006. Sempra's

11   Answer, ¶ 73 [Doc. No. 142]; Sempra's Mem. at 4. This was at least in part retaliatory

12   and in response to Ritchie having filed his own complaint against Sempra in July 2006

13   for unlawful occupation. Ex. 16 at 454, ¶ 4.[4]   However, Sempra Energy and its co-

14   conspirators knew that Plaintiff, and not Peña, Ramirez, or Castañon, was the legal

15   possessor of the Property.[5] Ex. 1 at 58; Ex. 8 at 343-56, 360 (Ritchie Depo. at 93:22-

16   106:25; 246:8-17); Ex. 9 at 373, ¶ 22; Ex. 7 at 324-28, 331-34 (Ruvalcaba Depo. at

17   147:2-150:1, 152:13-19, 155:10-156:1, 198:13-199:19); and Ex. 10 at 418-23 (Figeroa

18   Depo. at 169:14-174:7). Sempra and its agents also at least constructively knew given

19   the extensive and typical due diligence one does when acquiring property in Mexico,

20   or recklessly disregarded (Ex. 18 at 610-14 (Galván Depo. at 66:14-67:11, 93:12-

21   95:16); Exs. 19 and 20) that Gutierrez could not lawfully effectuate a sale of the

---

22

23   [4]   Sempra's references to the allegations that Ritchie was waiving a gun around and
     allegedly making threats is irrelevant. Rippa filed a separate criminal complaint about

24   the alleged incident which occurred while Ritchie was on his own property, and that
     complaint amounted to nothing. Ex. 17 at 578 (Rippa Depo. at 69:17-21).

25   [5]   Sempra was told and given supporting documentary evidence in 2001 that:
     Plaintiff had possessed the land for decades (Ex. 1 at 58); Ex. 8 at 343-56, 360

26   (Ritchie Depo. at 93:22-106:25; 246:8-17); Ex. 7 at 324-28, 331-34 (Ruvalcaba
     Depo. at 147:2-150:1, 152:13-19, 155:10-156:1, 198:13-199:19); Ex. 10 at 418-23

27   (Figeroa Depo. at 169:14-174:7); that he built a home there (*id.*); that he occupied
     the land continuously (*id.*); and that he had government-issued documents

28   supporting his claim. *Id.*

1   Property on behalf of Castañon because Gutierrez's power of attorney expired when

2   Castañon died in 2004. Ex. 21 at 660-63 (Paz Depo. at 165:5-168:20); Ex. 20 at 643-

3   44, 652-53, ¶¶ 2.2, 2.3, and 3.3. Given Castañon's death in 2004, the Power of

4   Attorney was a clear nullity and thus Sempra's alleged purchase and claim to

5   possession was a nullity too. Without itself having legal possession, there could be no

6   complaint against another for trespass on land one does not own or otherwise have

7   legal entitlement to possess. Ex. 20 at 644, ¶ 2.3. The Attorney General of Baja

8   California in 2006, Antonio Martinez Luna and his Assistant Attorney General, Sonia

9   Navarro who investigated Sempra's complaint against Plaintiff, have testified that had

10  these facts about Castañon's death in 2004 been known to them, the Attorney

11  General's office would have terminated the investigation and would not have sought

12  and not obtained a provisional order of dispossession. Ex. 22 at 670-72 (Navarro

13  Depo. at 26:16-19, 29:5-30:5); Ex. 23 at 691-94 (Luna Depo. at 23:23-26:9).

14          After a *full* record was developed and presented, the courts of Mexico found that

15  the Sempra entities, through Rippa, an ECA attorney, and another ECA attorney,

16  Gerardo Ranero Puig, as well as Armando Navarro Peña, and others, presented

17  knowingly false testimony purporting to establish that Plaintiff was a trespasser and not

18  entitled to possession of the Property. *See* Ex. 1 at 45, 46, and 58. The fraud went so far

19  as to cause Navarro-Peña to falsely testify in 2006 that Castañon was residing in

20  Nicaragua when in fact she had died in 2004. *Id.* at 45. The Mexican court also found

21  that Robles, Sempra's agent dealing with Ritchie and others in acquiring the properties

22  for Sempra, had lied to the court, causing his testimony to be rejected. *Id.* at 46.

23          In January 2007, based at least in part on Sempra's knowingly false

24  testimony that it knew nothing about Ritchie's claim of possession and that he was

25  simply a "squatter," the First Criminal Judge of Tijuana, Mexico issued an arrest

26

27

28

warrant, but it was ***based on Sempra's false statements***.[6]  That Order was contested and on October 11, 2007, after a full hearing and presentation of evidence by Plaintiff and Sempra, ***the court found that Plaintiff was the lawful possessor*** of the Property and resolved the false criminal complaint in Plaintiff's favor on the merits. Ex. 2 at 178-79. In March 2009, the Superior Court of the Tenth District of Ensenada, Mexico sustained the trial court's findings that Plaintiff was in fact the legal possessor of the Property. Ex. 4 at 199-200. *See also* Sempra's Answer, ¶ 32 [Doc. No. 142]. Despite the October 2007 court findings and subsequent affirmances on appeal, Sempra still refused to allow Ritchie back on his Property. Instead, Sempra remained defiant and continually denied possession to Mr. Ritchie until Sempra was forcibly removed in May 2010. This occurred only after the Mexican court's stinging condemnations and findings that Sempra had perpetrated a fraud on the courts. *See* Ex. 1 at 35, 45-46, 49-50, 52, and 58.

