UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RAMON EUGENIO SANCHEZ RITCHIE,<br><br>Plaintiff,<br><br>v.<br><br>SEMPRA ENERGY,<br><br>Defendant. | Case No.: 3:10-CV-1513-CAB-KSC<br><br>**ORDER GRANTING SUMMARY JUDGMENT**<br><br>[Doc. Nos. 226,227,228,229,235] |

After more than five years of spirited litigation, this matter is finally before the Court on Defendant Sempra Energy's ("Sempra") motion for summary judgment. The motion has been fully briefed, and the Court held oral argument on September 3, 2015. For the reasons set forth below, the motion is granted.

## I. Procedural Background

Plaintiff filed his original complaint on July 20, 2010, asserting thirteen claims for relief. [Doc. No. 1.] On December 1, 2010, the Court granted Sempra's motion to dismiss and dismissed the complaint without prejudice. [Doc. No. 12.] Plaintiff then filed a first amended complaint, asserting eight claims for relief. [Doc. No. 17.] On September 19, 2011, the Court granted Sempra's motion to dismiss the first amended complaint, once again dismissing the complaint without prejudice. [Doc. No. 33.] Plaintiff then filed a second amended complaint re-asserting the same eight claims as were asserted in the first

1

amended complaint. [Doc. No. 34.] On May 1, 2012, the Court granted Sempra's motion to dismiss seven of the eight claims and dismissed such claims with prejudice, leaving only a claim for malicious prosecution. [Doc. No. 62.] Now, more than three years later and after a host of discovery and other motions, Sempra moves for summary judgment on the malicious prosecution claim.

## II. Factual Background

Beginning in the early 2000's, Sempra's Mexican affiliate,[1] Energia Costa Azul ("ECA"), acquired numerous tracts of land and rights of way in Baja, Mexico, for the purpose of constructing a liquefied natural gas ("LNG") receipt terminal. [Doc. No. 226-2 at 9.][2] ECA worked with Francisco Molina Robles ("Molina"), and his firm Emetec S.A. de C.V., to effect the purchase of this land. [*Id.* at 9, 50.] Plaintiff's malicious prosecution claim in this litigation arises out of events surrounding ECA's efforts to purchase a piece of land that the parties refer to as Lot A-3.

Lot A-3 consists of two parcels, Fraccion A and Fraccion B. In early 2006, ECA paid $2,261,142 to purchase Fraccion A from Elodia Gomez Castañon ("Castañon"), and $2,251,831 to purchase Fraccion B from Luis Armando Navarro Pena ("Navarro") and his wife, Fabriela Natera Ramirez. [*Id.* at 36, 38, 54-96.] Molina had worked on the purchase on behalf of ECA. [*Id.* at 17, 45.] The transaction was conducted in Ensenada, Mexico, using a notary public. [*Id.* at 54.] Castañon was not present at the sale, but in her stead appeared Dinora Villafan Gutierrez, who purported to have power of attorney for Castañon. [*Id.* at 17, 86.] In fact, Castañon had died in 2004. Darcel Hulse, who was the president of another Sempra subsidiary called Sempra LNG [*Id.* at 7], represented ECA before the notary public. [*Id.* at 17, 86.]

---

[1] There is no evidence of the specific relationship between Sempra and ECA or any of the other entities mentioned in the papers such as Sempra Energy Mexico and Sempra LNG.

[2] All page references to the exhibits provided by the parties with the instant motion are to the page numbers provided by the parties at the bottom of each page, and not the docket page numbering or any page numbering native to the respective exhibit itself.

During the summer of 2006, Plaintiff entered, or attempted to enter Lot A-3 on several occasions. During these instances, Plaintiff deposited motor home shells on the property [*Id.* at 134, 148, 163], threatened ECA employees with a gun [*Id.* at 133, 135-37, 158], and cut his way through a perimeter fence that ECA had erected [*Id.* at 28-29]. In July or August 2006, following the incident with the gun, an ECA representative named Alejandro Enrique Rios Rippa ("Rios"), with the assistance of outside counsel for ECA, filed a criminal complaint in Mexico against Plaintiff. [*Id.* at 133, 135-39.] Rios later supplemented the complaint after the fence-cutting incident. [*Id.*] The Baja California attorney general's office then conducted an investigation into Plaintiff's actions with respect to Lot A-3 and whether he had committed the crime of *despojo,* or "dispossession." [*Id.* at 199-207.] During this investigation, both ECA and Plaintiff provided evidence concerning their claims to possession and ownership of Lot A-3. In addition, the Mexican prosecutor asked for documentation from the Secretary of Agrarian Reform "concerning whether there are titles which acknowledge ownership of [Lot A-3] in the name of [Plaintiff], and whether there is any cancellation of said titles. . ." [*Id.* at 187.] In response to this request, the Secretary of Agrarian Reform stated that "there is a copy of a document titled '**PROPERTY TITLE**' . . . in the name of [Plaintiff], dated November 15, 1994, with respect to the property in question. However, it bears mention that the aforementioned document does not include signature of any authority from this Secretariat of Interior. Furthermore, the document in question has the word '*CANCELLED*' printed on it." [*Id.* at 190-92.]

