1                    UNITED STATES DISTRICT COURT

2                  SOUTHERN DISTRICT OF CALIFORNIA

3

4    RAMON EUGENIO SANCHEZ RITCHIE,   )
                                      )
5                        Plaintiff,   )   CASE NO 10CV1513-CAB-KSC
                                      )
6             vs.                     )
                                      )
7    SEMPRA ENERGY,                   )
                                      )
8                        Defendant.   )

9

10                   Transcript Of Motion Hearing
              Before The Honorable Cathy Ann Bencivengo
11             Thursday, September 3, 2015, 2:00 p.m.
                      San Diego, California
12
     For The Plaintiff:
13       Hulett Harper Stewart
         Kirk B. Hulett, Esq.
14       Karen Thomas Stefano, Esq.
         525 B Street, Suite 760
15       San Diego, California 92101

16   For The Defendant:
         Hueston Hennigan LLP
17       Marshall A. Camp, Esq.
         Lee A. Linderman, Esq.
18       523 W. 6th Street, Suite 400
         Los Angeles, California 90014
19

20

21   Proceedings recorded by stenography, transcript produced by
     computer assisted software
22   _____

23              Mauralee Ramirez, RPR, CSR No. 11674
                  Federal Official Court Reporter
24                 333 West Broadway, Suite 420
                   San Diego, California 92101
25                   ordertranscript@gmail.com

1    San Diego, California; Thursday, September 3, 2015; 2:00 p.m.

2         THE CLERK:  10CV1513-CAB-KSC, Ritchie v. Sempra

3    Energy.  This is calendared for a motion hearing.

4         Counsel, please state your appearances.  We'll begin

14:01:02  5    with plaintiff's counsel.

6         MR. HULETT:  Good afternoon, your Honor.  Kirk Hulett

7    on behalf of Eugene Ritchie, plaintiff.

8         MS. STEFANO:  And Karen Stefano as well.

9         THE COURT:  Thank you.

14:01:12  10         MR. CAMP:  Marshall Camp and Lee Linderman for the

11    defendant, Sempra Energy.

12         THE COURT:  Thank you.  All right.  We are on calendar

13    for defendant's summary judgment request.  The Court did issue

14    a tentative early in the week.  I trust that you both had an

14:01:27  15    opportunity to get that and review it.  In light of the

16    tentative, which is in favor of the defendant's motion, I am

17    going to ask if you will yield the floor to the plaintiffs.

18         MR. CAMP:  Certainly, your Honor.

19         THE COURT:  There was a tremendous amount of material.

14:01:42  20    We went through it as best we could.  Our failure to find

21    evidentiary support that raises a material issue of fact here

22    that would meet the elements on which you have the burden of

23    proof.  So if you have specific evidence you feel we've

24    overlooked, please bring is to my attention.

14:02:04  25         MR. HULETT:  Thank you, your Honor.  And it's clear

14:02:06  1  that the Court has reviewed the volumes of material, and it's

2  very helpful to us as the litigants to have your Honor's

3  understanding and factual analysis.  I think that there's one

4  big question is, there's three exceptions to the general rule

14:02:28  5  that an interim judicial ruling would give as a matter of law,

6  probable cause to the defendant.  And there's no dispute that

7  there are three exceptions.  In fact, the exceptions are listed

8  in Sempra's own motion.

9  And those exceptions are, when the defendant here had

14:02:52  10  supplied knowingly false information to the prosecutor at the

11  initial phase back in 2006, that there was withholding of

12  material information from the prosecutor's office back in 2006

13  when the complaints were filed, and finally, if there was a

14  showing of unreasonable pressure or improper prosecutorial

14:03:20  15  intervention by Sempra or others on Sempra's behalf, those

16  three exceptions all exist here.

17  Your Honor has found that the Plumley case is the

18  applicable case here that really ought to be relied upon for a

19  finding by your Honor because Mr. Ritchie presented his version

14:03:50  20  of the facts at the preliminary hearing back in 2006 and 2007,

21  that it was necessarily found that Sempra and its agents had

22  not knowingly lied.  I challenge the defendants or the Court to

23  find anything in the exhibits, which are Exhibits S and T,

24  which are the two intermediary orders relied upon by Sempra for

14:04:18  25  a conclusion that there was a finding necessarily, or a finding

14:04:26   1   at Sempra or its agents had not intentionally lied.  That

2   finding doesn't exist in either one of those.  What is true.

3        THE COURT:  I think you're shifting a burden here that

4   you have because where is your evidence that they knowingly

14:04:45   5   lied?  First of all, that they, Sempra, knowingly lied in 2006?

6        MR. HULETT:  Well, I'd like to address the issue of

7   party -- the proper party here.  I can do that now, if you

8   like.  I was planning on addressing it later, but I can do it

9   now.  There is nowhere in the moving papers where it was

14:05:10   10   challenged that Sempra was a proper party here.  There has been

11   no challenge in their motion that it was some party other than

12   Sempra who was making the representations and is responsible

13   for the charge of malicious prosecution.

14        Your Honor has raised that and identified that as a

14:05:32   15   ground independent of the reasons that Sempra moved for.  And I

16   would just say that if your Honor is intending to stand by the

17   ruling that there is no evidence that it was Sempra, I would

18   ask, first of all, that I think that Rule 56 would require us

19   to be allowed to meet that question since it wasn't presented

14:05:53   20   by Sempra in its motion, and accordingly, we would have

21   sufficient time in which to respond.  The first time this issue

22   was raised was in the tentative ruling we received a couple

23   days ago.

24        Towards that point, as best we could in a short period

14:06:12   25   of time, a couple things struck me.  In our complaint, we

14:06:15   1   alleged at paragraph 8 that Sempra directly owns -- I'm sorry,

2   that's their answer.  We allege that Sempra owns, controls, and

3   operates ECA and Sempra LNG.  And we go on at paragraphs 10

4   through 12 to assert other reasons for alterego theories and

14:06:44   5   control person theories.  They are not dependent.  They are not

6   allegations simply that ECA and Sempra LNG were wholly-owned

7   subsidiaries of Sempra.  That's not the basis.  The basis for

8   the allegations are that Sempra controlled these entities.

9          THE COURT:  Did they admit that in their answer that

14:07:04  10   they owned --

11          MR. HULETT:  Well, I was going to get to that.  At

12   paragraph 8 of their answer, Sempra admits that Sempra

13   indirectly owns Sempra LNG, Sempra Mexico, and ECA, and also

14   admits that it directly owns LNG receipt terminals.  They don't

14:07:26  15   deny -- in that response, they don't deny the allegation that

16   Sempra owns, controls, and operates those entities.  There was

17   no denial that Sempra Energy controlled and operated those

18   subsidiaries.