Not content with having lost the criminal complaint it filed in 2006, and the resulting loss of possession of the Property, in April 2009 Sempra caused the Prosecutor to initiate a new criminal complaint against Ritchie based on the same knowingly false accusations it had made in 2006. *See* Ex. 24; Sempra Mem. at 22 ("[T]he 2009 prosecution was based on the same facts as the 2006 prosecution.").[7] As Sempra admits, the Attorney General pursued Sempra's criminal complaint against Plaintiff in 2009 based on no more than what had already been rejected by the courts. *Id.* In pursuit of this renewed prosecution, Sempra Energy and its co-conspirators again presented knowingly false evidence purporting to establish that Plaintiff was not the lawful possessor of the Property. Ex. 1 at 45, 46, and 58. The

---

[6]  As part of the ongoing scheme to maintain unlawful possession of Plaintiff's Property, the Sempra entities, through their representative Robles, asked Plaintiff's neighbor, Felipe Lopez Ruvalcaba, to lie to the Attorney General regarding Plaintiff's claim of ownership of the Property. Ruvalcaba refused. Ex. 7 at 335-39 (Ruvalcaba Depo. at 200:25-204:17).

[7]  A purported purchase from Castañon was ineffective given her death in 2004. Ex. 20 at 644, ¶ 2.3.

trial court ultimately rejected Sempra's claims and "acquitted" Ritchie of those renewed false charges, in part because pursuing such claims violated notions of double jeopardy, and that no new evidence had been presented, and he was thus "acquitted" – again. Ex. 24 at 716-17, 726. *See also* Ex. 25 at 742; Ex. 26.

## III.   **ARGUMENT**

### A.   **Sempra Cannot Satisfy the Legal Standard for Summary Judgment**

Summary judgment may only be entered if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The Court may grant summary judgment only if the pleadings, depositions, and admissions on file, together with the affidavits, if any, "shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." *Id.* Because summary judgment is a "drastic device," the moving party bears a "heavy burden" of demonstrating the absence of any triable issue of material fact. *Real v. Driscoll Strawberry Assoc.,* 603 F.2d 748, 753 (9th Cir. 1979); *Nationwide Life Ins. Co. v. Bankers Leasing Ass'n, Inc.,* 182 F.3d 157, 160 (2d Cir. 1999).

In determining whether summary judgment should be granted, the facts and inferences must be viewed in the light most favorable to the non-moving party. *Driscoll,* 603 F.3d at 753. A disputed material fact is not "genuine" unless a reasonable jury could return a verdict for the non-moving party on the basis of deciding that fact in favor of the non-moving party. That is, the determination must be "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail is a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251-52 (1986). On a motion for summary judgment, the moving party bears the burden of "'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325-26 (1986).

Although it is not enough for the party opposing a properly supported motion for summary judgment to "rest on mere allegations or denials of his

9

pleadings," all evidence, and all inference that may reasonably be drawn from the evidence, must be viewed in the light most favorable to the non-moving party. *Anderson,* 477 U.S. at 256. If any genuine issue of material fact appears to the trial court, it is not the function of the trial court to weigh evidence on that issue. Even if the weight or believability of the evidence is clearly in favor of one party, the other party is entitled to a trial by jury to determine the facts. *Id.*

In affirming a plaintiff's action for malicious prosecution, the judge in *Sierra Club Found. v. Graham*, cautioned courts to "not be led so astray" by the claim's purported disfavor as to "defeat the established rights of the plaintiff." 72 Cal. App. 4th 1135, 1148 (1999). In this case, numerous questions of fact exist that preclude a finding as a matter of law that Defendant Sempra had the requisite probable cause to instigate the false criminal charges against Mr. Ritchie.[8]

**B.   Because Sempra's Knowledge at the Time It Instigated the Criminal Actions in the Summer of 2006 and in 2009 Is in Dispute, Probable Cause Remains a Question of Fact that Must Go to the Jury**

Probable cause justifying the initiation of a criminal prosecution exists only where "'it was objectively reasonable for the defendant to suspect the plaintiff had committed a crime'" at the time it instigated proceedings. *Roberts v. McAfee, Inc.*, 660 F.3d 1156, 1164 (9th Cir. 2011); *see also Conrad v. United States,* 447 F.3d 760, 768 (9th Cir. 2006). It is well established that "[w]hat facts the defendant knew is an issue of fact for the jury" that cannot be decided as a matter of law. *Roberts*, 660 F.3d at 1164; *see also Sheldon Appel Co. v. Albert & Oliker*, 47 Cal. 3d 863, 876-77 (1989) ("if the facts upon which the defendant acted in bringing the prior action 'are controverted, they must be passed upon by the jury before the court can determine the issue of probable cause'"). Therefore, if there "is a dispute concerning the facts or beliefs on which the former plaintiff acted, that question must be resolved by a trier of

---

[8] "'One who procures a third person to institute a malicious prosecution is liable, just as if he instituted it himself.'" *Ecker v. Raging Waters Group, Inc.*, 87 Cal. App. 4th 1320, 1329-30 (2001). "The test is whether the defendant was actively instrumental in causing the prosecution." *Id.* at 1330.

10

1   fact." *Drummond v. Desmarais*, 176 Cal. App. 4th 439, 453 (2009), *as modified*

2   (Aug. 18, 2009); *see also Daniels v. Robbins*, 182 Cal. App. 4th 204, 222-24 (2010)

3   ("'When there is a dispute as to the state of the defendant's knowledge and the

4   existence of probable cause turns on resolution of that dispute . . . the jury must

5   resolve the threshold question of the defendant's factual knowledge or belief.'").