In January 2007, the First Criminal Judge of Tijuana, Mexico, issued a warrant for Plaintiff's arrest for the crime of dispossession based at least in part on the statements from ECA representative Rios and another representative named Gerardo Ranero Puig. [*Id.* at 198-207.] The criminal proceeding then wound its way through the Mexican court system, resulting in various written rulings. In February 2007, during a process called the "pre-instruction" phase that lasted six days, Plaintiff was allowed to present any evidence he wanted to prove that he did not commit the crime of dispossession. [*Id.* at 178] During

3

3:10-CV-1513-CAB-KSC

this phase, Plaintiff offered his own written statement and oral testimony [*Id.* at 220], testimony from at least seven witnesses [*Id.* at 224-255],[3] and documentary evidence concerning Plaintiff's claimed possession of Lot A-3 [*Id.* at 221]. Plaintiff also presented evidence of a 2001 meeting between Molina and Plaintiff "concerning an offer for the sale of [Lot A-3] by [Plaintiff]" that he claimed demonstrated that ECA was aware that Plaintiff possessed Lot A-3. [*Id.* at 235, 276.][4] Notwithstanding Plaintiff's evidence, on February 24, 2007, the Second Criminal Court in Ensenada, Mexico, issued an order of imprisonment of Plaintiff "as the probable responsible party for the commission of the crime of **DISPOSSESSION** in detriment of [**ECA**]." [*Id.* at 281-82]

Plaintiff challenged this ruling in a collateral proceeding and ultimately succeeded in having the February 24, 2007, decision reversed. [Doc. Nos. 238-3 – 238-5, and 238-7.] Following this collateral proceeding, a new criminal action was brought against Plaintiff for the crime of dispossession. This new criminal action was dismissed in 2010, with a written ruling stating, among other things, that: (a) "it is fully proven that the aggrieved party [ECA], SEMPRA ENERGY MEXICO, AND SEMPRA ENERGY, had knowledge, since July 18, 2001, that [PLAINTIFF] had possession of the affected real estate"; and (b) ECA had "inappropriately" acquired Fraccion A from Castañon because Castañon had died on October 10, 2004. [Doc. No. 238-2 at 57-58.]

Although this last decision terminated the criminal proceedings against Plaintiff concerning his actions at Lot A-3 in the summer of 2006, civil litigation concerning

---

[3] Those witnesses were Jose Luis Torres Martinez, Carlos Javier Figueroa Murillo, Felipe Lopez Ruvalcava, Humberto Castillo Villalobos, Aurelia Carrillo Hernandez, Jamie Osuna Rico, and Francisco Javier Paz Lucero. [Doc. No. 226-2 at 224-255.] Plaintiff included excerpts of depositions of Murillo and Ruvalcava in support of his opposition to the instant motion.

[4] The February 24, 2007 ruling from the Mexican court acknowledged that Murillo "stated that he knows [Molina], in his capacity as mediator of [ECA] for the purchase of lands located near [Lot A-3], was aware that [Plaintiff] held the possession of [Lot A-3] because on one occasion he had a meeting with him concerning an offer for the sale of said premise by [Plaintiff]." [Doc. No. 226-2 at 276.]

permanent possession of Lot A-3 is still pending in Mexican courts. [Doc. No. 226-2 at 286.]

### III. Legal Standards

The familiar summary judgment standard applies here. A party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). To avoid summary judgment, disputes must be both 1) material, meaning concerning facts that are relevant and necessary and that might affect the outcome of the action under governing law, and 2) genuine, meaning the evidence must be such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Cline v. Indus. Maint. Eng'g & Contracting Co.*, 200 F.3d 1223, 1229 (9th Cir. 2000) (citing *Anderson*, 477 U.S. at 248).