19          Moreover, given the opportunity, we believe that we

14:07:44  20   could establish through the testimony and through the

21   documentation that Sempra did, in fact, control on a day-to-day

22   basis, and otherwise the subsidiaries in question.  It's just

23   because it was not presented as an issue for dispute.  I know

24   your Honor has rules on motions for summary judgment, and

14:08:11  25   statements for uncontested facts are not part of the process.

14:08:14    1   Obviously we were going through the motion, read through the

2   motion, and there was no contest that Sempra was the proper

3   party.

4              THE COURT:  All right.

14:08:24    5              MR. HULETT:  So with that, I would ask for a

6   continuance on that issue, or if your Honor were to rule --

7              THE COURT:  Well, let's set that issue aside for the

8   moment and assume we're proceeding and Sempra is going to

9   accept that they're responsible for the acts of ECA, then let's

14:08:46   10   get back to your expressions that started with where there is

11   knowingly false or knowingly withheld information.  Other than

12   the statement that they knowingly did that, what is the

13   evidence that you have in the record that they knowingly

14   withheld or gave false information to the prosecutor in 2006?

14:09:09   15              MR. HULETT:  Well, the plaintiff and other witnesses

16   testified that there was a meeting in 2001 with the

17   representative of Sempra, Mr. Molina-Robles where it was

18   provided to him copies of information that Mr. Ritchie was

19   entitled to possession as a matter of law.  The Agrarian Reform

14:09:31   20   Department issued that right of possession.

21              And I note also, a side tack for a moment.  The issue

22   of title seems to keep coming up in this case.  And I

23   understand that Sempra wants to rely on the issue of title, but

24   the issue of title is not relevant to the question of the crime

14:09:55   25   with which Sempra accused Mr. Ritchie.  As Sempra admits in its

14:10:01  1    response and its motion, the Agrarian Reform Department in

2    Mexico issues entitlement to possession.  It's sort of like the

3    old Oklahoma territory days, the government wanted people to

4    cultivate and ranch parcels down in Mexico.  Adverse possession

14:10:18  5    granted to Mr. Ritchie by the Agrarian Reform Department was,

6    in fact, certified deliverance of that information.

7          Through that process, once he gets the right to

8    possession, which he did receive in 1994, thereafter there is a

9    process by which he can obtain legal title.  But whether he

14:10:42  10   gets legal title through that process or not does not negate

11   his entitlement to possession.  So the evidence that Sempra

12   knew that he had a legal entitlement to possession is through

13   the testimony my client and several other clients who were at

14   that meeting.

14:11:01  15         THE COURT:  This is the same document though that is

16   stamped canceled and has no signature of authority on it, this

17   1994...

18         MR. HULETT:  No, no.  It's a different document, your

19   Honor.

14:11:12  20         THE COURT:  And what document is that?

21         MR. HULETT:  The other document?

22         THE COURT:  Yes.

23         MR. HULETT:  The document that you're referring to was

24   a Petition for Title, but there was not a delivery of that, and

14:11:26  25   that was canceled by the Agrarian Reform Department, but it

14:11:30  1  didn't cancel his right to possession.  That's what's been

2  found repeatedly by the courts in Mexico.

3       THE COURT:  The document you're telling me that

4  demonstrates that he then has this document from the Agrarian

14:11:44  5  Reform.  Where is that?  What document is that?

6       MR. HULETT:  I don't have that document as part of

7  this record.

8       THE COURT:  So there is no document?

9       MR. HULETT:  There is a document, your Honor.

14:11:55  10       THE COURT:  Well, it's not part of the record.

11       MR. HULETT:  It's part of the record that was

12  submitted to the courts in Mexico.  Your Honor, one of the

13  things that happened in this court case is your early ruling

14  that we're not going to try to question of whether Mr. Ritchie

14:12:13  15  was entitled to possession or not.  That issue was finally and

16  adjudicated in Mr. Ritchie's favor.  That issue is admitted.

17       THE COURT:  They're saying no.

18       MR. HULETT:  Well, the final judgments of the courts

19  in Mexico found that Mr. Ritchie was entitled to possession.

14:12:31  20  That's an order from October of 2007, an order in 2009, another

21  order affirming that judgment, and finally, 2010.  During that

22  entire period of time Mr. Ritchie was dispossessed because

23  Sempra refused to give the property back despite the rulings.

24       THE COURT:  So has Sempra been ordered by Mexico to

14:12:53  25  return the property to Mr. Ritchie?

14:12:55   1          MR. HULETT:  Yes, yes.

2          THE COURT:  Have they vacated it?

3          MR. HULETT:  Yes.

4          THE COURT:  Have they paid him?

14:13:00   5          MR. HULETT:  Mr. Ritchie is in possession of the

6    property and has been since May of 2010, at which point because

7    of the orders of 2010, Mr. Ritchie was given possession and

8    Sempra was ousted, thrown off the property with the help of

9    legal officials because Sempra refused to move.  Mr. Ritchie is

14:13:22  10    in possession of that property today.  So one of the issues is,

11    if you're asking me whether Mr. Ritchie has come to court today

12    to prove his entitlement to possession, that issue is, I don't

13    believe, part of --

14          THE COURT:  Well, no.  The question is, what can you

14:13:43  15    prove ECA knew in 2006 that they either misrepresented,

16    knowingly and falsely, to the prosecutors or withheld, and your

17    first piece of information you told me was the meeting from

18    2001 where Mr. Ritchie presented evidence to them that he had a

19    documented property right, but that document is not part of

14:14:12  20    this record.  I only have a representation that that happened.

21    And I don't know what that document actually said.

22          MR. HULETT:  Fair enough.  I don't know that it

23    matters.

24          THE COURT:  Well, it does, because it was obviously

14:14:26  25    disputed whether or not he owned a piece or part of that lot.

14:14:32   1   It was not necessarily facially clear at the time to everybody

2   involved, or at least to Mr. Molina who met with him, that he

3   had legitimate and legal control of the property and that

4   buying it from him would put an end to it.

14:14:53   5        MR. HULETT:  Well, I think the evidence is that Sempra

6   knew through their due diligence process -- there's another

7   piece of evidence, Interrogatory No. 2 to Sempra's responses,

8   where they admit that they searched through the Agrarian Reform

9   Department records, and through that search, as our expert

14:15:16   10   testified, the chain of possessory interest that Mr. Ritchie

11   had included documents that post-dated the 1994 so-called

12   cancellation.

13        There were other events that occurred throughout that

14   period, and those are findings of the courts in making

14:15:38   15   determinations in '07, '09 and December 2010 explaining

16   precisely all of the Agrarian Reform documentation that was

17   part of the record as of 2006.  So that's additional

18   information.