6        Moreover, Sempra necessarily lacked the requisite probable cause because it

7   fabricated the entire predicate for its claim. *See Sierra Club,* 72 Cal. App. 4th at 1154

8   ("'A litigant will lack probable cause for his action . . . if he relies upon facts which he

9   has no reasonable cause to believe to be true . . . .'"). Therefore, given that Sempra

10  was aware that the facts it asserted in initiating the Mexican government's criminal

11  complaint against Mr. Ritchie were untrue, *its "knowledge of facts which would*

12  *justify initiating suit is zero, and probable cause is nonexistent." Id.* at 1153-54; *see*

13  *also Roberts*, 660 F.3d at 1164-65. Where "there is evidence that the defendant may

14  have known that the factual allegations on which his action depended were untrue, the

15  *jury* must determine what facts the defendant knew before the trial court can

16  determine the legal question whether such facts constituted probable cause to institute

17  the challenged proceeding." *Sheldon Appel*, 47 Cal. 3d at 881. Determinative of

18  probable cause are those facts "'known to [Sempra] *at the time the underlying action*

19  *was filed.*'" *See Walsh v. Bronson*, 200 Cal. App. 3d 259, 264 (1988); *Williams v.*

20  *Coombs*, 179 Cal. App. 3d 626, 632, n.4 (1986). Sempra thus lacked probable cause

21  for its action if it either "relies upon facts which . . . [it] has no reasonable cause to

22  believe to be true, *or* if [it] seeks recovery upon a legal theory which is untenable

23  under the facts known to [it]." *See Sangster v. Paetkau*, 68 Cal. App. 4th 151, 164-65

24  (1998). Here, the Courts have already concluded as a matter of fact and law that

25  Sempra knew, contrary to the sworn testimony it provided, that Ritchie did have

26  possession of the land. Ex. 1 at 58. This finding alone defeats Sempra's motion.

27

28

1

2

### 1.   The Mexican Court's Interim Orders in September 2006 and January 2007 Do Not Insulate Sempra from Liability

3    Sempra cannot rely on the Mexican courts' interim orders to shield it from

4   liability for malicious prosecution. In a malicious prosecution action, any *prima*

5   *facie* presumption of probable cause created by a subsequent court finding

6   (including the functional equivalent of a grand jury proceeding), may be rebutted if

7   the indictment was, as it was here, based on false evidence or lack of an independent

8   investigation. *See Roberts*, 660 F.3d at 1166; *see also Sierra Club,* 72 Cal. App. 4th

9   at 1153; *Conrad v. United States*, 447 F.3d 760, 768 (9th Cir. 2006); *Williams v.*

10   *Hartford Ins. Co.,* 147 Cal. App. 3d 893 (1983). Even Sempra concedes that an

11   interim order is of no relevance if the prosecutor was subjected to unreasonable

12   pressures, or Sempra knowingly withheld information with the intent to harm the

13   Plaintiff, or Sempra knowingly supplied false information. Sempra Mem. at 19.

14    If "the interim ruling was obtained by fraud or perjury, ***the ruling does not***

15   ***establish probable cause***." *Parrish v. Latham & Watkins*, 238 Cal. App. 4th 81, 97-98

16   (2015). Here, the evidence is compelling that Sempra committed a fraud on the

17   Mexican courts and its agents provided perjured testimony to secure the interim rulings.

18

19

### 2.   Sempra is Collaterally Estopped from Re-Litigating the Final Findings of the Mexican Courts

20    The doctrine of collateral estoppel, or issue preclusion, bars re-litigation of

21   issues argued and decided in prior proceedings, including the Mexican court's

22   findings that Sempra knew Ritchie was legally in possession of the Property.

23   *Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 327 n.5 (1979). Where, as here,

24   federal jurisdiction is invoked on diversity grounds, the Ninth Circuit applies the

25   collateral estoppel rules of the forum state. *Jacobs v. CBS Broad., Inc.*, 291 F.3d

26   1173, 1177 (9th Cir. 2002). California law prohibits re-litigation of issues decided

27   in a prior proceeding if (1) the issue sought to be precluded is identical to the issue

28   decided in the prior proceeding, (2) the issue was actually litigated in the prior

12

proceeding, (3) the issue was necessarily decided in the prior judgment, (4) the prior judgment was final and on the merits, and (5) the party against whom preclusion is brought is identical to or in privity with the party in the prior proceeding. *Lucido v. Superior Court*, 51 Cal. 3d 335, 341 (1990); *Clark v. Bear Stearns & Co., Inc.*, 966 F.2d 1318, 1320-21 (9th Cir. 1992).

Where the parties in the prior action were afforded due process rights, principles of comity dictate that collateral estoppel applies to foreign judgments. *British Midland Airways Ltd. v. Int'l Travel, Inc.*, 497 F.2d 869, 871 (9th Cir. 1974) (approving British judgment and finding that "unless a foreign country's judgments are the result of outrageous departures from our own notions of 'civilized jurisprudence,' comity should not be refused"). The California Supreme Court has held that "California courts must recognize a foreign judgment . . . so long as the judgment is final, conclusive, and enforceable in the country where it was rendered." *Manco Contracting Co. (W.W.L.) v. Bezdikian*, 45 Cal. 4th 192, 201 (2008). Here, the Mexican court orders ruling against Sempra's claims and for Ritchie were final and on the merits. Ex 25 at 741-43, ¶ 1.8. *See also* Ex. 1.

In each proceeding and at each step of each proceeding, Sempra presented its own extensive evidence (*see* October 2007 Order (Ex. 2) and March 2010 Order (Ex. 1)), and when its complaints were rejected, there were appeals. Accordingly, the Mexican court rulings must be given full faith and credit here, and collateral estoppel is properly applied to preclude a re-litigation of Sempra's knowledge of Ritchie's possessory interest in the Property when Sempra falsely testified otherwise. Collateral estoppel precludes re-litigating whether Ritchie was legally on the Property because (1) Plaintiff prevailed against the false trespassing and *despojo* complaints, (2) the issues were actually litigated in the prior proceedings, (3) the issues were necessarily decided in the prior rulings, (4) the prior rulings were final and on the merits, resulting in the eviction of Sempra from the Property after the claims were exhausted by appeals (Ex. 25 at 741-43, ¶ 1.8), and (5) the parties in the proceedings are identical or

13

1 | in privity to those now before this Court. *Lucido,* 51 Cal. 3d at 341.