The initial burden of establishing the absence of a genuine issue of material fact falls on the moving party. *See Celotex Corp.*, 477 U.S. at 322-323. If the moving party can demonstrate that its opponent has not made a sufficient showing on an essential element of his case, the burden shifts to the opposing party to set forth facts showing that a genuine issue of disputed fact remains. *Id.* at 324. When ruling on a summary judgment motion, the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### IV. Discussion

The Court has previously determined that California law applies to Plaintiff's malicious prosecution claim. [Doc. No. 62.] In California, "malicious prosecution has been dubbed a disfavored tort because of its potential chilling effect on the willingness of the ordinary citizen to pursue resolution of disputes in court." *Sierra Club Found. v. Graham*, 72 Cal. App. 4th 1135, 1148 (Cal. Ct. App. 1999) (citing *Sheldon Appel Co. v.*

*Albert & Oliker*, 47 Cal. 3d 863, 872 (1989)); *see also Estate of Tucker ex rel. Tucker v. Interscope Records, Inc.*, 515 F.3d 1019, 1030 (9th Cir. 2008) ("Under California law, a malicious prosecution claim is disfavored . . ."). "To prevail on a malicious prosecution claim, the plaintiff must show that the prior action (1) was commenced by or at the direction of the defendant and was pursued to a legal termination favorable to the plaintiff; (2) was brought without probable cause; and (3) was initiated with malice." *Soukup v. Law Offices of Herbert Hafif*, 39 Cal. 4th 260, 292 (2006).

With its motion, Sempra provides evidence that ECA had purchased and taken possession of Lot A-3 and that Plaintiff had performed the acts, including entering Lot A-3 and threatening ECA employees at gunpoint, which led to the Rios making a criminal complaint to the Mexican authorities. Sempra also provides evidence that neither ECA nor Sempra learned of Castañon's death until 2008. Plaintiff's opposition, meanwhile, is heavy on rhetoric and light on evidence. Even where Plaintiff cites to evidence, more often than not the cited evidence does not support the factual statement in Plaintiff's brief for which it was cited. In the end, a careful review of Plaintiff's opposition and evidence in support thereof reveals, as discussed in detail below, that Plaintiff does not have any evidence that could establish any of the three elements of his malicious prosecution claim.

### A. There No Evidence of Any Involvement By *Sempra* In The Criminal Prosecution of Plaintiff

The first element of a malicious prosecution claim actually has two subparts. First, the prior action must be been commenced by or at the direction of the defendant. Second, the prior action must have been resolved in favor of the plaintiff. Plaintiff's malicious prosecution claim is premised on the Mexican criminal court proceedings against Plaintiff that began in 2006. Although Plaintiff arguably has identified evidence sufficient to create a genuine issue of material fact as to whether the criminal prosecution against him was pursued to a legal termination favorable to him, there is no competent evidence that *Sempra*, as opposed to ECA or ECA representatives, directed or had any involvement whatsoever in the Mexican criminal proceedings.

Under California law, "the malicious prosecution plaintiff must plead and prove that the prior proceeding [was] commenced by or at the direction of the malicious prosecution defendant." *Womack v. County of Amador*, 551 F.Supp. 2d 1017, 1031 (E.D. Cal. 2008). The malicious prosecution defendant in this case is Sempra. Although Sempra concedes that ECA was involved in bringing criminal charges against Plaintiff, Sempra does not concede that Sempra was involved. Moreover, while Plaintiff's opposition repeatedly asserts that Sempra was responsible for the criminal proceedings, none of Plaintiff's citations to evidence (when there were citations) support an argument that Sempra had any involvement in the criminal proceedings against Plaintiff.

Plaintiff's primary support for his claim that Sempra was involved in the criminal proceedings against Plaintiff is the 2010 ruling from the Mexican appeals court reversing the lower court and stating that Sempra and ECA knew since 2001 that Plaintiff had possession of Lot A-3. [Doc. No. 238-2 at 57-58.] Plaintiff's reliance on this ruling is misplaced. The Mexican court's factual finding concerning Sempra's knowledge in 2001 is inadmissible hearsay and is not judicially noticeable here as evidence that Sempra or ECA in fact knew that Plaintiff had possession of Lot A-3. *Wyatt v. Terhune*, 315 F.3d 1108, 1114 n.5 (9th Cir. 2003) ("Factual findings in one case ordinarily are not admissible for their truth in another case through judicial notice."), *overruled on other grounds by Albino v. Baca*, 747 F.3d 1162 (9th Cir. 2014); *see also Impac Funding Corp. v. Endresen*, No. SACV 15-588-JLS RNBX, 2015 WL 3970482, at *3 (C.D. Cal. June 30, 2015) ("[A] court may take judicial notice of the existence of another court's opinion, or of the filing of pleadings in related proceedings; the Court may not, however, accept as true the facts found or alleged in such documents.") (internal citations omitted).