19        Those are admissions by Sempra that during the course

14:15:54   20   of their due diligence in 2005 when they were purporting to buy

21   the property from Pena Navarro, they admit they searched those

22   Agrarian Reform files and necessarily would have found those

23   documents.  Now the reason we don't know exactly what they

24   found is because they have identified four or five specific due

14:16:20   25   diligence files that they claim to have created back in 2005

14:16:28   1   and early 2006 before they purchased the property from these

2   alleged owners.

3        But they refused to produce those documents.  They've

4   identified in the attorney/client privilege documents.  We made

14:16:44   5   a motion to compel the production of those documents.  Those

6   motions were denied, and so what we have here is Sempra saying

7   that throughout the course of the due diligence files, we

8   didn't learn that Castanon was dead.  We didn't really know

9   what Mr. Ritchie knew or didn't know, but we're not going to

14:17:02   10   let you see whether the files confirmed that or not.  So they

11   should be estopped from making the argument that they didn't

12   know what the Agrarian Reform files contained.

13        THE COURT:  Do you have that file though?  Because if

14   it's a public file that they searched in due diligence and

14:17:21   15   you're saying that they should have found those things, are

16   those things part of this record that I can conclude from those

17   things that had they done due diligence, although I'm not

18   really sure what any of that has to do with the criminal

19   prosecution here.  In terms of whether they did due diligence

14:17:38   20   or not goes to the whole question of maybe the ownership later

21   of the property, but are those -- where are those things?

22   They're your client's documents.  Are they part of this record?

23        MR. HULETT:  They had been produced as part of the

24   record.  They were part of the court records that have been

14:17:57   25   produced in the case, and the courts of Mexico have cited to

14:18:01   1    them and made conclusions.

2           THE COURT:  Help me here.  I have two big stacks of

3    documents from you.  Where are they?

4           MR. HULETT:  The documents?

14:18:14   5           THE COURT:  The documents that you're saying it is not

6    reasonable that they couldn't have found if they had actually

7    done due diligence.

8           MR. HULETT:  The documents are referred to in Exhibit

9    1 and 2 specifically.

14:18:26  10           THE COURT:  Those are not admissible.  The documents.

11   Not conclusions, factual conclusions drawn by the Court.  The

12   underlying documents.  Those would be the facts that would

13   support that finding, those facts would be admissible.  The

14   Court's finding in and of itself is hearsay and is not

14:18:45  15   admissible.  Do you have the underlying documents that you say

16   support the Court's finding in 2010, and are they part of this

17   record.

18           MR. HULETT:  They are not.

19           THE COURT:  In this court, in this motion?

14:18:57  20           MR. HULETT:  They have not been submitted in this

21   record.

22           THE COURT:  Okay.

23           MR. HULETT:  They are part of the production of

24   documents that were part of the case.

14:19:03  25           THE COURT:  Well, they should have been the record

14:19:06  1   here.

2   MR. HULETT:  That may be, your Honor.

3   THE COURT:  Okay.  Go ahead.

4   MR. HULETT:  Given an opportunity, if that's the basis

14:19:11  5   for your Honor's rulings, my understanding of --

6   THE COURT:  No, it's showtime.  We're not going to

7   supplement later.  If it's not here, it's not part of the

8   record, I'm not considering it in the future, so...

9   MR. HULETT:  Well they had --

14:19:25  10   THE COURT:  Go ahead.

11   MR. HULETT:  Well, I would just suggest that Sempra

12   has not challenged that there was a lack of knowledge on their

13   part about the Agrarian Reform documents.

14   THE COURT:  Oh, I think they would disagree with that.

14:19:39  15   MR. HULETT:  Well, it's not part of the record.  They

16   didn't make that part of their motion.  Their motion is saying

17   that the evidence that was presented by Mr. Ritchie was

18   necessarily concluded by the interim judge, as to eliminate our

19   claim that they lack probable cause.  That's the gist of their

14:19:59  20   argument.

21   And the question is not what Mr. Ritchie told the

22   courts by way of trying to defend himself, the question is,

23   what did Sempra say, and did they tell the courts the truth.

24   We've cited that they didn't tell court the truth because they

14:20:19  25   didn't disclose that they had a reasonable basis to believe

14:20:24   1   that Mr. Ritchie was the legal possessor of the property.  And

2   I think what the case law says is that when there's a question

3   of what the defendant knew at the time of the interim hearing,

4   that is a question of fact, and we believe that we've

14:20:46   5   identified evidence to let a trier of fact determine whether

6   Sempra knew at the time they presented evidence at the hearing

7   whether it did or did not know that Mr. Ritchie was entitled to

8   possession.

9        Let me move on to another important piece of evidence.

14:21:16  10   And that is the withholding of evidence from the prosecutor.

11   What we have -- what we have provided by way of evidence, we've

12   established that there was a 1999 ruling that was submitted to

13   the Court by the prosecutor's office that said that

14   Navarro-Pena and Castanon, who were the purported sellers of

14:21:54  15   the property, had sought an order in 1999 from the courts in

16   Mexico that the two of them were entitled to possession of the

17   property that is in dispute.

18        And in reality, there was a 2001 ruling in that same

19   case, the same case number, and that 2001 ruling rejected the

14:22:22  20   notion that Navarro-Pena and Castanon had possessory interest

21   in the property.  The prosecutor testified that he was provided

22   with a copy of the 1999 order that was evidence of their

23   entitlement to possession and not Mr. Ritchie's, and testified

24   that had he been provided a copy of the 2001 Amparo ruling, he

14:22:50  25   would not have pursued the prosecution of Mr. Ritchie.

14:22:54  1        What we know is that Sempra had in its file, in its

2     production of documents in this case, had in its file the 2001

3     ruling.  It also had a copy of the 1999 ruling in its files.

4     But there was no production by Sempra of that 2001 ruling to

14:23:22  5     the prosecutor, and we challenged Sempra.  We provided it as an

6     uncontested statement of fact that that ruling was in its files

7     and that it was not provided to the prosecutor's office, and

8     the prosecutor said they had an obligation to do so because

9     they had it, and given opportunity to respond and say, we

14:23:44  10    haven't had it in our files, they haven't done so, they haven't

11    rebutted the assertion that they had it in their files and they

12    haven't provided any evidence they did not have it in their

13    files as of 2006.  They were presented with that opportunity

14    and --

14:23:59  15        THE COURT:  Where?  When?  I'm sorry.  I'm not

16    following your "presented with that opportunity."  The

17    document-- take me down to where we're talking about, because

18    this is your notion prove that they had this information, and

19    it's not sufficient in my point of view for you to simply say,

14:24:20  20    well, we said they did, and they didn't show they didn't.  How

21    do you know they had this document in their possession in 2006?

22        MR. HULETT:  We don't know that.

23        THE COURT:  Oh, okay.

24        MR. HULETT:  What we do know is, they had the 1999

14:24:34  25    order in possession and that they had the 2001 order in their

14:24:38   1   possession.

2        THE COURT:  Right.  Later in discovery, you found that

3   out.