2 |      **C.**     **The Prosecutions Were Procured by Fraud and Perjury**

3 |      Regardless of the interim findings of the courts in September 2006 and

4 | January 2007, Plaintiff's claim does not fail since the findings were procured by

5 | fraud and perjury. Ex. 1 at 45-46, 57-58.[9]  There were at least three key pieces of

6 | material evidence reasonably known to Sempra and its agents at the time of the

7 | 2006 investigation and provisional possession proceedings that were fraudulently

8 | withheld and affirmatively and knowingly misstated in furtherance of seeking an

9 | order to provisionally dispossess Plaintiff of the Property.

10 |      *First*, as the Mexican courts have conclusively found, Sempra knew in 2001

11 | that Ritchie had valid and legitimate claims to possession of his property, and

12 | learned of that through at least its agent Robles who met with Ritchie and others at

13 | Sanborn's restaurant in Tijuana. Ex. 1 at 58. Despite this knowledge, Sempra lied to

14 | prosecutors and the courts by stating that it knew of no such entitlement. *Id.* at 45-

15 | 46, 57-58. These findings preclude reliance on any interim order Sempra asserts as

16 | giving it a basis for establishing probable cause.

17 |      *Second*, Sempra and its co-conspirators knew in 2006, or at least recklessly

18 | disregarded, (Ex. 20 at 643-44, 652-53, ¶¶ 2.2 and 3.3; Ex. 21 at 656-59 (Paz Depo. at

19 | 160:20-163:10)), that Castañon (one of the alleged "sellers" to Sempra) had died in

20 | 2004, making the alleged sale by her to Sempra on January 31, 2006 a nullity as a

21 | matter of law. Ex. 20 at 644, ¶ 2.3. If Sempra's possession was not valid, there could

22 | be no *despojo* claim regardless of Ritchie's possession. Ex. 27 at 969-77 (Orenday

23 | Depo. at 50:18-51:6, 55:5-56:22, 67:6-71:6). Indeed, at least one basis for the Mexican

24 | court later affirming Plaintiff's right to possession was the revelation in 2008 (due to

25 | Ritchie's efforts) that Castañon had died in 2004, making the earlier Power of

26 | Attorney she had allegedly signed many years earlier a nullity upon her death. *Id.*

27 |

28 | [9]  *See* Ex. 27 at 968, 975-85 (Orenday Depo. at 42:5-12, 69:23-71:6, 76:22-80:21; 97:2-99:6); Ex. 40.

14

1   Antonio Martinez Luna, the Attorney General of Baja California from 2001-2007, and

2   Sonia Navarro, an Assistant Attorney General in 2006 who investigated Sempra's

3   claims against Plaintiff, both testified under oath that had the Attorney General's office

4   known that Castañon had died in 2004, there would have been no further investigation

5   of Plaintiff and no prosecution. Ex. 22 at 670-72 (Navarro Depo. at 26:16-19, 29:5-

6   30:5); Ex. 23 at 691-94 (Luna Depo. at 23:23-26:9).

7        *Third*, Sempra, but not the Prosecutors, knew in 2006 (because it was

8   fraudulently withheld from the prosecuting Attorney General) that one of the

9   alleged sellers of the Property to Sempra, Castañon, through the other seller,

10  Attorney Peña, had in 1999 applied for, ***and been denied in 2001***, a legal

11  declaration from the Mexican courts that the purported sellers to Sempra (Navarro-

12  Peña and Castañon) were the legal possessors of the Property. Ex. 22 at 673-74

13  (Navarro Depo. at 33:21-34:21); Ex. 23 at 694-705 (Luna Depo. at 26:24-37:8).[10]

14  Attorney General Luna testified that the August 2001 *Amparo* ruling was against

15  Castañon and was a key piece of evidence that was *not* provided to him by Sempra.

16  Ex. 23 at 696, 703-05 (Luna Depo. at 28:17-20, 35:22-37:8). Luna testified that had

17  he known of this 2001 Mexican court ruling against Castañon's possessory

18  interests, *a court ruling Sempra had in its business files* (SEMPRA_0054152-

19  54210) but which was withheld from the prosecutor (Ex. 23 at 703-05 (Luna Depo.

20  at 35:22-37:8)), the prosecution would *not* have proceeded. Ex. 23 at 694-97 (Luna

21  Depo. at 26:3-29:25). As prosecutor Luna testified, this ruling eliminated

22  Castañon's claim to possession and thus any claim Sempra had to legally possess

23  the Property since Castañon could not legally have transferred a right she did not

24  have. *Id.* As Luna testified, this Order contradicts Sempra's representations to him

25  and his staff while pursuing its criminal complaints against Ritchie. Ex. 23 at 702-

26  _____

27  [10]  The Order was an *Amparo* dated August 14, 2001 in Case No. 849/96. Ex. 23 at 694-96 (Luna Depo. at 26:24-28:1). *See* Ex. 29 (2001 Amparo Order). Exhibit 29

28  is a certified English translation of deposition Exhibit C which was attached to both the Sonia Navarro and Antonio Luna sworn statements.