Second, contrary to Plaintiff's argument, the Mexican court's 2010 ruling is not subject to collateral estoppel against either ECA or Sempra as neither entity was a party to, or in privity with a party to, the Mexican criminal proceedings against Plaintiff. *See generally White v. City of Pasadena*, 671 F.3d 918, 927 (9th Cir. 2012) ("[T]he party against whom preclusion is sought must be the same as, or in privity with, the party to the

former proceeding.") (quoting *Lucido v. Superior Court*, 51 Cal. 3d 335, 341 (1990)).[5] Accordingly, it would be impermissible for the Court to consider the Mexican courts' factual findings, which Plaintiff offers for the truth of the matter asserted, in connection with the instant summary judgment motion.

Plaintiff's other citations to the record simply do not support Plaintiff's argument that Sempra was involved in Plaintiff's criminal prosecution. Plaintiff repeatedly cites to testimony from witnesses who owned land around Lot A-3 that they participated in a 2001 meeting at a restaurant with Molina and Plaintiff where the purchase of Lot A-3 was discussed. Plaintiff argues that this meeting somehow proves that Sempra knew that Plaintiff owned Lot A-3. However, Sempra's knowledge of the 2001 meeting, and its knowledge of Plaintiff's ownership claims generally, are irrelevant to the issue of whether Sempra was involved in the 2006 criminal complaints against Plaintiff. The undisputed evidence is that Rios, who worked for ECA, filed the criminal complaints against Plaintiff. [Doc. No. 22 at 133, 135-38.] Plaintiff does not point to any evidence of any criminal complaints filed by Sempra employees or even any testimony from Sempra employees during the criminal investigation and court proceedings. Nor does Plaintiff present any facts or legal authority that would support an exception to the general rule that Sempra is not liable for the acts of its subsidiaries. *See generally United States v. Bestfoods*, 524 U.S. 51, 61 (1998) ("It is a general principle of corporate law deeply 'ingrained in our economic and legal systems' that a parent corporation (so-called because of control through

---

[5] Plaintiff also fails to establish most of the other requirements for collateral estoppel to apply against Sempra (or ECA), including that "(1) 'the issue sought to be precluded from relitigation must be identical to that decided in a former proceeding'; (2) the issue to be precluded 'must have been actually litigated in the former proceeding'; [and] (3) the issue to be precluded 'must have been necessarily decided in the former proceeding.'" *White*, 671 F.3d at 927 (quoting *Lucido*, 51 Cal. 3d at 341). Further, even if all of the other elements were satisfied, applying collateral estoppel here is improper because it "would violate well-established principles that litigants and attorneys who bring a legally tenable action are not subject to liability for malicious prosecution simply because a trier of fact disbelieves their version of conflicting evidence and makes findings adverse to them." *Plumley v. Mockett*, 164 Cal. App. 4th 1031, 1050 (Cal. Ct. App. 4th 2008).

8

ownership of another corporation's stock) is not liable for the acts of its subsidiaries.").
For these reasons alone, Sempra is entitled to summary judgment.[6]

### B. ECA Had Probable Cause To Pursue Criminal Charges Against Plaintiff

Even assuming that Sempra could be held liable for ECA's actions in connection with the criminal complaint against Plaintiff, and that ECA's knowledge at the time it initiated the criminal complaint could be imputed to Sempra, Plaintiff does not offer any evidence demonstrating that ECA lacked probable cause when initiating the criminal investigation of Plaintiff. "Probable cause . . . is a question of law that turns on whether the underlying claim was 'legally tenable, as determined on an objective basis.'" *Estate of Tucker*, 515 F.3d at 1031 (quoting *Padres L.P. v. Henderson*, 114 Cal. App. 4th 495, 517 (2004)). "Probable cause for the initiation of a criminal prosecution exists where 'it was objectively reasonable for the defendant to suspect the plaintiff had committed a crime.'" *Roberts v. McAfee, Inc.*, 660 F.3d 1156, 1164 (9th Cir. 2011) (quoting *Conrad v. United States*, 447 F.3d 760, 768 (9th Cir. 2006)).