4        MR. HULETT:  Yes.

14:24:44   5        THE COURT:  You don't know when they got them, how

6   they got them, and if they had them in 2006?

7        MR. HULETT:  That's right.  We do know the prosecutor

8   was provided a copy of the 1999 order.

9        THE COURT:  When?

14:24:56  10        MR. HULETT:  We don't know from whom.

11        THE COURT:  You don't know from whom, okay.

12        MR. HULETT:  The prosecutor did not identify the

13   source of that.  We do know that Sempra provided documents to

14   the prosecutor's office as part of the complaint that it

14:25:08  15   instigated.  Specific documents, we don't know which documents

16   Sempra gave the prosecutor's office or didn't, and the

17   testimony of the prosecutor does not reveal that he received it

18   from Sempra.  But there's no evidence as to what source that

19   document is.  But there's also no rebuttal to the assertion

14:25:32  20   that Sempra had those documents at the relevant period of time.

21   There's no rebuttal to that assertion, your Honor, and the

22   evidence is that they had it in their files.  And I believe

23   that when a statement of uncontested fact is made, that the

24   responding party, in this case, Sempra, had an obligation to

14:25:54  25   step forward and say, no, we didn't have it in our files at the

14:25:58  1   time, at the time the complaint was filed.

2        THE COURT:  We addressed this in the order, and my

3   recollection was that the only evidence that you provided that

4   they had it was that it had a Bates stamp number on which

14:26:28  5   showed it was in their files during the course of this

6   litigation?

7        MR. HULETT:  That's right.  There was no testimony

8   elicited during the discovery phase as to when that document

9   was.

14:26:43  10       THE COURT:  Did you ask?

11       MR. HULETT:  I don't remember that it was asked.

12       THE COURT:  Okay.

13       MR. HULETT:  Turning to the third reason why the

14   exception here, we believe, applies and why and the evidence

14:27:03  15  that we've submitted, I think we submitted a compelling group

16  of facts that the prosecutor's office here was unreasonably

17  pressured, and those are the words from Sempra's own brief,

18  that if the prosecutor's office and the prosecutor were

19  unreasonably pressured or otherwise committed to prosecuting

14:27:28  20  the case with or without evidence, that in and of itself is

21  grounds to not accept the interim rulings as providing Sempra

22  with cover for probable cause.

23       We've set forth the prosecutor was called into a

24  meeting from the very first time they heard about this case.

14:27:49  25  Sempra's representatives were there with the lieutenant

14:27:53  1   governor of Mexico.  He testified that he was effectively

2   ordered by the lieutenant governor to prosecute the case before

3   an investigation was even commenced.  He felt that the governor

4   of Mexico, Baja, excuse me, his boss the one who could

14:28:13  5   terminate him for cause or no cause, had exerted pressure on

6   the prosecutor to make sure that Sempra got the land back, or

7   kept the land, I should say.

8       And remember Sempra needed this land in order to

9   proceed with its licensing.  We've set forth evidence on the

14:28:35  10  record as to Sempra's plans in 2005 to expand its plant.  The

11  testimony is that expanded plant would require the lots that

12  Mr. Ritchie claimed ownership to, and that's why Sempra went

13  out to secure it.  Without having possession of that land,

14  Sempra was at risk of not being able to complete the licensing

14:29:02  15  process and have those licenses revoked.  So we have that

16  testimony from Mr. Hulse.

17      They didn't file applications for licensing until they

18  secured all the necessary lands.  They had secured in their

19  mind title through the process that we've described, and when

14:29:20  20  they realized that they were faced with a contest, even though

21  they knew that the contest was a likely contest because of

22  Mr. Ritchie's possessory interest, they took steps to have the

23  prosecutor's office influenced, unfairly so.  And as the

24  prosecutor said, he felt compelled to pursue the claims.  And

14:29:46  25  we think that that in and of itself is sufficient.

14:29:49    1          We've also provided evidence of the interference with

2       the judiciary process.  Mr. Molina-Robles -- I'm sorry.

3       Mr. Rippa testified that he had written an e-mail or written a

4       letter about judge No. 2 in code about influencing the judge

14:30:10    5       through political and other means to assure the conviction of

6       Mr. Ritchie.  Those pieces of evidence have not been rebutted

7       at all by Sempra.  They relegate the request to a footnote

8       saying that Mr. Luna and Ms. Navarro, who were the prosecutors,

9       testified that despite all of the pressure that they felt, that

14:30:35   10       they had done a legitimate job.

11          That's for the trier of fact to decide whether the

12       prosecutor's office was unfairly pressured.  And that fact

13       alone should give rise to allowing the trier of fact to decide

14       that issue as to whether the interim rulings were or were not

14:31:01   15       secured in a proper fashion.

16          And there is one other fact that we've set forth as

17       being within Sempra's knowledge, constructive knowledge, at

18       least as of 2006, which was withheld from the prosecutor's

19       office and withheld from the Court in seeking interim rulings,

14:31:31   20       and that is, Ms. Castanon had passed away in 2004, two years

21       after Sempra claims to have acquired the property from

22       Ms. Castanon.  I don't think there is much doubt here, the

23       experts on both sides testified that one who is deceased cannot

24       transfer property in Mexico through a power of attorney, either

14:31:53   25       void or voidable, however one wants to articulate that.

14:31:57   1          And what our testimony is, is through the experts, our

2      expert, Mr. Gallo, and through Omar Paz.

3          THE COURT:  Mr. Paz's statement that somebody who is

4      dead told him somebody undisclosed and it was so loaded with

14:32:16   5      inadmissible hearsay, the Court would not consider the

6      statement for any worth.

7          MR. HULETT:  And I wasn't even going to make that

8      argument.

9          THE COURT:  Okay.  There is an argument featured in

14:32:28  10      your papers.

11          MR. HULETT:  Actually it's not.  We didn't make the

12      argument in our papers.  Sempra raised it in reply, but we

13      don't actually make the argument.  Mr. Paz's receipt of

14      information from Sempra's agent, that Sempra knew, that was not

14:32:43  15      part of our argument, so...

16          THE COURT:  All right.  Well, go ahead with what the

17      evidence is.

18          MR. HULETT:  But it is through -- Mr. Paz did testify

19      that a representative of Sempra said they knew Castanon was

14:33:00  20      dead.  That is testimony that is part of the record.

21          THE COURT:  No, it's not because it's inadmissible

22      hearsay.

23          MR. HULETT:  It may not be admissible, but it's part

24      of the record.

14:33:11  25          THE COURT:  No, because I'm sure they objected to it,

14:33:13   1   therefore, it does not become part of the record.  It's not

2   factual evidence in the case.  What's evidence that you have

3   that they knew in 2006 that Castanon was dead?