1  05 (Luna Depo. at 34:4-37:8). Since Sempra had this Order in its files, it can be

2  reasonably inferred by a finder of fact that it was withheld to mislead the

3  Prosecutor, especially when Sempra had provided him a copy of an earlier dated

4  ruling from the same case file, No. 849/96. Ex. 23 at 702 (Luna Depo. at 34:4-8).[11]

5      Mr. Luna's Assistant Attorney General Sonia Navarro similarly testified that had

6  this material fact, i.e., the existence of the August 2001 Amparo Order against Castañon,

7  been disclosed, a fact she testified Sempra had a duty to disclose, the investigation

8  would have terminated and no action to dispossess Plaintiff from the Property would

9  ever have proceeded. Ex. 22 at 673-74 (Navarro Depo. at 33:21-34:21).[12]

10
11  **D.    The Investigation Was Neither Independent Nor Free of Sempra's Unreasonable Pressures**

12      The so-called "independent investigation" by Mexican officials was ***anything***

13  ***but independent and reeks of improper influence***. The sworn testimony of the Lead

14  Prosecutor, Attorney General Antonio Luna, establishes that at the beginning of the

15  investigation, he was called to a meeting at the Lt. Governor's office where Sempra

16  was already then meeting with the Lt. Governor regarding the criminal charges

17  Sempra was pursuing. Luna was then heavily pressured by the Lt. Governor of Baja

18  California to speed the investigation along and push it in Sempra's favor. Ex. 23 at

19  686-90 (Luna Depo. at 10:20-12:14, 13:15-14:1); Sempra's Answer, ¶ 82 [Doc.

20  No. 142]. Luna was instructed by the Lt. Governor to side with Sempra and he felt

21  "compelled" to follow the Lt. Governor's "order" to find in Sempra's favor. Ex. 23 at

22  706-07 (Luna Depo. at 40:8-41:6). Luna was also quite aware when being so ordered

23  of Sempra's enormous political and economic power. *Id.* The Attorney General is

24

---

25  [11]  A review of the Prosecutor's files (SEMPRA_0054612-57780, *see* Linderman Decl., Ex. G (Ibañez Report) at 99, ¶ 7 [Doc. No. 226-2]), confirms Luna's

26  testimony. The Prosecutor's files that were presented to the Courts to obtain the interim rulings against Ritchie (SEMPRA_0054612-57780) do *not* contain a copy

27  of the August 14, 2001 Amparo Ruling, but Sempra's files do. *See id.*

28  [12]  Withholding information from the prosecutor's office constitutes obstruction. Ex. 3 at 187-88 (Ibañez Depo. at 55:15-56:2).

appointed by the Governor, and can terminate the Attorney General at any time. Ex. 3 at 189 (Ibañez Depo. at 64:21-24). Not coincidently, the Lt. Governor of Baja California, who ordered Luna to move forward against Ritchie, was later hired by Sempra as an executive. Ex. 21 at 664 (Paz Depo. at 173:4-6). Sempra also admits to having met repeatedly with the Governor of Baja during the pendency of the so-called investigation and before the complaint was initiated to remind the Governor of the importance of the LNG Plant to Baja's prosperity. Ex. 17 at 589-97 (Rippa Depo. at 87:22-89:19, 121:4-126:8).[13]   Sempra also routinely met *ex parte* with Judges to discuss pending matters relating to Ritchie.[14] Ex. 17 at 598-603 (Rippa Depo. at 134:5-139:8). Indeed, the Mexican Appeals Court took issue with the failed process of the lower court's dealing with the Ritchie criminal charges. Ex. 1 at 35-36, and 44. Moreover, the prosecution was unusually rushed, especially given that it was a prosecution for alleged criminal trespass. Plaintiff's expert has testified that such investigations typically take a year or more and rarely results in any interim property restitution orders being sought. Ex. 40 at 1280; Ex. 27 at 983-87 (Orenday Depo. at 97:6-98:1, 99:24-101:5). Sempra's efforts to control the process devolved so far that one of the lead prosecutors who left her position in 2008 was approached two or three times by Sempra's lawyers to "remind" her of what "happened" and to also offer her a job working for Sempra against Ritchie. She declined due to the impropriety of the offer. Ex. 22 at 675-79 (Navarro Depo. at 35:21-39:24).

Sempra even documented some of the unusual and intense political and economic pressure it used to keep Ritchie's criminal case from dissolving. Sempra attorney, and Government Affairs Liaison Rippa, sought and received support from

---

[13]  *See also* Ex. 3 at 188 (Ibañez Depo. at 56:15-24), Sempra's own expert testified that it is not appropriate for the Governor's office to use political influence on a Prosecutor.

[14]  While it may not have been illegal in Mexico in 2006-2008 to conduct such meetings, it was thereafter. Ex. 3 at 190 (Ibañez Depo. at 74:3-10). The reason being, of course, is that such meetings undermine the integrity of the judicial process. At a minimum, it is compelling evidence that the process was lacking in independence.

local government authorities to work with the Attorney General on the Ritchie matter. Ex. 17 at 604 (Rippa Depo. at 160:14-15). Rippa documented that if certain politicians lost the next election, the Ritchie case would suffer and Sempra would lose its influence over the case. Ex. 17 at 605-06 (Rippa Depo. at 168:12-169:20). *See also* Exs. 30, 31. Sempra admitted to receiving support from the Baja state government in dealing with the State Attorney General and state legal system. Sempra wrote, "if PAN [a political party] wins, [Sempra] can expect to receive . . . the same support . . . ." Ex. 30 at 1057. Sempra also bragged that it had reached an agreement with a candidate about the Ritchie case. Ex. 31. Rippa admitted to secretly meeting with a judicial member of the court in Ensenada whom he code-named "Judge 2[th]." According to Sempra lawyer Rippa, he gave "Judge 2[th]" an analysis regarding legal, economic, and political "*consequences of a Sentence in the Sanchez Ritchie case*." Rippa noted that he "*will keep in touch with 'Judge 2[th]' and will implement a legal-political strategy to win the [Ritchie] case*." Ex. 32 at 1162. Sempra also told the lead prosecutor it was "urgent" for it to get back the Property, or huge financial investment would be risked. Ex. 23 at 687-90 (Luna Depo. at 11:22-14:1). These are extraordinary facts revealing at a minimum a seriously tainted prosecution process that was far from independent. *See also* Ex. 40 at 1280 (finding that the circumstances demonstrated the existence of "unlawful influence" on the Prosecutor and that he acted in a hasty and unusual manner). Ex. 27 at 968, 975-85 (Orenday Depo. at 42:5-12, 69:23-71:6, 76:22-80:21, 97:2-99:6); Ex. 40 at 1279-85.