---

[6] At oral argument, Plaintiff claimed that Sempra had not raised the issue of Sempra's responsibility for ECA's actions in Sempra's motion papers and that therefore Plaintiff did not address the issue in its opposition. Although Plaintiff is technically correct that Sempra did not frame its argument specifically around this issue, the heading of the first section of Sempra's argument in its memorandum was: "Undisputed Facts Demonstrate that Sempra is Not Liable for Malicious Prosecution." Further, Sempra never concedes that it is responsible for ECA's conduct, clearly distinguished between Sempra and ECA in its papers, and specifically argued that Plaintiff did not have any evidence sufficient to support any of the elements of its malicious prosecution claim. Faced with Sempra's evidence and argument, and in light of Plaintiff's burden of proof, Plaintiff was required to present sufficient evidence to allow a jury to find *Sempra* liable for malicious prosecution. *Celotex Corp.*, 477 U.S. at 324. Evidence of *ECA*'s actions, without some evidence establishing Sempra's liability for ECA's actions does not satisfy this requirement. Moreover, the Court gave Plaintiff a tentative copy of this order two days before the hearing on this motion, and gave Plaintiff the opportunity to present evidence as to why Sempra was liable for ECA's actions during oral argument. Given this opportunity, the only evidence Plaintiff identified was Sempra's admission in its answer to the second amended complaint that Sempra indirectly owns ECA. Indirect ownership of a subsidiary is insufficient to hold a parent company liable for the subsidiary's actions. *See Bestfoods*, 524 U.S. at 61. In any event, as discussed below, even if Sempra's is liable for ECA's actions, summary judgment is appropriate because Plaintiff does not have any evidence that creates a genuine issue of material fact related to a malicious prosecution against ECA.

"This element requires the trial court to make an objective call as to the reasonableness of the defendant's conduct; that is, to determine whether, on the facts known to defendant, institution of the prior action was legally tenable. If the prior action was objectively reasonable, the malicious prosecution claim will fail." *Sierra Club Found.*, 72 Cal. App. 4th at 1153. "The only potential factual issue for purposes of probable cause is the state of the defendant's knowledge at the time she initiated the underlying lawsuit." *Estate of Tucker*, 515 F.3d at 1031 (internal quotations omitted). "Only those actions that any reasonable attorney would agree are totally and completely without merit may form the basis for a malicious prosecution suit." *Wilson v. Parker, Covert & Chidester*, 28 Cal. 4th 811, 817 (2002) (internal quotations omitted). Thus, "a trial court judgment or verdict in favor of the plaintiff or prosecutor in the underlying case, unless obtained by means of fraud or perjury, establishes probable cause to bring the underlying action, even though the judgment or verdict is overturned on appeal or by later ruling of the trial court." *Id.*

Here, at the first Mexican court, Plaintiff was permitted to present a defense and provided most of the evidence he offers in this action to support his claim that he was not guilty of dispossession because he was the rightful owner of Lot A-3, including that ECA knew of Plaintiff's possession because of the 2001 meeting. The Mexican court considered Plaintiff's evidence and argument but nevertheless issued a ruling that there was evidence sufficient to find Plaintiff guilty of the crime of dispossession. [Doc. No. 226-2 at 282.] This ruling, without more, establishes that ECA had probable cause unless this ruling was obtained by fraud or perjury. *Wilson*, 28 Cal. 4th at 817; *see also Roberts*, 660 F.3d at 1166 ("[U]nder California law, the indictment itself created a *prima facie* presumption that probable cause existed for the underlying prosecution.") (internal quotations omitted).

As this Court previously held when granting Sempra's motion to dismiss the original complaint, "for the fraud exception to apply, 'the fraud alleged to bring the case within the exception . . . [cannot have previously been] presented and rejected by the trier of fact.'" [Doc. No. 33 at 10 (quoting *Plumley*, 164 Cal. App. 4th at 1054).] Here, Plaintiff argues that the Mexican court's original decision was obtained by fraud or perjury because ECA

10

withheld or lied about its knowledge that (1) Plaintiff "had valid and legitimate claims to possession of his property" [Doc. No. 242 at 14], (2) Castañon was dead at the time ECA entered into the transaction to purchase Fraccion A of Lot A-3 from Castañon and Fraccion B of Lot A-3 from Navarro, and (3) in 2001, Castañon and Navarro had unsuccessfully applied to the Mexican courts for a legal declaration of title, called an "amparo" to Lot A-3. Thus, Plaintiff's entire claim hinges on whether ECA (and in turn Sempra, the actual defendant here) knew of these facts at the time of the purchase transaction, or at least before initiating the dispossession proceedings against Plaintiff.[7] Plaintiff's opposition, however, does not cite to any evidence supporting his arguments about the state of ECA's knowledge in 2006. Moreover, even if ECA knew of these facts in 2006, it had probable cause to file a criminal complaint against Plaintiff.