4           MR. HULETT:  What our expert, and Mr. Paz also

14:33:26   5   testified on this subject, that's why I mentioned Mr. Paz, not

6   on the other issue.  But Galvin Gallo our expert and Omar Paz

7   both testified that in transactions, real estate transactions

8   in Mexico, especially one of this size, they had an obligation

9   to contact the seller, even if there is a power of attorney,

14:33:47   10   especially one that is an old power of attorney.

11           And again, we were not able to get any further into

12   this evidence because Sempra refused to produce any of its due

13   diligence files as to what efforts, if any, they made to

14   contact Ms. Castanon.  The experts testified that due diligence

14:34:15   15   would have necessarily revealed her unavailability.  And also

16   as a matter of public record, the death certificates in Mexico

17   would have revealed her having passed.  We don't have any.

18           THE COURT:  If this was so obvious that this

19   transaction was a sham that she was dead, and the power of

14:34:34   20   attorney was ineffective and anyone who had done a modicum of

21   due diligence would have recognized that this was never going

22   to carry the day, why in the world they have paid $2.5 million

23   to her power of attorney, her executor for this property then?

24   What would be the rationale behind that.

14:34:54   25           MR. HULETT:  Well, I don't know that we have to prove

14:34:56   1   the rationale behind it.

           2          THE COURT:  You want me to draw an inference that they

           3   would have done this, they would have done this if they would

           4   have done any looking.  It is so obvious it would have been an

14:35:07   5   improper and ineffectual deal.  To draw that inference, I would

           6   have to have some reason why you would pay that kind of money

           7   when you know, according to you, that Mr. Ritchie actually owns

           8   the property.  Why not just give the money to him then and be

           9   done with it?  Why create this entire sham and put all this

14:35:29  10   money on the table and all these years of litigation if it was

          11   so obvious to them in 2006 that Mr. Ritchie was the proper

          12   party to negotiate with?

          13          MR. HULETT:  Let me answer the first question, what

          14   would motivate Sempra to engage in transaction where the sale

14:35:48  15   may be ineffective.  The real reason is they were rushing to

          16   get licenses so they could expand the plant.  They could not

          17   get an application filed.  They could not get a license issued

          18   until such time as they secured the land under its control and

          19   ownership.  That's what was motivating them to move forward.  I

14:36:11  20   can't tell you, as I stand here, how long it would have taken

          21   them to acquire the property with the legitimate process with

          22   the heirs of Ms. Castanon.  I don't know.  I don't know that.

          23          It's clear that Mr. Pena was representing Castanon in

          24   the sale.  He repeatedly lied to the Court.  He told the Court

14:36:33  25   she was alive in Nicaragua and all sorts of lies.  He was not

14:36:38  1   able to be found in this case.  He is sort of the architect, if

2   you will, of this.

3            THE COURT:  So he took the 2 million and ran?

4            MR. HULETT:  Apparently.

14:36:50  5            THE COURT:  Possibly?

6            MR. HULETT:  Apparently.

7            THE COURT:  And if he hadn't lied to Sempra and told

8   them she was alive and she was in Nicaragua and this was all

9   legitimate and the woman and man with the power of attorney of

14:37:04  10  her estate was able to make the deal, then they -- again, it's

11  hard for me to connect the dots.  If they're creating this

12  entire sham to dispossess your client from property, then why

13  go through all this mechanism and actually pay good money to

14  somebody finish a deal you think is a deal, that is going to

14:37:37  15  give you possession of the property?  Why not create sham

16  documents and go forward?  I mean, why?

17            Like this expensive part to look like there's no lie

18  when the whole thing is a big lie?  It doesn't follow to me

19  that Sempra went into this arrangement or ECA went into this

14:37:56  20  arrangement through their agents with people representing folks

21  who said they owned that property and had whatever title issues

22  they had, bought it from them, took possession, started to

23  build, and did all that knowing that it was all false and that

24  at any moment your client was going to show up with a gun and

14:38:18  25  say, get the hell off my property.

14:38:22    1          MR. HULETT:  All I can tell you is that if you're

        2   Sempra and you need title to that property and ownership

        3   interest in that property, and you need it quickly, there's one

        4   way to do it and to secure the property through this title.

14:38:35    5          THE COURT:  There was nothing quick about this.

        6          MR. HULETT:  As I tried to explain it in the papers, I

        7   agree with you.  I don't think for a second Sempra ever

        8   expected Mr. Ritchie could defend himself, not because they

        9   didn't know that he had legitimate possessory interest in the

14:38:54   10   property, but because we have this had alleged squatter with,

       11   you know, no means to defend against the rich and powerful

       12   Mr. Sempra.  I can't get into the heads and minds of Sempra --

       13          THE COURT:  All right.

       14          MR. HULETT:  -- as to whether or not they forecasted

14:39:10   15   in their own head that this would be going on nine years later,

       16   questioning over whether they mistreated Mr. Ritchie or took

       17   advantage of him or not.

       18          THE COURT:  All right.  I interrupted you.  Why don't

       19   you go ahead and -- I know there's a lot here, but why don't

14:39:30   20   you finish up whatever you think is most important to finish

       21   your argument, so I can give Sempra some time.

       22          MR. HULETT:  Okay.  I think I have dealt with the

       23   Castanon issue.  We've presented evidence that they could have

       24   at least found out that she as unavailable and otherwise not be

14:39:48   25   able to transfer title through their admissions of due

14:39:53   1   diligence process.

2            Your Honor also indicated that you found there was no

3   indicia of malice, and obviously, if the Court were to find

4   that there is evidence that would support a claim that Sempra

14:40:11   5   had lied, that in and of itself would provide us with malice

6   alone.

7            One thing that has not really been discussed in the

8   papers very deeply is the existence of the 2009 prosecution.

9   Also remember, if you will, that in 2006, there was a complaint

14:40:30   10   filed against Mr. Ritchie, a criminal complaint, ultimately

11   exonerated of that in 2009, in 2007, and also on appeal in

12   2009.  And immediately thereafter, at Sempra's insistence with

13   the prosecutor's office, they duplicate the 2009 prosection of

14   the exact same claim defense was filed, and it was ultimately

14:40:59   15   terminated due to conditions of double jeopardy.  And that just

16   shows you the level of malice, if you will, that Sempra had

17   towards Mr. Ritchie.