Rippa also testified that he paid $16,000 in cash to a Mexican prosecutor, whose name Rippa cannot recall. Ex. 17 at 579-87 (Rippa Depo. at 77:7-87:14). The cash payment was allegedly for a bond to cover damages Ritchie might suffer. Ex. 17 at 580 (Rippa Depo. at 78:4-14). But, at a minimum it was inadequate and not properly done. Ex. 27 at 988-91 (Orenday Depo. at 104:25-107:6). The next day, there was a raid on Ritchie's Property and he and his family were ousted. Sempra Energy's management then rewarded Rippa with a bonus of nearly

18

1  $20,000. Ex. 17 at 583-85 (Rippa Depo. at 81:17-83:11).

2      The levels of political and other influence Sempra exerted in Mexico to secure
3  the successful launch of its LNG project were so overt that in 2011 FBI agents
4  investigating possible Foreign Corrupt Practices Act violations by Sempra believed
5  there were "ample facts and indicators which reflect that Sempra and its business
6  executives may have engaged in criminal activity as to justify the opening of a full
7  investigation." Ex. 33 at 1169. Specifically, Sempra, under the cover of using a
8  "community trust" fund, offered Ensenada's mayor approximately $7 million for the
9  Trust *if, but only if*, Sempra's use permits were approved. *Id.* at 1167-68; Ex. 11 at
10  435 (Hulse Depo. at 103:3-15). While the government apparently opted not to
11  ultimately prosecute Sempra, there is sufficient evidence of *quid pro quo* favors that
12  a trier of fact could reasonably conclude that Sempra's vast economic and political
13  influence unfairly compromised the so-called independent investigation. As the lead
14  prosecutor testified, he felt enormous pressure from the Lt. Governor, so much so he
15  was "compelled" to follow his "order" to prosecute Sempra's claims against Ritchie.
16  Ex. 23 at 706-07 (Luna Depo. at 40:8-41:6). These facts clearly raise a question of
17  material fact concerning the lack of independence of the prosecution and undue
18  pressures exerted by Sempra.

19      **E.    Sempra Acted with Malice**

20      "***Malice is always a question of fact for the jury.***" *Sheldon Appel*, 47 Cal.
21  3d at 875. "Because malice concerns the former plaintiff's actual mental state, it
22  necessarily presents a question of fact." *Id.* at 874; *see also Drummond*, 176 Cal.
23  App. 4th at 451-52 ("We have no doubt that a jury could infer malice from such
24  evidence."). "Malice means actual ill will or some improper purpose, whether
25  express or implied." *See Albertson v. Raboff*, 46 Cal. 2d 375, 383 (1956). "It may
26  range anywhere from open hostility to indifference." *Grindle v. Lorbeer*, 196 Cal.
27  App. 3d 1461, 1465-66 (1987).

28      "Since parties rarely admit an improper motive, malice" – a requisite element

19

of malicious prosecution – "it is usually proven by circumstantial evidence and inferences drawn from the evidence." *See Daniels v. Robbins*, 182 Cal. App. 4th 204, 225 (2010). Proof of malice can consist of evidence a party *knowingly* brings an action without probable cause. *See Swat-Fame, Inc.*, 101 Cal. App. 4th at 634 ("While after *Sheldon Appel* a lack of probable cause, standing alone, does not support an inference of malice, malice may still be inferred when a party *knowingly* brings an action without probable cause.") (*overruled on other grounds* in *Zamos,* 32 Cal. 4th at 973) (emphasis in original). Correspondingly, "malice can be inferred when a party *continues* to prosecute an action after becoming aware that the action lacks probable cause." *Daniels*, 182 Cal. App. 4th at 226 (2010) (emphasis in original). The so-called registered title holders from whom Sempra claims to have legally bought the property, were not entitled to possess the land and Sempra knew it. *See supra* § II(B). Lying to the Mexican court and prosecutors is also sufficient to show malice.

Sempra seeks refuge from a finding of malice in the alleged representations it received from the sham sellers and of its lawyers who did the pre-purchase due diligence. Surprisingly, Sempra refused to produce the due diligence files it allegedly created, claiming them to be privileged.[15] Ex. 34 at 1177-80 (Resp. to Interrog. No. 2). Sempra does acknowledge it reviewed public filings, including Agrarian Reform files, but has withheld what it learned from its search. *See id*. While Plaintiff filed a Motion to Compel the due diligence files citing the principle that one cannot use attorney communications as a sword and a shield, the motion was denied. *See* Joint Motion Concerning Dispute Regarding Sempra's Privilege Log and Sempra's Improper Withholding of Documents, December 18, 2014 [Doc. No. 197] and Order re Joint Motion for Determination of Discovery Dispute, June

---

[15]   In response to Plaintiff's request for information about what it learned during the due diligence process, Sempra identified five separate communications from attorneys (September 5, 2005, November 15, 2005, October 25, 2005, December 2, 2005, and December 2005), but each of these were withheld from production. *See* Ex. 39 at 1274-77, relevant excerpts (entries numbers 3159, 108, 220, 223, 1193-94) from Sempra's 3,392 entries on its privilege logs.

20

11, 2015 [Doc. No. 218]. Plaintiff's motion was denied in part based on Sempra's express representation to the Court that it was *not* asserting an advice of counsel defense, and yet that is precisely the argument Sempra is asserting here. Based upon Sempra's prior representations, Sempra should be precluded from asserting an advice of counsel defense now. *See generally, Peterson v. Highland Music, Inc.*, 140 F.3d 1313, 1318 (9th Cir. 1998) ("Most defenses . . . may be waived as a result of the course of conduct pursued by a party during litigation.").