As to ECA's alleged knowledge of Plaintiff's purportedly "valid and legitimate" claims to possession of Lot A-3, Plaintiff's main evidence is the inadmissible factual finding of the Mexican court. *See* Section IV.A., *supra*. The ruling itself, however, does not identify any basis for its assertion that Sempra or ECA had knowledge of Plaintiff's possession claims. Indeed, even Plaintiff's pinpoint citations to other portions of the decision is to the court's description and evaluation of the testimony of Molina concerning the 2001 meeting. Plaintiff fails to explain why any purported false statements by Molina can be attributable to ECA. In any event, Plaintiff's reliance on the 2001 meeting he attended with Molina as evidence of ECA's knowledge that Plaintiff possessed Lot A-3 is misplaced because Plaintiff made this exact argument of fraud or perjury (or at least had the opportunity to make it) to the Mexican courts who issued the initial ruling that he could

---

[7] This argument, and Plaintiff's entire opposition, ignores the fact that ECA purchased Fraccion B of Lot A-3 from Navarro, and Plaintiff does not explain whether or why ECA knew that the purchase of Fraccion B was improper. Plaintiff's tacit acknowledgment that ECA's purchase of Fraccion B of Lot A-3 from Navarro was proper may be sufficient, on its own, to warrant summary judgment. Regardless, because Plaintiff's arguments as to the ECA's knowledge concerning Castañon's death and the propriety of the purchase of Fraccion A are unsupported by evidence, the Court need not base its ruling on Plaintiff's failure to address the purchase of Fraccion B.

be held liable for dispossession. Plaintiff cannot relitigate this factual matter for the purpose of establishing the fraud exception to the presumption of probable cause resulting from the initial rulings in the Mexican criminal proceedings. *Plumley*, 164 Cal. App. 4th at 1056.

Beyond the 2001 meeting with Molina, Plaintiff offers no documentary evidence proving that he clearly owned the land, and even undermines his argument by admitting that in 2005, both Plaintiff and Castañon/Navarro claimed ownership rights in Lot A-3. [Doc. No. 238 at 5.] Plaintiff goes so far as to imply that ECA should have paid *both* him and Castañon/Navarro for Lot A-3 to avoid litigation over title to the property, essentially admitting that his claim to the property was far from clear. [*Id.*] This acknowledgement that ownership of Lot A-3 was disputed is fatal to Plaintiff's claim, because even if ECA was aware of evidence supporting Plaintiff's claims to possession of the property, "[a] litigant or attorney who possesses competent evidence to substantiate a legally cognizable claim for relief does not act tortiously by bringing the claim, even if also aware of evidence that will weigh against the claim." *Wilson*, 28 Cal. 4th at 822; *see also Sangster v. Paetkau*, 68 Cal. App. 4th 151, 164 (Cal. Ct. App. 4th 1998) ("In our system, litigants have the right to present issues that are arguably correct even if it is extremely unlikely that they will win.").

Plaintiff's second argument of fraud or perjury, that ECA or Sempra knew that Castañon was dead and therefore knew that its transaction to buy Lot A-3 was a "sham," is based on nothing more than speculation. *R.W. Beck & Associates v. City & Borough of Sitka*, 27 F.3d 1475, 1480 n.4 (9th Cir. 1994) ("Arguments based on conjecture or speculation are insufficient to raise a genuine issue of material fact. . . ."). Putting aside that Plaintiff offers no explanation as to why ECA would knowingly pay $4.5 million to acquire property from individuals whom it knew did not actually own the property, there is simply no admissible evidence that anyone affiliated with ECA or Sempra knew of Castañon's death until at least 2008. Plaintiff cites to deposition testimony of Plaintiff's Mexican attorney, Omar Paz Arellano, who claimed to have spoken with Abel Ochoa, who,

according to Mr. Paz, was an attorney for Sempra, and is now deceased. Mr. Paz testified that Mr. Ochoa told Mr. Paz that Sempra's representatives knew that Castañon was deceased when ECA purchased Lot A-3. [Doc. No. 238-24 at 660-63.] Mr. Ochoa, however, never told Mr. Paz the names of any specific individuals, only that "Sempra" knew. [*Id.*] Mr. Paz's testimony not based on personal knowledge and is inadmissible hearsay on several levels, and because there is no way in which Plaintiff would be able to offer that testimony to a jury, it does not create a genuine issue of material fact to defeat summary judgment. *See Block v. City of Los Angeles*, 253 F.3d 410, 419 (9th Cir. 2001) (holding it was an abuse of discretion for trial court to consider on summary judgment information in a declaration not made on personal knowledge and based on inadmissible hearsay); *see also Stonefire Grill, Inc. v. FGF Brands, Inc.*, 987 F. Supp. 2d 1023, 1037 (C.D. Cal. 2013) ("[T]he Court may not consider inadmissible hearsay evidence which could not be presented in an admissible form at trial.").

Plaintiff also cites to statements from the Mexican prosecutors involved in the investigation following the initial criminal complaint against Plaintiff that they would not have prosecuted Plaintiff if they had known that Castañon died in 2004. This evidence simply does not support Plaintiff's claim that Sempra or ECA actually knew that Castañon was dead and withheld the information from the prosecutors when the ECA employees filed the criminal complaints in 2006.