18            Also the fact that Mr. Ritchie had filed a complaint

19   against Sempra in 2006 once he first found out about the

14:41:23   20   illegal occupation, there was a retaliatory complaint.  Sempra

21   had not filed a complaint against Mr. Ritchie for anything

22   until after Mr. Ritchie had initiated proceedings against

23   Sempra for its wrongful occupation.

24            I think finally, just I would like to discuss the

14:41:50   25   concept of collateral estoppel.  I know your Honor has already

```
14:41:56  1   made findings on that.  The question is whether or not there
          2   was the prosecution of the claims and the defensible claims in
          3   Mexico were identical as far as the issues here.  We have
          4   identical issues, who was entitled to possession.  And Sempra
14:42:16  5   prosecuted, or I should say, participated in the prosecution in
          6   seeking to have that determination in its favor.

          7        So that is clearly step No. 1, are the issues
          8   identical?  Yes, in fact, they are.  Were the issues actually
          9   litigated to a final determination?  That's not in dispute.
14:42:37 10   Was the issue necessarily decided?  Yes, because the issue of
         11   possession was the ultimate question of whether or not
         12   Mr. Ritchie was guilty of any crime.

         13        So the only real question is, has there been a showing
         14   of privity between Sempra and the prosecution?  I think we have
14:42:59 15   already talked about the level of participation that Sempra had
         16   in the prosecution the prosecutor's office, the supplying of
         17   evidence, the participation in the appeals.  All of that, we
         18   believe is sufficient evidence to establish that there was a
         19   privity of interest between Sempra and the government.

14:43:16 20        THE COURT:  Do you have any cases that would parallel
         21   that sort of thing where a criminal prosecution was found to be
         22   collateral estoppel against a private party against the
         23   bringing of the charges on the basis that they were in privity
         24   with the government entity that brought a prosecution?  Because
14:43:36 25   we sure didn't find anything.
```

14:43:49  1      MR. HULETT:  Not that specific case, but I don't

2   think -- I think the cases say that what you have to establish

3   is a common interest.  And clearly there was a common interest

4   the government proving its complaint against Mr. Ritchie, and

14:44:06  5   that common interest was identical to Sempra's.

6      THE COURT:  The interests were different.  The result

7   might have had some commonality to it, but the government's

8   interest was not to benefit Sempra to build the plant there.

9   It was to prosecute someone as a result of violating the laws

14:44:25  10  of Mexico, someone who yielded a gun and forced his way onto

11  the property and threatened people's lives.  That was the

12  government's interest.  Sempra's interest, according to you,

13  was to get him off, so they can build their plant or protect

14  the property they believed they lawfully owned, but I don't see

14:44:43  15  it.  Well, the Court didn't find privity.  I don't find

16  authority for it.

17     MR. HULETT:  On that issue, I think that as we try to

18  establish with the evidence that the prosecutor's office and

19  the government of Mexico's interest was the same as Sempra's,

14:44:58  20  which was, get Ritchie offer the land so that Sempra could

21  develop the billion and a half dollar project that the

22  government --

23     THE COURT:  If it was, then wouldn't Mr. Ritchie still

24  be depossessed right now?  I mean --

14:45:13  25     MR. HULETT:  I'm not that --

14:45:15   1          THE COURT:  Do you really think that train would have
        2   stopped at that point?
        3          MR. HULETT:  I'm not that cynical to suggest that the
        4   courts of Mexico wouldn't ultimately see the truth of the
14:45:24   5   facts, and, in fact, they did.
        6          THE COURT:  And if the individual prosecutors provided
        7   testimony that said, we were not unduly influenced by this, and
        8   we did a fair and independent investigation, then it's just
        9   really your inference that there was something else going on,
14:45:42  10   but not in spite of their comments.
       11          MR. HULETT:  I respectfully disagree.  I think you're
       12   weighing the evidence at this point.  You're saying that we
       13   have testimony and evidence that suggests the prosecutor's
       14   office was unduly influenced by the lieutenant governor, the
14:45:56  15   governor's office, and Sempra, and the judiciary was unduly
       16   influenced by those people, and we have the declarants of the
       17   prosecutor saying, oh, gosh none of that pressure, none of
       18   those orders, none of that stuff jeopardized by prosecution.
       19   That's the question for if the jury.  You can't imagine a
14:46:17  20   prosecutor actually testifying that they did something
       21   inherently wrong despite the evidence that he was compelled by
       22   his superior to prosecutor.
       23          THE COURT:  All right.  Thank you.
       24          I would like to start with the first question because
14:46:34  25   the plaintiffs are right, the Court raised issue of whether

14:46:38   1   Sempra is -- whether the plaintiffs demonstrated that Sempra

2   actually was involved in this case, and the reason it was

3   heavily on my mind was the whole reason this case is still

4   here, that it survived the motion to dismiss and it's before

14:46:53   5   this Court was that the Court found that because of all these

6   acts that happened in Mexico, that involved property in Mexico

7   between parties in Mexico and a criminal prosecution in Mexico

8   against a Mexican citizen by Mexican prosecutors brought by a

9   Mexican company, the only reason this district court would have

14:47:12   10   any interest in this case was because a U.S. corporation that

11   resides in this district was accused of orchestrating these

12   events, and, therefore, we would have some interest in

13   jurisdiction and subject matter jurisdiction under a malicious

14   prosecution claim and applying California malicious prosecution

14:47:35   15   law to all these events that happened extrajudicially.

16          I was very surprised actually that that was not your

17   first argument that there was no evidence to suggest that

18   Sempra from its corporate offices sitting over in Kearny Mesa

19   pulled the strings on this thing.  So why not?

14:47:54   20          MR. CAMP:  Well, your Honor, first of all, thank you.

21   And I just want to start by saying we appreciate the tentative.

22   It's going to sound solicitous, but it's incredibly detailed.

23   We appreciate the time the Court obviously took too look at the

24   record.

14:48:09   25          To answer that directly, the allegations obviously

14:48:11  1    that form the nucleus of the complaint, and the plaintiffs

2    approached this entire case to conflate Sempra with its

3    indirect subsidiary.  So we fought the whole time against the

4    reality that until this point, we were dealing with allegations

14:48:26  5    about what Sempra did.  At this point, at summary judgment,

6    what we said is that there is no evidence sufficient to meet

7    the elements of the malicious prosecution claim against the

8    defendant here, Sempra Energy.

9        It is certainly plaintiff's burden if they would like

14:48:43  10   to argue that, in fact, ECA did something, and those acts can

11   either be contributed to Sempra or Sempra orchestrated them, to

12   produce evidence to that effect.  We don't have to sort of

13   anticipate every alternative theory they have and explain why

14   it's wrong.  What we said is, there isn't evidence that Sempra,

14:49:00  15   No. 1, initiated a criminal action against Mr. Ritchie; No. 2,

16   lacked probable cause as California law defines that; No. 3,

17   acted with any malice.

18       If they want to come back and say, no, there's all

19   kinds of evidence that ECA did, and here is why ECA is really

14:49:19  20   Sempra, they can do that.  They didn't.  It wasn't our burden

21   to do that, I submit, your Honor.

22       I want to, if I could, address something that we've

23   dealt with, and I think your Honor encountered it here

24   throughout this case.  The plaintiff's case focuses a lot on

14:49:33  25   bald claims about what happened in Mexico and what documents

14:49:36   1   say.  And when you push, when you drill, you get answers like,

2   well, it's in a document that's in Mexico, that's not here,

3   that's not in the record, I've never seen it, I don't have it.