So the record is left with vague and grand statements that a due diligence was done, and bald assertions and conclusory statements of what Sempra allegedly learned from its attorneys, but the record holds nothing in the way of admissible evidence to support such claims, and despite its best efforts Plaintiff has been precluded from examining Sempra's records. These gaps and improper "sword and shield" use of the attorney-client privilege makes the opinions of Plaintiff's expert Galván even more necessary for the jury to consider. Mr. Galván will testify about what the real estate due diligence process entails, what Sempra necessarily found therefrom, and he will help establish what the Mexican courts have already concluded: that Sempra knew as early as 2001 and certainly by 2006 that Ritchie had a legitimate claim to the Property and its criminal complaint allegations to the contrary were fraudulent. *See* Ex. 18 at 610-14 (Galván Depo. at 66:14-67:11, 93:12-95:16); Exs. 19 and 20.

In addition to the malice that exists solely from the making of false statements to secure the Property, further facts showing Sempra's malice include that Sempra, through its Managing Attorney Raul Olamendi Smith, retained private investigator Jaime Niebla of Chula Vista, California, for the purpose of harassing and intimidating Plaintiff under the guise of conducting surveillance and reporting on Plaintiff and his family and others, including Plaintiff's lawyer, Omar Paz Arrellano. Ex. 35 at 1188-95 (Niebla Depo. at 6:4-8, 6:22-8:16, 13:5-18, 16:9-19:22); Ex. 8 at 362-65 (Ritchie Depo. at 267:2-268:2, 268:10-269:9, 270:5-12). On or about June 30, 2008, after discovering that he was being followed by Niebla (Ex. 35 at 1196-99 (Niebla Depo. at

21

24:19-27:22)) and reasonably fearing for his physical safety, Plaintiff called the local police to inform them of Niebla's activities. Ex. 8 at 364-65 (Ritchie Depo. at 267:2-270:12). When Niebla called Lt. Governor Aguirre and informed him that the local police had detained him, Aguirre directed Niebla to conceal Niebla's association with Sempra. Ex. 35 at 1200-02 (Niebla Depo. at 28:25-29:4, 39:11-23).

Additionally, within only days after having Ritchie ousted in September 2006 from his ranch, LNG executive Hulse ordered that his ranch house be destroyed. It was not in the way of Sempra's operations, but was razed solely to ruin it and keep "squatters" out. Ex. 11 at 427-30 (Hulse Depo. at 47:22-50:23). Thereafter, in April 2009, having just been told by the Mexican Court of Appeals that Plaintiff could not properly be charged of the crime Sempra had pursued for three years, Sempra proceeded with a second and equally frivolous criminal complaint against Plaintiff arising from the same earlier asserted, but rejected, alleged crimes of trespass. Sempra Mem. at 22; Sempra Answer, ¶ 31 [Doc. No. 142]. These already rejected allegations were especially frivolous and malicious given the body of evidence.

**F.      The False Criminal Charges Initiated By Sempra Were Determined Favorably to Plaintiff**

Sempra hints, (Sempra Mem. at 1:21-22), but does not specifically address, the erroneous proposition that there was not a final and favorable determination in Mr. Ritchie's favor on the merits. Other than this one-liner, Sempra otherwise ignores this element of Plaintiff's claim. For good reason. Sempra has admitted that Plaintiff prevailed against the false charge Sempra filed against him (Sempra Answer, ¶ 30 [Doc. No. 142]), and that as a consequence, Sempra was evicted by Mexican authorities in 2010 and the Property restored to Mr. Ritchie's possession. *Id.*; *see also* Exs. 1, 2, and 24. Moreover, the October 2007, 2009, and March 2010 Orders clearly reflect that the criminal charges were favorably resolved in Richie's favor. *See also* Ex. 25 at 741-42, ¶ 1.8.

**G.      The False Criminal Complaints Were Initiated by Sempra**

Again, Sempra's brief alludes to some possible question about whether the

22

1   false criminal charges were instigated by someone other than Sempra. First, Sempra

2   admits to filing the *despojo* criminal charges in August 2006 (Sempra Mem. at 5),

3   and that Sempra renewed and pursued the complaint in 2009 cannot be seriously

4   contested given Sempra's admissions. *See* Sempra Answer, ¶ 31 [Doc. No. 142] –

5   Sempra admits that in 2009 the Attorney General resumed the criminal prosecution

6   against Plaintiff "relating to *ECA's claim of dispossession*." *Id.* Moreover, a

7   criminal prosecution for alleged trespass necessarily required Sempra to proceed

8   with the charges. And proceed it did, by submitting new declarations supporting the

9   government's renewed claim. Ex. 1 at 41.

10       Sempra attempts to distance itself from the implications of liability for the

11   pursuit of the patently frivolous second prosecution in 2009, a prosecution ***it***

12   pursued. *Id.* It seeks to distance itself from that complaint because by then the

13   courts had already ruled that Plaintiff and ***not*** Sempra was entitled to possession

14   and that there was no basis to prosecute Ritchie for the alleged crime of *despojo*.

15   *See* Sempra Mem. at 22-23. By 2009, even Sempra admits it knew the alleged

16   seller, Castañon, had passed away in 2004, yet continued pursuit of its complaint

17   based on no new facts. Sempra Mem. at 16 and 22. Sempra necessarily pursued the

18   2009 renewed prosecution, since without a complaint there could have been no

19   renewed pursuit of the frivolous and already rejected claims.