As for the 2001 *amparo* proceedings, Plaintiff's evidence of ECA's knowledge is equally non-existent. Plaintiff's sole argument that ECA knew of the 2001 *amparo* proceeding when it initiated the criminal proceedings in 2006 is that Sempra produced a copy of the *amparo* ruling to Plaintiff in this litigation in 2014. However, Plaintiff offers no evidence of when or how ECA or Sempra acquired the copy of this ruling or where the document was located in Sempra's files, such as whether it was with documents related to the purchase of Lot A-3 or with legal files related to the eight plus years of litigation concerning Lot A-3, which is still ongoing [Doc. No. 226-2 at 286.]. Accordingly,

13

Sempra's possession of the *amparo* ruling in 2014 is not sufficient, without more, to allow an inference that Sempra was aware of the ruling in 2006.[8]

Ultimately, there is no dispute that (1) ECA paid $4.5 million to purchase Lot A-3 from Castañon and Navarro, (2) after the transaction, ECA took possession of the land and put a fence around it, (3) Plaintiff was not on the land when ECA took possession, and (4) while ECA was on the land, Plaintiff cut through the fence and threatened ECA employees at gunpoint.[9] Following all of these events, ECA initiated the criminal proceedings at issue here. There is no evidence that Plaintiff's claimed ownership of Lot A-3 was unquestionable, let alone that ECA (or Sempra) *knew* for certain that Plaintiff owned Lot A-3 (or conversely that ECA had no legally tenable to claim ownership of Lot A-3) when ECA initiated the criminal proceedings. Indeed, Plaintiff does not even argue that ECA's purchase of Fraccion B from Navarro was improper, and possession of Lot A-3 as a whole is still the subject of litigation in the Mexican courts a full nine years later. [Doc. No. 226-2 at 286.] Moreover, even if ECA withheld information about Plaintiff's claims to ownership of Lot A-3 or the 2001 *amparo* proceeding, this fact would not necessarily render the criminal complaint based in part on Plaintiff threatening ECA employees at gunpoint, objectively unreasonable. *See generally Roberts*, 660 F.3d at 1164 ("("[U]nder California law, lying about the facts is not enough to destroy probable cause. . . [A] defendant who fabricates evidence still acts with probable cause if the defendant is aware of other evidence which would make it objectively reasonable to suspect the plaintiff's

---

[8] It bears noting that Plaintiff does not argue that the 2001 *amparo* ruling supports his claim to ownership of Lot A-3. Even if ECA knew of the *amparo* in 2006, it is unclear why such evidence would be relevant to ECA's criminal complaint against Plaintiff.

[9] When asked whether he had ever pointed a firearm at someone he understood to be working for ECA or Sempra, Plaintiff refused to answer on the grounds that the question called for self-incrimination. [Doc. No. 226-2 at 158.] Because Sempra has presented independent evidence that Plaintiff threatened ECA employees with a gun [Doc. No. 226-2 at 133-37], an adverse inference can be drawn from Plaintiff's refusal to answer questions about the incident. *See Doe ex re. Rudy-Glanzer v. Glanzer*, 232 F.3d 1258, 1264 (9th Cir. 2000) ("[A]n adverse inference can be drawn when silence is countered by *independent evidence* of the fact being questioned. . . .").

guilt."); *Sangster*, 68 Cal. App. 4th at 167 ("If undisputed facts in the record do establish an objectively reasonable basis for bringing the underlying action, the existence of other, allegedly disputed facts is immaterial.").

In sum, based on the undisputed facts, ECA had probable cause to initiate the criminal proceedings against Plaintiff. Accordingly, Sempra is also entitled to summary judgment on this ground.

### C. There is No Evidence That Sempra Acted With Malice

"The 'malice' element of the malicious prosecution tort relates to the subjective intent or purpose with which the defendant acted in initiating the prior action. . . ." *Estate of Tucker*, 515 F.3d at 1030 (quoting *Sheldon Appel Co.*, 47 Cal. 3d at 874). Although malice is usually a question of fact for the jury, "[s]ummary judgment on the basis of lack of malice is nonetheless appropriate when there is no evidence from which a reasonable fact finder could conclude that the defendant pursued the underlying action with malice." *Id.* "[W]here malice must be shown, only 'other, additional evidence' apart from a lack of probable cause, is sufficient." *Id.* at 1032 (quoting *Swat-Fame, Inc. v. Goldstein*, 101 Cal. App. 4th 613, 634 (Cal. Ct. App. 2002). In other words, "a lack of probable cause, standing alone, does not support an inference of malice." *Id.* (quoting *Swat-Fame*, 101 Cal. App. 4th at 634); *see also Downey Venture v. LMI Ins. Co.*, 66 Cal. App. 4th 478, 498 (Cal. Ct. App. 1998) ("[B]y itself, the conclusion that probable cause is absent logically tells the trier of fact nothing about the defendant's subjective state of mind.").