4   Those are the answers we've been getting for five years.

14:49:49   5   And so I just want to quickly before I -- and I'm

6   going to keep this brief.  Before I address the elements, I

7   just want to give you a few examples of what just happened in

8   this argument.  First, we had evidence of where is this key

9   document that we have been hearing about too that holds that

14:50:04   10   Mr. Ritchie had possessory rights?  Don't have it.

11   Second, we just heard a moment ago this theory that

12   Sempra, really ECA, must have been trying to get Mr. Ritchie

13   off the land, so he could get the permits, and that's why they

14   rushed into this absurd scenario your Honor identified,

14:50:24   15   spending more than $4 million to buy property from someone they

16   didn't genuinely believe owned it rather the than the guy who

17   was trying to sell it five years earlier, according them, which

18   makes no sense.  Why did they do it?  They needed the permits.

19   But that's wrong.  The permits were granted before lot

14:50:42   20   A3 was purchased.  In June of 2005, the permits were approved.

21   The lot wasn't purchased until to January of 2006.  So you just

22   get this sort of bald claim.  Where is the evidence of that?

23   Never mind.  Let's move on.  That's sort of the response we

24   get.

14:50:57   25   I do want to focus on this comment about Mr. Paz, and

14:51:00  1   then I'll turn back to the big picture.  In their opposition,

2   you get finally at page 14, where they lay out this theory that

3   the prosecutions were procured by fraud and perjury.  It's hear

4   of their -- it's the res gestae of this case.  And they say

14:51:14  5   there are three ways that was true.  No. 1, Mexican courts have

6   conclusively found.  You can stop there.  They're relying on

7   inadmissible fact findings without any significant specificity.

8   Second, this is No. 2.  Second, Sempra and its co-conspirators

9   knew in 2006 or at least recklessly disregarded that Castanon

14:51:35  10  had died in 2004.  What do they cite?  No. 1, an expert who we

11  have challenged separately, but on the subject of what sort of

12  real estate diligence normally involves.  And No. 2, the

13  testimony by Mr. Paz that he heard from a dead guy that heard

14  from another guy that Sempra knew.  And then what happens is,

14:51:54  15  we respond to that, okay, there's the evidence.  We can answer

16  that.  He gets up here and says, you know, it's very funny, we

17  didn't raise that issue.  Sempra injected it into the reply.

18  This has gone on for five years.  It's whack-a-mole.  So

19  finally, when you drill down to the specific evidence, there's

14:52:12  20  nothing there.

21       I want to turn back quickly to the elements of

22  malicious prosecution.  It certainly doesn't need restating

23  that it's a disfavored tort, and there's a good reason for

24  that.  You don't want everyone who thinks they have won some

14:52:26  25  way in a litigation to now have a basis for a tort claim

14:52:29  1   against a loser, which is what would happen if you had a very

2   liberal standard.  So the elements, what happens is, plaintiff

3   tends to focus sort of obsessively on parts of an element but

4   doesn't talk about the entire element.  So element No. 1 is

14:52:44  5   that the action was commenced by or at the direction of the

6   defendant.  I've addressed that.  I will address it again in a

7   moment.  But in a criminal case where the criminal authority

8   initiates the action, plaintiff has to overcome the presumption

9   of an independent investigation.  I'll talk about that in a

14:53:00  10   moment.  No. 2, that the action was commenced without probable

11   cause.  No. 3, that the defendant acted with malice.

12        So let's talk just for a second about No. 2.  This is

13   not, of course, the probable cause standard we know from

14   criminal.  There is a California standard for this tort, and

14:53:17  15   quoting from the Wilson case, it applies only to those actions

16   that any reasonable attorney would agree are totally and

17   completely without merit may form the basis for a malicious

18   prosecution claim.

19        So what was the claim?  We've outlined this in detail

14:53:34  20   with a lot of citations to evidence in our papers, ECA's claim

21   in June 2006 -- I'm sorry, July of 2006 and then amplified in

22   August of 2006 was based on three acts.  No. 1, June of 2006

23   after ECA has purchased the property from the titled owners

24   with notarial recitations of chain of title they started doing

14:53:58  25   topography jobs.  Plaintiff admittedly, undisputedly deposits

14:54:02  1   motor homes shells there and does so on Fraction B, the part

2   that has nothing to with Castanon.  That's the No. 1 basis of

3   the complaint and arrest warrant.

4          No. 2, July 21, 2006, undisputed, plaintiff enters on

14:54:17  5   the property, pulls out a gun, and threatens to kill the ECA

6   employees who are building the fence there that is already

7   partially up.  No dispute.  He invoked the fifth.  The Court

8   may make an adverse inference.

9          No. 3, August 20, 2006, no dispute, plaintiff cuts

14:54:32  10   through the fence now erected, and he and family members occupy

11   the property.  It is all undisputed.  It is the basis for the

12   complaint, it is the basis for the arrest warrant approved in

13   January of 2007, and it's the basis for the order of commitment

14   entered in February 2007.

14:54:49  15          Everything they're talking about does not go to that

16   reasonable basis to believe a crime is committed.  And if you

17   find there is a reasonable basis, or not just a reasonable

18   basis, but that no attorney would agree that this is -- has any

19   possible merit, that it's totally, completely without merit, if

14:55:06  20   you find there's any reasonable basis for the claim, it's the

21   end of the analysis because there was no lack of probable

22   cause.

23          What my friend Mr. Hulett's entire presentation

24   fixated on was an alternative ground for finding probable

14:55:20  25   cause, which was there was an error of ruling.  Well, these are

14:55:23  1   two separate ways you can get to the same outcome.  If you find

2   there was an interim ruling by a court in a criminal case or a

3   civil case on the merits, even if it's subsequently reversed,

4   that ruling establishes dispositively that the claim wasn't so

14:55:39  5   lacking in potential merit that a reasonable attorney or

6   litigant wouldn't necessarily recognize it as frivolous.

7       We cite Wilson and Parish.  There are other cases that

8   your Honor's tentative addresses it.  We think that's an

9   alternative, but equally sufficient basis to find there was

14:55:53  10  probable cause.  Two courts found it to be so.

11      The reason Mr. Hulett focuses on it is because of this

12  argument that ECA somehow withheld or misled the Court into its

13  judgment.  But nearly everything he talked about were things

14  plaintiff presented or could have presented in the course of

14:56:13  15  this six-day evidentiary hearing.  So the idea that we, ECA, or

16  Sempra withheld something from the Court is sort of frivolous

17  because the plaintiff had every opportunity to and did present

18  all of that evidence.