20       Sempra does not even argue it had probable cause to pursue the 2009 complaint.

21   The best Sempra can do is argue that the final outcome of that malicious prosecution

22   was resolved on statute of limitations grounds. Sempra Mem. at 22-23. Sempra is

23   wrong. As demonstrated through Plaintiff's expert David Lopez and supporting

24   exhibits, the 2009 prosecution was favorably terminated by way of "acquittal" due to,

25   at least in part, principles of double jeopardy and there being no new facts alleged

26   against Ritchie. *See* Ex. 25 at 741-42, ¶ 1.8; *see also* Ex. 26; Ex. 24 at 714, 717, 726,

27   733. A dismissal "in the interests of justice" satisfies the favorable termination

28   requirement "if it reflects the opinion of the prosecuting party or the court that the

action lacked merit or would result in a decision in favor of the defendant." *Awabdy v. City of Adelanto*, 368 F.3d 1062, 1068 (9th Cir. 2004) (citing *Jackson v. Beckham*, 217 Cal. App. 2d 264 (1963)). In "determining whether the complaint is dismissed on its merits," the Court should consider "whether or not a second complaint could be issued on the same charges, or if the defendant could, in such event, claim the defense of double jeopardy." *Jackson v. Beckham*, 217 Cal. App. 2d 264, 269-70 (1963).

**H.    Summary Judgment is Improper as to Ritchie's Claims for Damages**

Sempra argues that two of several of Plaintiff's damages claims are not recoverable as a matter of law. Sempra is incorrect. As Sempra itself admits, "[t]he basis for the award of damages in a malicious prosecution action is harm resulting 'naturally or directly' from the prosecution." Sempra Mem. at 25 (citing 6A Cal. Jur. 3d *Assault & Other Willful Torts* § 379). Damages arising from a malicious prosecution claim are all damages reasonably caused by Sempra's unlawful conduct. *Davis v. Local Union 11 Int'l Bhd. of Elec. Workers*, 16 Cal. App. 3d 686 (1971). Indeed, "[t]he range of damages potentially recoverable in a malicious prosecution action . . . is strikingly broad." *Von Brimer v. Whirlpool Corp.*, 536 F.2d 838, 847 (9th Cir. 1976). Mr. Ritchie is entitled to recover the "the inconvenience or harm resulting, naturally or directly, from the original prosecution." *Id.*

As detailed above, Mr. Ritchie will introduce evidence at trial demonstrating that the driving force behind Sempra's malicious prosecution of him was to dispossess him of his land, thus opening the door for Sempra to access his Property unhindered, proceed with construction of the LNG Plant, and generate millions of dollars in profits from its operations. Sempra cites no authority – nor can it – that precludes Plaintiff from recovering statutory damages arising from the direct and intended result of Sempra's malicious prosecution, to wit, its unlawful occupation of Plaintiff's land.

Here, the wrongful occupation of Ritchie's land by Sempra was itself directly resulting from the original malicious prosecution. But for its complaint and the seeking of an interim order that Ritchie be ousted before trial, Sempra would not have gained

24

use of the land. The legislature specifically enacted Civil Code § 3334 to provide victims of a wrongful occupation of land with specific *damages* arising therefrom. *Id.* ("The detriment caused by the wrongful occupation . . . is deemed to include the value of the use of the property for the time of that wrongful occupation . . . .").[16] Whether or not these damages were caused by the malicious prosecution at issue is a disputed issue of material fact that may not be properly resolved on a motion for summary judgment. Likewise, Sempra's argument that the diminution of property value is not the "natural" or "direct" result of the malicious prosecution (Sempra Mem. at 25) is a disputed question of material fact. *See, e.g.,* Ex. 38. Plaintiff will offer evidence at trial demonstrating this precise connection. *See* Ex. 36 at 1209-16 (Araiza Depo. at 78:5-81:25, 148:17-23. 149:11-150:18, 152:7-15); Exs. 37 and 38.

Similarly, Sempra's argument that disgorgement is an equitable remedy that cannot be recovered under a malicious prosecution claim is not only unsupported by any relevant case law, but completely ignores the legislature's express language and intent to provide a specific measure of recovery *as damages* for victims of unlawful occupation of land by enacting Civil Code § 3334. *See* Civil Code § 3333 (setting forth tort remedies "except where otherwise expressly provided by this code . . ."). If the jury finds the trespass was the direct result of the malicious prosecution, Plaintiff will be entitled to recover these damages.

## IV.   <u>CONCLUSION</u>

For the reasons set forth above, Defendant's motion for summary judgment should be denied in its entirety.

DATED: August 14, 2015                    HULETT HARPER STEWART LLP


                                          */s Kirk B. Hulett*
                                          KIRK B. HULETT

---

[16]   *Starrh & Starrh Cotton Growers v. Aera Energy LLC*, 153 Cal. App. 4th 583 (2007), upon which Sempra relies, actually supports Plaintiff's position. "[W]e conclude that the term 'benefits obtained' may include profits enjoyed . . . that are directly linked to the wrongful trespass."  *Id.* at 604.

25

550 West C Street, Suite 1500
San Diego, CA  92101
Telephone:  (619) 338-1133
Facsimile:  (619) 338-1139
Email:       kbh@hulettharper.com

Attorneys for Plaintiff Ramon Eugenio
Sanchez Ritchie

WILLIAMS & CONNOLLY LLP
PETER J. KAHN (admitted *pro hac vice*)
WILLIAM P. ASHWORTH
  (admitted *pro hac vice*)
MEGHAN FERGUSON
  (admitted *pro hac vice*)
JAMES GILLENWATER
  (admitted *pro hac vice*)
725 Twelfth Street, N.W.
Washington, DC  20005
Telephone:  (202) 434-5000
Facsimile:  (202) 434-5029
Email:       pkahn@wc.com
             washworth@wc.com
             mferguson@wc.com
             jgillenwater@wc.com

THE LAW OFFICES OF LEONARD B.
  SIMON, P.C.
LEONARD B. SIMON; SBN: 58310
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone:  (619) 338-4549
Facsimile:  (619) 231-7423
Email:       lens@rgrdlaw.com

Of Counsel Attorneys for Plaintiff Ramon
Eugenio Sanchez Ritchie

26