Here, Plaintiff's primary argument of malice boils down to his unsubstantiated argument that ECA lied to or withheld evidence from the Mexican prosecutors. However, "[a] 'bare assertion that [defendants ] "fabricated" evidence' does not show malice." *Estate of Tucker*, 515 F.3d at 1033 (quoting *Sangster*, 68 Cal. App. 4th at 167). Just as this argument about ECA's alleged lying to or withholding information from the Mexican prosecutors does not pass muster when evaluating the probable cause element of Plaintiff's claim, it is equally unavailing with respect to the element of malice.

15

The only evidence of malice aside from Plaintiff's unsupported assertions that ECA knew that Plaintiff owned Lot A-3 is (1) that Sempra retained a private investigator to surveil Plaintiff and his lawyer in 2008, and (2) that in September 2006 ECA demolished a dwelling structure on Lot A-3 (which Plaintiff claims was his ranch house). Both of these acts, however, occurred after the ECA filed the criminal complaints against Plaintiff. As such, they are not probative of ECA's subjective intent in filing those criminal complaints against Plaintiff. *Id.* at 1034-35 (holding that conduct occurring after the filing of the prior lawsuits was not probative of the defendant's subjective intent in initiating the prior lawsuits). Accordingly, even assuming the other elements of malicious prosecution were satisfied, Plaintiff has not produced sufficient evidence from which a jury could infer that ECA pursued the criminal action against Plaintiff out of malice.[10]

## V. Conclusion

Plaintiff has not presented any evidence that Sempra was involved in the Mexican criminal proceedings underlying his malicious prosecution claim. Further, Plaintiff has not presented any evidence that either ECA or Sempra lied to or knowingly withheld relevant information from the Mexican investigators and Mexican courts. Moreover, regardless of any information ECA may have withheld concerning Plaintiff's claims to ownership of Lot

---

[10] Having concluded that Plaintiff has not identified any competent admissible evidence that could establish any of the three elements of a malicious prosecution claim, the Court need not address in detail, or base this summary judgment ruling on, Sempra's affirmative defense that Plaintiff cannot overcome the presumption that the Mexican prosecutors exercised independent judgment which would defeat the malicious prosecution claim. *Williams v. Hartford Ins. Co.*, 147 Cal. App. 3d 893, 898 (Cal. Ct. App. 1983) ("[I]n most cases, a person who merely alerts law enforcement to a possible crime and a possible criminal is not liable if, law enforcement, on its own, after an independent investigation, decides to prosecute."). That being said, the evidence Plaintiff cites to support his argument that the investigation was not independent is hardly compelling insofar as it consists primarily of evidence of the events that occurred after the investigation concluded and the case entered the Mexican court system. Moreover, the statements of the prosecutors themselves contradict any argument that they did not conduct an independent investigation. [Doc. No. 247-1 at 320-21 and 350-52.] In the end, Plaintiff's argument that investigation was not independent makes sense, if at all, only in conjunction with the argument that ECA or Sempra withheld their knowledge of Castañon's death or of the 2001 amparo proceeding, and as discussed above, there is simply no evidence that ECA knew of these events and withheld the information from the prosecutors.

16

3:10-CV-1513-CAB-KSC

A-3, it was objectively reasonable for ECA to suspect Plaintiff had committed a crime when it filed a criminal complaint after Plaintiff threatened ECA employees at gunpoint and entered Lot A-3 by cutting through a fence ECA had erected. Finally, Plaintiff has presented no evidence that ECA acted with malice in filing the criminal complaints. For each of these reasons, Sempra is entitled to summary judgment. Accordingly, it is hereby **ORDERED** as follows:

1. Sempra's motion for summary judgment [Doc. No. 226] is **GRANTED**;
2. Sempra's motions to exclude the opinions of Plaintiff's preferred experts [Doc. Nos. 227, 228, 229] are **DENIED AS MOOT**;
3. Plaintiff's motion to strike portions of the declaration of Lee Linderman [Doc. No. 235] is **DENIED AS MOOT** because the Court did not rely on any of the disputed evidence in reaching its decision on Sempra's summary judgment motion;
4. The pending motions to file under seal [Doc. Nos. 192, 195] related to since resolved discovery motions are deemed **WITHDRAWN**; and
5. The Clerk of Court is instructed to enter **JUDGMENT** in favor of Sempra and **CLOSE THIS CASE**.

Dated: September 4, 2015

Hon. Cathy Ann Bencivengo
United States District Judge