19      So if there is a mystery document in Mexico that

14:56:30  20  definitively establishes his possession and Sempra has no valid

21  claim, presumably that would have been presented and the Court

22  might have thought something about it.  We detailed in some

23  detail the 197-page order that found probable liability.

24  That's enough.  That's an independent basis.  So that's one

14:56:49  25  element.  And without that element satisfied, and we don't

think there is any evidence to satisfy it, it's the end of the analysis.

Next, malice.  It gets very short shrift in both plaintiff's papers and in this argument, but I want to focus on what Mr. Hulett said.  He said, there's evidence that Sempra intentionally -- well, I don't think I have the quote right, but the point of the law is that a bare assertion --

THE COURT:  I think he said it would become a question of fact.  I'll paraphrase.  A question of fact for the jury if the Court finds that Sempra intentionally misrepresented or intentionally withheld material information to procure the prosecution.  Then because that was an intentional lie or misrepresentation --

MR. CAMP:  Right.

THE COURT:  -- or omission, one could infer malice.

MR. CAMP:  Thank you, your Honor.  Yes, that is what he said.  And we think it's contrary to the Estate of Tucker. A bare assertion that something was fabricated does not show malice.  Malice is the plus factor, so intentionally misstate, intentionally filing a claim that you believe to have probable cause, that is not enough.  There's something else, an animus, a motivation.

I would submit that's why we have all this irrelevant collateral stuff about needing the property and the permits. The problem is, there is just no evidence of it.  The evidence

14:58:10   1   was that the property wasn't needed for any permits, that the

2   permits were actually approved before the property was

3   acquired.

4           And finally, very briefly on the first element, I know

14:58:20   5   we talked about ECA and Sempra.  We think the tentative

6   correctly finds there is no evidence Sempra initiated the

7   proceeding.  Your Honor's tentative also notes there is no need

8   to get to the question of independent judgment of the

9   prosecution.  We agree.

14:58:36  10           We also raise another independent basis to grant

11   summary judgment, and particularly it's noteworthy, I think

12   your Honor may have mentioned it, in the tentative, these

13   one-sided depositions they took without any participation from

14   us.  Remarkably, despite the nature of them, both the attorney

14:58:54  15   general and his deputies say they carefully investigated, they

16   had to weigh the evidence on both sides, they found and quote

17   this, they found Mr. Ritchie's evidence was -- it was

18   impossible to substantiate things like claims of farming the

19   land.  So they investigated thoroughly.

14:59:12  20           The only argument they were sort of not independent is

21   this claim that we withheld information.  I think we have

22   thoroughly addressed the stuff about Ms. Castanon.  Your

23   Honor's questions revealed you're very conversant with this

24   2001 order.  It doesn't have anything to do with plaintiff.

14:59:30  25   His name is nowhere in it.

14:59:32   1          There is no evidence other than it was produced in

2    November 2014 that ECA, much less Sempra, was aware of it in

3    2006 or if they had been, it wouldn't have affected anything,

4    as their own witness in this one-sided deposition said, all

14:59:47   5    that order says is the request for a certificate of possession

6    is outside the scope of relief they saw in Amparo, okay.  So

7    it's never been explained why knowledge of this is Sempra's

8    belief that a crime had been committed.

9          And, finally, if your Honor doesn't mind, I would just

15:00:03   10   ask my associate, Mr. Linderman, to briefly address the

11   collateral estoppel issue, or do you not need anything on that?

12        THE COURT:  No, that's okay.  Why don't you go ahead

13   and do that.  Just a point of clarification for the Court, what

14   is the status from Sempra's point of view of the --

15:00:20   15        MR. CAMP:  Yes.  I'm sorry, your Honor.  It is

16   certainly not over.  There has been, and we have a -- I believe

17   it's Exhibit U to Mr. Linderman's declaration in support of the

18   motion, the declaration of Mr. Araiza, the issue of who has a

19   legal right of possession to the property is still being

15:00:38   20   actively and hotly litigated in Mexico.  It is true there was a

21   status quo order entered in 2010, I believe, that allowed

22   Mr. Ritchie to return to the property, but certainly as

23   Mr. Hulett said, no quote final adjudication of his rights.  It

24   is an ongoing litigation.

15:00:59   25        THE COURT:  Okay.  Thank you.

15:01:00    1              MR. CAMP:  Thank you.

            2              MR. LINDERMAN:  Thank you, your Honor.  I just wanted

            3      to address the collateral estoppel arguments that Mr. Hulett

            4      made.  As an initial matter, he identifies the five elements in

15:01:14    5      his opposition.  He went through them again up here, but he

            6      hasn't actually established any of them.  He just said, these

            7      are the exact same issues litigated.  These parties are in

            8      privity.  There is no evidence suggesting these elements have

            9      been established.  And as the plaintiff, it's his burden to

15:01:33   10      establish collateral estoppel.

           11              I also just wanted to mention what the Court

           12      recognized in its tentative which is, collateral estoppel can't

           13      apply as a matter of public policy or shouldn't apply as a

           14      matter of public policy to a malicious prosecution.  That's

15:01:49   15      what the Plumley court said.  It would violate well-stablished

           16      principles that litigants and attorneys who in a legal credible

           17      action are not subject to liability for malicious prosecution

           18      simply because a trier of fact disbelieves their version of

           19      conflicting evidence and makes findings adverse to them.

15:02:04   20              It would be perverse to permit a litigant in a

           21      malicious prosecution case to come into the court and say, here

           22      is an order conclusively establishing this fact, therefore, I

           23      win, which is essentially what the plaintiff is trying to do

           24      here.  So in addition, to not establishing any of the five

15:02:22   25      elements, plaintiff hasn't even addressed the issue of applying

1   collateral estoppel in a malicious prosecution action.  Thank

2   you, your Honor.

3          THE COURT:  All right.  Thank you.  The matter is --

4          MR. HULETT:  Can I?

5          THE COURT:  It's their motion.  They get the last

6   word.  Whatever you had to say, I hope you said it.  Thank you.

7   We will issue a final ruling.

8          MR. CAMP:  Thank you, your Honor.

9          MR. HULETT:  Thank you, your Honor.

10      (Court in recess at 3:00 P.M.)

11      *** End of requested transcript ***

12              CERTIFICATE OF OFFICIAL REPORTER

13          I, Mauralee Ramirez, Federal official Court Reporter,

14   in and for the United States District Court for the Southern

15   District of California, do hereby certify that pursuant to

16   Section 753, Title 28, United States Code that the foregoing is

17   a true and correct transcript of the stenographically reported

18   proceedings held in the above-entitled matter and that the

19   transcript page format is in conformance with the regulations

20   of the Judicial Conference of the United States.

21           Dated this 6th day of January 2016.

22      /S/ Mauralee Ramirez
        Mauralee Ramirez, CSR No. 11674, RPR
23      Federal Official Court Reporter

24

25